**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRI-VALLEY CORPORATION, *et al.*, | ) | Case No. 12-12291 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: August 30, 2012 @ 12:30** |
| _____ | ) | **Rel. Dkt. No. 8** |

**OBJECTION OF PETER MARGUGLIO, GEORGE BEAN, PETER HUGGINS, TODD GARRETT, AND GEORGE ROBERT MILLER, EQUITY HOLDERS OF TVC OPUS I DRILLING PROGRAM LP, TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION; (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

Peter Marguglio, George Bean, Peter Huggins, and Todd Garrett, as Limited Partners, and George Robert Miller, as a General Partner, (the "Opus Special Committee Partners"), equity partners of TVC Opus I Drilling Program, L.P. ("Opus") object to the Debtors' Motion For Entry Of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection; (D) Scheduling a Final Hearing, and (E) Granting Related Relief (the "DIP Motion") and state as follows:

**BACKGROUND FACTS**

A.      **Formation of Opus**

1.      Opus, a Delaware limited partnership, was formed in 2002 by Tri-Valley Corporation ("Tri-Valley") for the purpose of seeking investors in the partnership, the business of which is the exploration, drilling, developing and operating oil and gas prospects in California and Nevada.  *See* Declaration of Maston N. Cunningham In Support of Chapter 11 Petitions and

First Day Motions and Applications ("Cunningham Dec."), ¶ 30. (Dkt. No. 3).  Between 2002

and 2012, Tri-Valley raised approximately $97 million through private placement of Opus

partnership units. *Id.*   Currently, there are approximately 73 general partners and 222 limited

partners of Opus. *Id.* at ¶ 45.  The Opus Special Committee Partners invested over $5 million in

Opus and hold a general partner and limited partner interests.

2.      Pursuant to the Agreement of Partnership TVC Opus I Drilling Program, L.P.,

dated May 16, 2002 and thereafter amended (the "Opus Partnership Agreement"), Tri-Valley

was delegated certain authority to manage the business of Opus.[1]  While Tri-Valley is labeled the

"Managing Partner" under the Opus Partnership Agreement, it is not an equity partner of Opus.

"General Partner" is defined to specifically exclude the Managing Partner, except to the extent it

owns a General Partner Interest, which Tri-Valley does not. Opus Partnership Agreement,

Section 2.01, n.   "Limited Partner" also excludes the Managing Partner is the same fashion. *Id.*,

Section 2.01, v.  "Investor Partners" include General Partners and Limited Partners, but not the

Managing Partner. *Id.*, Section 2.01, s. Because Tri-Valley is not an Investor Partner, it is not

entitled to any distribution from the partnership assets, nor is Tri-Valley entitled to vote on any

matter as a partner.  Tri-Valley and Opus are separate, unaffiliated entities with separate owners.

3.      Opus holds a 75% working interest in certain leases located in a producing super

heavy oil field, known as the Pleasant Valley property; specifically, the Hunsucker, Lenox and

Snodgrass Leases. Tri-Valley holds title to the Opus working interest in the Lenox and

Snodgrass Leases for the benefit of Opus.  Cunningham Dec. ¶¶ 12-14.  These three leases,

together with others, are referred to as the "Pleasant Valley Leases."  Tri-Valley owns the

remaining 25% working interest in the Pleasant Valley Leases, as well as interests in other oil

---

[1] The authority of Tri-Valley to file the bankruptcy petition on behalf of Opus is being investigated by the Opus
Special Committee Partners, with the support of other partners.  Nothing herein should be construed as a waiver to
their challenge to the authority of Tri-Valley to file the Opus petition, with all such rights being preserved.

and gas leases and certain mineral rights interests.

**B.     Formation of the Opus Special Committee**

4.      For its services, Tri-Valley is entitled to certain fees under the Opus Partnership Agreement.  Tri-Valley has, over the years, however, breached its duties and obligations under the Opus Partnership Agreement.  From October, 2008 and after, Opus Investor Partners requested that Tri-Valley, as the Managing Partner of Opus, cure the numerous significant Tri-Valley breaches of the Opus Partnership Agreement.

5.      In April, 2011, the Opus Special Committee was formed by Tri-Valley, with the approval of the majority of the Opus Investor Partners, to, among other things, attempt to negotiate a resolution of Tri-Valley's breaches and to recommend a negotiated solution to the Opus Investor Partners for approval.

6.      During the course of the negotiations, which lasted until approximately late July, 2012, new management at Tri-Valley, together with the Opus Special Committee (which was comprised of the five Opus Special Committee Partners), investigated the operations of the Opus drilling program by prior Tri-Valley management. The investigation included a detailed accounting review and a wholesale restatement of the Opus financial reporting. As a result of the investigation, the Opus Special Committee and Tri-Valley came to an agreement to resolve the issues, which was announced in August 2011.  *See* Tri-Valley Press Release dated Aug. 19, 2011.  The settlement, which was to be presented to the Opus Investor Partners for a vote, was later revised.  It contemplated the formation of a new entity to own and operated the Pleasant Valley Leases.  That entity was to be owned by Tri-Valley and Opus.  Under the agreement, Opus would have received a disproportionate share of the distributable profits from the new entity to compensate Opus for its claims against Tri-Valley, in exchange for a release of claim by Opus.  Tri-Valley disclosed the results of the investigation and the terms of the settlement to the

3

Opus Investor Partners in the Opus May 2012 Newsletter (Attached as Exhibit 1).  Tri-Valley

disclosed that, contrary to the terms of the Opus Partnership Agreement:

> (1) Tri-Valley charged Opus $11.3M in finder's fees, which were paid to Behrooz Sarafraz, who was not a registered broker-dealer and who pled guilty in 2000 to a felony conviction for making a false statement to the government in connection with an investigation into previous sales of securities.  Based on Mr. Sarafraz' role and activities as Tri-Valley's principal finder in the private placement of Opus partnership units, Tri-Valley agreed to credit Opus $6.3 million in determining the disproportionate sharing of profits of the new entity, plus reimburse Opus the first $5 million Tri-Valley may recover from legal actions against its finders.

> (2) The former Tri-Valley CEO allowed Mr. Sarafraz, a finder and Opus partner, to withdraw more than $1 million from Opus, which was not permitted under the Opus Partnership Agreement. Because Tri-Valley was responsible for this transaction, it agreed to credit Opus, in determining the disproportionate sharing of profits of the new entity, for the amount Tri-Valley allowed Mr. Sarafraz to receive.

> (3) Tri-Valley was entitled to charge Opus only "Competitive Pricing" for services provided to Opus.  Tri-Valley charged Opus $24.6 million for certain turnkey drilling operations, which was a 116% markup over actual costs to Tri-Valley.  Tri-Valley and the Opus Special Committee agreed that a 25% markup of the $11.4 million of actual costs was reasonable.  Accordingly, Tri-Valley overcharged Opus by $10.4 million.  This amount was to be credited to Opus in determining the disproportionate sharing of profits of the new entity.

> (4) Tri-Valley wrongfully charged Opus $7.5M in Lease Acquisition Costs related to certain leases in 2005 and 2006.  Under the Opus Partnership Agreement, Tri-Valley was obligated to pay 100% of all lease acquisition costs related to the Opus drilling program.  As a result, Tri-Valley agreed to credit Opus $7.5 million in determining the disproportionate sharing of profits of the new entity.

> (5) An additional $2.6 million in legal expenses incurred to defend lease titles was wrongfully charged to Opus.

Thus, as determined by the Opus Special Committee and conceded by Tri-Valley, Opus' claims

against Tri-Valley amount to more than $30 million, plus interest.

C.      **Background of the Bankruptcy Cases**

7.      Although Tri-Valley admitted the facts on which its liability is based in its May Opus Newsletter, prior to consummation of the settlement, on August 7, 2012 (the "Petition Date"), Tri-Valley and its two subsidiaries, Tri-Valley Oil & Gas Company and Select Resources Corporation filed chapter 11 petitions.  In addition, Tri-Valley, as the manager (not a partner) of Opus, filed a chapter 11 petition on behalf of the Opus partnership.  Tri-Valley did not seek the consent of the Investor Partners to file the petition on behalf of Opus.

8.      While the schedules and statements have not yet been filed, the Opus Special Committee Partners believe that Opus has relatively little debt, all of which is unsecured.  In addition, Opus holds a 75% interest in a very valuable asset: the Pleasant Valley Leases.  The Pleasant Valley Leases have been producing between 300-500 barrels of oil per day. Cunningham Dec. ¶ 15.  In 2011, the Pleasant Valley Leases generated a gross operating profit of approximately $1.6 million. *Id.* ¶ 16.

9.      In contrast, Tri-Valley has significantly more debt and owns less valuable assets. Tri-Valley owns a 25% working interest in the Pleasant Valley Leases, the "Edison Project", which has been producing approximately 30 barrels per day, and mineral rights on the "Richardson Project" and the "Shorty Creek Property", which do not appear to be producing any income.  Tri-Valley has approximately $7.2 million in secured debt, owed to the Gamble Trust. In addition, Tri-Valley claims that the Debtors have total unsecured debt of approximately $9.4 million.  However, most of that debt belongs to Tri-Valley.  Approximately two-thirds of the unsecured debt is for legal fees incurred by Tri-Valley.  Another $500,000 is for Tri-Valley's purchase of equipment. Cunningham Dec. ¶ 59. There are some trade payables owed by Opus, however, the Opus Special Committee Partners believe that most of the approximately $3 million

remaining unsecured debt belongs to Tri-Valley.  The bulk of the Tri-Valley debt is not allocable to Opus under the terms of the Partnership Agreement.

10.  Tri-Valley purports to hold a $5.7 million claim against Opus.  Cunningham Dec. ¶ 38.  However, after their investigation of the matter, the Opus Special Committee Partners dispute Tri-Valley's claim against Opus.  In any event, Opus is entitled to setoff any and all amounts purportedly due to Tri-Valley from Opus, against its conceded claims of more than $30 million against Tri-Valley.

11.  Pursuant to the recently filed motion, Tri-Valley proposes to sell the assets of Tri-Valley and Opus in a Section 363 sale.  Because of Opus' claims for breaches of the Opus Partnership Agreement against Tri-Valley, Tri-Valley's claims against Opus, Tri-Valley's financial condition and the significant value of the Opus assets, the Opus Special Committee Partners are concerned that the Opus Investor Partners' interests are not adequately protected in these cases. Therefore, on behalf of all the Investor Partners of Opus, they requested that the Office of the United State Trustee ("UST") form an official committee of Opus equity holders, pursuant to Section 1102 of the Bankruptcy Code. The Debtors have advised the UST that they support this request.  The UST has not yet responded to the request.  The UST has advised after the August 20 formation meeting, that an official committee of unsecured creditors has not been formed.

**D.    The DIP Motion**

12.  By the DIP Motion, the Debtors seek approval of financing (the "DIP Facility") from George T. Gamble 1991 Trust or an affiliated designee ("Gamble Trust").  G. Thomas Gamble was a director of Tri-Valley and its chairman.  Cunningham Dec. ¶ 47. He is also, through trusts, a significant stockholder of Tri-Valley and is the largest single investor in Opus.

13.     Prior to the Petition Date, the Gamble Trust loaned Tri-Valley, a separate entity, approximately $7.2 million for operations and to settle litigation. *Id.* ¶¶ 48-58. This debt was secured by a lien on the capital stock in Tri-Valley's subsidiaries and was guaranteed by the subsidiaries.  In addition, Tri-Valley assigned certain of its royalty interest in other Tri-Valley assets to the Gamble Trust.  Cunningham Dec. ¶ 50.  The Gamble Trust debt was not secured by a lien on Opus' assets.

14.     The Debtors propose a DIP Facility of $11,048,078.55, which consists of a $3,850,000 in new money funding and a roll-up of $7,198,078.55 (defined as the "Existing Indebtedness" in the DIP Motion) of the Gamble Trust debt.  The DIP Facility contemplates that the Debtors will be jointly and severally liable for the full Existing Indebtedness.  In addition, it seeks to secure the DIP Facility, including Existing Indebtedness, by granting the Gamble Trust a perfected first-priority lien on all the currently owned or after acquired assets and property of the Debtors, including Opus' assets, all of which are unencumbered.

## ARGUMENT

15.     To obtain approval of proposed financing under Section 364(c), a debtor must show that it is unable to obtain financing under 364(b); the financing is necessary to preserve the value of the estate; and the terms are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."  *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).  Similarly, financing under Section 364(d) may not be authorized if it appears that financing could be obtained under other sections of 364. *Id.*  Courts should not authorize post-petition financing when its primary purpose is to benefit or improve the position of the secured lender.  *See, e.g., Id.* at 195-98 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."). *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors."). Courts "recognize that debtors-in-possession generally enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral." *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38. When the proposed financing includes a roll-up, it is often subjected to intense scrutiny by the court. 3 Collier on Bankruptcy ¶ 364.04[2][e] (Alan N. Resnick & Henry J. Sommers eds. 16th ed.).

16. The Opus Special Committee Partners understand that to sell the assets of the Debtors, financing will be needed to obtain the highest value for the assets. However, due to the relationship between Tri-Valley and Mr. Gamble, the Tri-Valley claims being asserted against Opus, the Opus claims being asserted against Tri-Valley, and Tri-Valley's lack of bargaining power, the terms of the DIP Facility benefit the DIP lender, at the expense of Opus and its Investor Partners. Accordingly, the Opus Special Committee Partners' object to DIP Facility as follows:

    a. <u>Preservation of Equity Committee's Rights</u>: The Opus Special Committee Partners have requested that the UST form an Opus equity committee. If such a committee is formed, the entry of an order approving the DIP Motion should not prejudice the Equity Committee's right to object to the DIP Facility.

    b. <u>Improper Roll-Up</u>: Roll-ups are not viewed favorably. Indeed, there is no provision in the Bankruptcy Code that authorizes a debtor to obtain post-petition credit to satisfy pre-petition obligations. The DIP Facility seeks to roll-up $7.2 million of Tri-

8

Valley's pre-petition secured debt (the Existing Indebtedness).  While it is questionable whether such a roll-up is appropriate as to Tri-Valley, it is clearly not appropriate as to Opus.  The Existing Indebtedness is not a pre-petition obligation of Opus.  Yet, the DIP Facility seeks to secure that debt with Opus' assets, all of which are unencumbered.  The Debtors have not shown that the benefit, if any, of the roll-up outweighs the prejudice to the Opus Investor Partners, nor that it is in the best interest of Opus, or the other Debtors, their estates and the creditors and equity holders.  Should a roll-up be approved, it should be subject to disgorgement to the extent of any successful committee challenge.

        c.      <u>Unnecessary Adequate Protection</u>:  The Debtors seek to grant the Gamble Trust adequate protection of: (i) a lien on all of the Debtors' assets, including Opus' unencumbered assets; (ii) a superpriority claim on all of the Debtors' assets, including Opus' unencumbered assets; (iii) payment of fees and expenses incurred in connection with these chapter 11 cases; and (iv) payment of fees and expenses, including consultants, to monitor the Debtors' operations. Adequate protection, however, should not be granted absent a showing of diminution in value.   To the extent that adequate protection is provided, the secured creditor is only entitled to adequate protection for the anticipated or actual decrease in the collateral securing the debt during the bankruptcy case.  *See In re First South Saving Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 854 (Bankr. D. Col. 1995).  Here, the Gamble Trust has not attempted to make such a showing.  Indeed, the Opus Special Committee Partners believe that the Gamble Trust is oversecured.  Thus, there is no need for adequate protection.  To the extent that there is a need, it should be granted only on Tri-Valley's assets.  To the extent that the Gamble Trust asserts a claim for fees and expenses, such

request for fees and expenses should be subject to the reasonableness standard under section 330 of the Bankruptcy Code and the U.S. Trustee Guidelines.

d.    Facility Fee:  The DIP Facility proposes a facility fee of 2% of the aggregate principal amount of the DIP Facility, which is approximately $221,000.  However, that fee is not reasonable when measured against the new money funding of $3,850,000.  The Facility Fee is over 5.7% of the new money funding.  Compared to a break-up fee (which are typically not approved if more than 3%), the Facility Fee is excessive.

e.    Unreasonable Time Constraints:  The DIP Facility requires that the Debtors conduct an auction within 75 days of the Petition Date, have a sale approved within 80 days and a sale close within 90 days of the Petition Date.  It does not appear that the Debtors marketed the assets prior to the Petition Date.  Thus, the time constraints in the DIP Facility for a sale are unreasonable.  The Special Committee Partners believe that at least an additional 30 days will be necessary to properly market the assets.

## CONCLUSION

In sum, the proposed financing is structured to benefit the pre-petition lender at the expense of the Debtors' estate, their creditors and the Opus Investor Partners.  The DIP Facility can be structured in a way to provide the Gamble Trust with sufficient protections, without unduly prejudicing the other constituents in these cases.  Accordingly, the Opus Special Committee Partners request that the DIP Motion be approved only if modified consistent with

{12182:MOT:10182082.DOCX}

their objections.

Dated:  August 27, 2012

SMITH, KATZENSTEIN & JENKINS LLP

By: _Kathleen M. Miller_
Kathleen M. Miller (No. 2898)
Michael P. Migliore (No. 4331)
The Corporate Plaza
800 Delaware Avenue, 10th Floor
P.O. Box 410 (Courier 19801)
Wilmington, DE 19899
Tel. (302) 652-8400
Fax (302) 652-8405
kmiller@skjlaw.com
mpm@skjlaw.com


Counsel to Peter Marguglio, George Bean, Peter
Huggins, Todd Garrett and George Robert Miller

11