# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRI-VALLEY CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 12-12291 (MFW)<br>(Jointly Administered)<br><br>Related Docket Nos. 8, 29, 49, 79, 92, 122 |

## OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF TVC OPUS I DRILLING PROGRAM L.P. TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION; (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF

The Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P. (the "Equity Committee"), by and through its undersigned proposed counsel, Ashby & Geddes, P.A., hereby submits its Objection to entry of a final order approving the Debtors' *Motion for Entry of Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection; (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [Docket No. 8] (the "DIP Motion"). In support of its Objection, the Equity Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Equity Committee was appointed approximately one week ago. It has

---

[1]      The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

{00671920;v4 }

engaged proposed counsel and a proposed financial advisor to assist in analyzing the myriad issues in this case. Although only recently formed, it immediately became apparent to the Equity Committee that the proposed DIP financing is not in the best interest of Opus. Indeed, because of structural conflicts, it appears that no substantial effort was previously taken to analyze the option of reorganizing Opus as a standalone entity. The Equity Committee believes it needs two weeks to attempt to find DIP financing for Opus on a standalone basis and consider the prospects of promulgating a chapter 11 plan for Opus.

2. The proposed DIP financing should not be approved because it contains several provisions which are overreaching and inequitable including, in part, (1) the roll-up and cross-collateralization of approximately $7.2 million in prepetition debt regarding which Opus was neither borrower nor guarantor in exchange for $3.85 million in new money, only a portion of which may be used on behalf of Opus, and (2) the provision that seeks to fix a challenge period for the commencement of certain actions against Gamble (the proposed DIP lender) that is in violation of tolling agreements with Opus and its individual investors previously agreed to by Gamble and improperly provides for the release of the investors' claims.

**RELEVANT BACKGROUND**

3. From its formation in 2002, TVC Opus I Drilling Program L.P. ("Opus") has been managed by Tri-Valley Corporation ("Tri-Valley") pursuant to an Agreement of Partnership, dated May 16, 2002 (as amended, the "Partnership Agreement"). (*See* Decl. of Maston N. Cunningham, ¶¶30-31 [Docket No. 3]) (the "Cunningham Decl."). Under the Partnership Agreement, Tri-Valley serves as Managing Partner of Opus and holds the

authority to conduct the business operations of Opus as specifically set forth in the Partnership Agreement. (Cunningham Decl. ¶31). Tri-Valley, however, is not an equity partner in Opus.[2]

### The OSC Investigation of Tri-Valley's Numerous Breaches of the Partnership Agreement

4. From 2006 until 2011, G. Thomas Gamble ("Gamble") served as a member of the Board of Directors and, for a time, Chairman of the Board of Tri-Valley. (Cunningham Decl. ¶47). During Gamble's service on the Board of Tri-Valley, the Opus equity partners discovered numerous breaches by Tri-Valley of the Partnership Agreement. In April 2011, the Opus equity partners formed the Opus Special Committee (the "OSC") to conduct a further investigation, which lasted over a year. (Cunningham Decl. ¶¶69-71). The OSC's findings and the framework for a restructuring of the Tri-Valley–Opus relationship and settlement of the claims resulting from Tri-Valley's breaches was reported to Opus Investors in the Opus May 2012 Newsletter (the "May Newsletter").[3] Specifically:

- Tri-Valley charged Opus $11.3 million in finder's fees, most of which were paid to Behrooz Sarafraz, who was not a registered broker-dealer and pled guilty in 2000 to a felony conviction for making a false statement to the government during the course of an investigation. Tri-Valley and the OSC agreed to credit Opus $6.3 million, plus remit to Opus the first $5 million of recoveries from those finders.

- Tri-Valley overcharged Opus $13.2 million for certain turnkey drilling

---

[2] While Tri-Valley is labeled the "Managing Partner" under the Partnership Agreement, it is not an equity partner of Opus. "General Partner" is defined to specifically exclude the Managing Partner, except to the extent it owns a General Partner Interest, which Tri-Valley does not. Partnership Agreement, Section 2.01(n). "Limited Partner" also excludes the Managing Partner in the same fashion. Id., Section 2.01(v). "Investor Partners" include General Partners and Limited Partners, but not the Managing Partner. Id., Section 2.01(s).

[3] A copy of the May Newsletter is attached hereto as Exhibit A.

services provided by Tri-Valley to Opus. Tri-Valley and the OSC agreed that Tri-Valley would credit Opus $10.4 million.

- Tri-Valley wrongfully charged Opus for certain Lease Acquisition Costs, for which Tri-Valley was liable under the Partnership Agreement. Tri-Valley agreed to credit Opus $7.5 million on account of the wrongful charges.

- Tri-Valley's former CEO wrongfully permitted Mr. Sarafraz, the main "finder" and an Opus partner, to withdraw over $1 million from Opus as a loan that was never repaid. Because Tri-Valley was responsible for that transaction, Tri-Valley agreed with the OSC to credit Opus $1 million.

- In addition, Tri-Valley wrongfully charged Opus for $2.6 million in legal fees for the defense of title to certain leases (the "Scholle-Livingston Lease Dispute").

5. Altogether, Tri-Valley conceded to the OSC of having wrongfully charged Opus in excess of $30 million plus accrued interest. (See May Newsletter). In order to allow time for the OSC's investigation and negotiations, Tri-Valley and each of the Tri-Valley Board members, **including Gamble**, entered into tolling agreements (together, the "Tolling Agreements") with Opus and the Opus investors for the purpose of preserving any claims that may be asserted by Opus or the Opus investors against Tri-Valley or the members of Tri-Valley's Board. (See Agreement to Facilitate Dispute Resolution attached hereto as Exhibit B (the "Board Tolling Agreement"), and Agreement to Facilitate Dispute Resolution (the "Tri-Valley Tolling Agreement") attached hereto as Exhibit C). The Tolling Agreements toll any applicable statute of limitation until September 30, 2014.

6. In addition to the potentially valuable claims of Opus and the Opus Investors against Tri-Valley and the members of Tri-Valley's Board, Opus holds in excess of 75% of the total amount of Tri-Valley's unsecured debt and, thus, is by far the

largest unsecured creditor of Tri-Valley. (See Tri-Valley's Schedules of Assets and Liabilities [Docket No. 183]).

### Pre-Petition Debt of Tri-Valley Owed to Gamble

7. In 2011, the Gamble Trust and Tri-Valley entered into three short-term demand loans in the aggregate amount of $3,150,000. (Cunningham Decl. ¶49). Those loans were refinanced on March 30, 2012 by a senior secured note payable to the Gamble Trust in the amount of $3,298,310 (the "First Gamble Senior Secured Note"). (Cunningham Decl. ¶48). A few days later, on April 3, 2012, Tri-Valley and the Gamble Trust entered into a second senior secured note (the "Second Gamble Senior Secured Note") in the aggregate amount of $1.5 million for the purpose of financing the settlement of the Scholle-Livingston Lease Dispute. (Cunningham Decl. ¶52, n.12). On June 1, 2012, Tri-Valley issued a Senior Secured Demand Note (the "Gamble Demand Note") (the First Gamble Secured Note, Second Gamble Secured Note and the Gamble Demand Note together, the "Gamble Notes") to the Gamble Trust permitting advances to be made not to exceed $1,350,000. (Cunningham Decl. ¶55). On August 2, 2012, Tri-Valley and the Gamble Trust amended the Gamble Demand Note to permit additional borrowing not to exceed $294,258.14. (Cunningham Decl. ¶56).

8. The Gamble Notes are backed by a package of collateral and corporate guarantees that includes, among other things: (i) a pledge of the capital stock of debtors Tri-Valley Oil & Gas Co. ("TVOG") and Select Resources Corporation, Inc. ("Select"); (ii) a pledge of certain of TVOG's oil and gas leases; (iii) an assignment, in perpetuity, of (a) 2% of Tri-Valley's overriding royalty interests ("ORRI's") on the Claflin Lease, (b) 1% of its ORRI's on certain other leases, and (c) 1% of its ORRI's on any other current or

after acquired lease; (iv) a warrant to purchase 3,000,000 shares of Tri-Valley's common stock at an exercise price of $0.19 per share exercisable for five years beginning March 30, 2012; (v) a security interest in certain property of TVOG including the Claflin Lease; and (vi) a warrant to purchase 1,365,000 shares of Tri-Valley's common stock at a price of $0.10 per share exercisable for a five year period. (Cunningham Decl. ¶¶49-56). In sum, the outstanding amount owed to the Gamble Trust under the Gamble Notes as of the Petition Date is $7,198,078.55 (the "Gamble Pre-Petition Debt"). (Cunningham Decl. ¶58).

9.      Importantly, **none** of the Gamble Pre-Petition Debt was incurred by Opus, secured by any assets of Opus or guaranteed by Opus.[4] In Tri-Valley's Schedules of Assets and Liabilities [Docket No. 183], Tri-Valley has scheduled the Gamble pre-petition debt as a claim against Tri-Valley and TVOG, but not against Opus.

## PROCEDURAL BACKGROUND

10.     On August 7, 2012 (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

11.     The Debtors continue to operate their businesses and manage their

---

[4] The Equity Committee is informed and believes that the Gamble Pre-Petition Debt was incurred and spent by Tri-Valley for 1) Tri-Valley's separate G&A expenses, 2) drilling and other improvements on Tri-Valley's separately owned Claflin Lease, and 3) Tri-Valley's own separate attorneys' fees and litigation costs in connection with the OSC Investigation and the Scholle-Livingston Lease Dispute. Since securing the improved Plains Marketing LP oil purchase terms in November, 2011, see May Newsletter, pg. 4, Opus has earned a substantial operating profit from its Pleasant Valley working interest.

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, or examiner has been appointed in these Chapter 11 Cases.

12. On August 27, 2012, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors Committee"). On September 15, 2012, the Office of the United States Trustee appointed the Equity Committee, which has, subject to the Court's approval, retained Ashby & Geddes as its bankruptcy counsel and Conway MacKenzie as its financial advisor.

13. On August 9, 2012, the Court entered an Interim Order [Docket No. 29] (the "Interim Order") granting the DIP Motion on an interim basis. The hearing to consider entry of an order approving the DIP Motion on a final basis is scheduled for September 27, 2012 at 9:30 a.m.

## OBJECTIONS

I. **The Equity Committee Is Actively Attempting to Locate a DIP Lender for Opus.**

14. Upon information and belief, no substantial effort was made by the Debtors to explore the prospects of a separate standalone DIP loan for Opus. The Equity Committee requests that the Court deny the DIP Motion as to Opus or adjourn the hearing to consider approval of the Gamble DIP Loan for two weeks. The Equity Committee's professionals are currently seeking a separate DIP loan facility for Opus and have discussed the prospects of such a facility with several potential lenders. The Equity Committee believes that it will be able to locate a debtor-in-possession lender for Opus – one willing to provide financing on terms far superior to those required by the Gamble Trust – in approximately two weeks. Given that it was only recently appointed, the

Equity Committee submits that it should be given the opportunity to explore and obtain an alternate DIP lender.

15. Delaying consideration of the Gamble DIP Loan for two weeks will have no prejudicial effect upon Opus or Tri-Valley. As the Debtors' DIP budget shows, Opus will be cash flow positive. (See Interim Order, Ex. A) (showing approximately $480,000 receipts net of operating costs and royalties before G&A expense for the Pleasant Valley operation). Even after accounting for Opus' monthly share of general and administrative expenses of $11,489.00 (see Opus' August 31, 2012 MOR [Docket No. 175] at 5), Opus will operate on at least a break even basis. Thus, Opus does not have an immediate need for additional financing and can continue to operate and pay its share of administrative expenses for at least an additional two weeks during which time the Equity Committee can continue to pursue an alternate lender willing to provide financing on terms less onerous than the Gamble DIP Loan.

16. Currently, with the exception of a modest amount of purported statutory liens which resulted from Tri-Valley's failure to pay Opus leasehold expenses while diverting Opus revenue to Tri-Valley's use, Opus has no secured debt. Of the approximately $7 million of unsecured debt scheduled for Opus, over $5.5 million is an intercompany claim asserted by Tri-Valley, which the Equity Committee asserts is not a valid claim, and nevertheless is subject to setoff against Opus' $30 million plus claim against Tri-Valley for breaches of the Partnership Agreement as outlined in the May Newsletter. Of the remaining approximately $1.5 million of unsecured claims, approximately $500,000 is a claim by Pleasant Valley Ranch for environmental remediation expense that the Equity Committee believes will be covered by applicable

insurance. (See Opus' Schedules of Assets and Liabilities [Docket No. 177]) (listing Pleasant Valley Ranch's claim as "Subject to setoff"). Opus has very little debt and enjoys a 75% ownership stake in the Debtors' most valuable asset – the Pleasant Valley lease. In short, Opus appears to be an attractive borrower for lenders and the Equity Committee believes that an alternate lender will be found.

17. A separate standalone DIP loan for Opus will provide Opus with the ability to consider options for maximizing the value of the Opus estate including, without limitation, pursuing a standalone reorganization of Opus, which option will be obviously impeded if Opus is laden with the Gamble DIP Loan.

## II. The Proposed Gamble DIP Financing Is Unnecessary, Overreaching And Predatory As To Opus.

18. While approval of the proposed Gamble DIP Loan is within the Court's discretion, and the Equity Committee is mindful of Tri-Valley's financial condition and Tri-Valley's need for working capital, the Court must balance the interests of the Gamble Trust, and creditors and equity interest holders. Striking this balance requires that a debtor seeking post-petition financing on a superpriority basis and granting liens on previously unencumbered assets demonstrate that the proposed financing will permit formulation of a successful plan for the benefit of the Debtors' estates and the interests of all its stakeholders. See In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Ames Department Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtors, for the sake of obtaining post-petition financing promptly, cannot abrogate their fiduciary duties to their estates and creditors. Id. at 38.

19. Section 364 of the Bankruptcy Code is not a "secured lenders' act"

allowing a creditor to upset the level playing field contemplated by the Bankruptcy Code. See Ames Department Stores, 115 B.R. at 37; see also In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D. N.H. 1989). Courts generally acknowledge that chapter 11 debtors have little bargaining power against a post-petition lender, especially when that lender also holds a prepetition lien on the debtor's assets. Ames Department Stores, 115 B.R. at 38. Accordingly, courts reviewing proposed post-petition financing "focus[] their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the right of all creditors[.]" Id. at 37.

20. Transactions involving insiders—such as Gamble, who until fairly recently was a member of the Board of Tri-Valley—"are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." In re Biderman Ins. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997); see also In re Enron Corp., 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved ... ."); In re Papercraft Corp., 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and, when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

21. Here, the Court should closely scrutinize the proposed Gamble DIP Loan and find that it includes a number of impermissible provisions, as set forth in detail herein. The Equity Committee objects to the DIP Motion being granted on a final basis, and submits that:

- granting the DIP Lenders liens on and security interests in the substantial unencumbered assets of Opus that was never a borrower or guarantor under the Gamble Pre-Petition Debt unfairly deprives the Opus estate of value and optionality, and, therefore, such liens and security interests must be denied;

- the $40,000 limit on the Committees' expenses to investigate the Gamble Trusts' purported liens is inadequate, would prevent a complete assessment of the extent, validity, perfection, and priority of such liens, and should be increased to at least $60,000;

- any order granting the DIP Motion should not provide for a release of Gamble in violation of the Tolling Agreements;

- the Gamble Trust must not be absolved of the requirements of the equitable doctrine of marshaling and any similar equitable principles.

    **a.**    **No Post-Petition Liens Should Attach To Opus' Assets On Account Of The Gamble Pre-Petition Debt.**

22. Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender. See, e.g., Aqua Assocs., 123 B.R. at 195-96 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); Ames Department Stores, 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); Tenney Village Co., 104 B.R at 568 (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor") (quotations omitted). The law has acknowledged the unequal bargaining power inherent in negotiations leading to proposed postpetition financing, as well as the very significant harm that can befall creditors if the proposed financier is able to exploit its position of leverage. See In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the

basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

23. The Debtors admit in the DIP Motion they were at a severe disadvantage and lacked bargaining power regarding the Gamble DIP Loan. (DIP Motion, ¶24). Pursuant to the Gamble DIP Loan, the Debtors seek to roll-up and cross-collateralize in excess of $7 million of Tri-Valley's prepetition debt with Opus' otherwise unencumbered assets (the "Roll-Up"). (DIP Motion, ¶15). The Debtors have not made any showing whatsoever that the Roll-Up is in the best interests of Opus – indeed, it does not appear that any independent fiduciary for Opus was involved in the Debtors' decision to acquiesce to the Gamble Trust's demands. Permitting the Gamble Trust to obtain security interests, under the guise of an incentive to lend, in property whose value properly belongs to the Opus estate, is an attempt to inequitably recraft the Gamble Trust's prepetition collateral package. The Proposed Final DIP Order must not grant these overreaching and unnecessary liens on Opus' unencumbered assets. In the event the Roll-Up (and cross-collateralization) is approved, it must be subject to disgorgement in the event of a successful challenge to the Gamble Pre-Petition Debt.

  b. **The Budget and Carve-Outs for the Committees' Investigations Are Inadequate.**

24. The amount that has been allocated to any investigation of the Gamble Trust's liens and claims by the Equity Committee is insufficient. Paragraph 7 of the Interim DIP Order attempts to restrain the Committee's ability to investigate the liens and security interests of, and potential claims against, the Gamble Trust or its affiliates by imposing a $25,000 expense cap on lien investigation efforts. The Equity Committee

understands that cap has been increased to $40,000, however, the Creditors' Committee has laid claim to $30,000 of that amount. Given that Opus may hold claims against Gamble and the Gamble Trust that are different from those that may be held by the other Debtors' estates, the Equity Committee requires an independent ability to investigate such claims. Especially under the circumstances of this case, $10,000 is woefully inadequate and could all but preclude the Equity Committee from performing anything more than a superficial investigation that could result in legitimate claims going unprosecuted to the detriment of the Opus estate.

25. The Equity Committee therefore objects to paragraph 7 of the Interim DIP Order and any parallel provision in the Proposed Final DIP Order, and requests that the allowance for investigation expenses be increased to no less than $60,000 with such amount to be shared equally between the Creditors Committee and the Equity Committee.

      **c.**    **The Final DIP Order Should Not Override the Board Tolling Agreement Signed by Gamble and Should Not Release Individual Investor Claims.**

26. The Proposed Final DIP Order violates the Tolling Agreement entered into by Gamble for the benefit of all Opus Partners. Pursuant to the Proposed Final DIP Order, all "claims or causes of action (including any avoidance claims) relating to, the amount validity and/or priority of Lender's Existing Indebtedness and the liens or claims securing same against the Lender or any affiliate of the Lender (including G. Thomas Gamble)" must be asserted on or before October 30, 2012 (the "First Challenge Period"). (Proposed DIP Order, ¶19.(b)). With respect to "any claims or causes of action other than Possible Existing Indebtedness Claims against the Lender or its affiliates," such

claims must be asserted on or before the earlier of (i) 120 days following the closing of the sales of substantially all of the Debtors' assets or (ii) April 30, 2013 (the "Second Challenge Period"). (Proposed DIP Order, ¶19.(b)). Failure to assert any such claims on or before the expiration of the First Challenge Period or Second Challenge Period, as applicable, will result in a "deemed [] waiver of any and all such objections or claims and causes of action as against the Lender and its affiliates (including G. Thomas Gamble)."

27. As described above, the results of the OSC investigation revealed numerous breaches of the Partnership Agreement by Tri-Valley while Gamble sat as a member of the Tri-Valley Board. Recognizing that potential claims may exist against Gamble and the other Tri-Valley Board members, each of the Tri-Valley Board members (including Gamble) entered into the Board Tolling Agreement for the purpose of preserving such claims for the benefit of Opus and the Opus investors. (See Board Tolling Agreement, attached hereto as Exhibit B). The Board Tolling Agreement provides that "any and all claims of any and every nature whatsoever, including, without limitation, **direct**, derivative, class and representative claims" shall be preserved for the benefit of the Opus investors until September 30, 2014 notwithstanding the expiration of any applicable statute of limitation (the "Claim Deadline"). (Board Tolling Agreement, ¶¶2, 4) (emphasis added).

28. The provisions of the Proposed Final DIP Order that require any claims against Gamble to be asserted prior to the Claim Deadline violate the Board Tolling Agreement that Gamble entered into following the OSC's discovery of Tri-Valley's breaches of the Partnership Agreement. Gamble should not be permitted to violate the Board Tolling Agreement. Clearly, Gamble is taking advantage of the lack of bargaining

power of Tri-Valley and the absence of an independent fiduciary for Opus in an effort to obtain a release and or waiver of claims against him that he otherwise could not have obtained outside of bankruptcy.

29.     Importantly, the Equity Committee objects to the Proposed Final DIP Order to the extent that it would provide Gamble with a release of any claims of third party individual investors for whose benefit Gamble signed the Board Tolling Agreement. The Proposed Final DIP Order requires the assertion of all "claims and causes of action..., which may include claims derivative of the Debtors' estates" prior to the expiration of the Second Challenge Period. Failure to assert such claims "against the Lender and its affiliates (including G. Thomas Gamble)" will result in a deemed waiver of such claims. (Proposed Final DIP Order, ¶19(b)). It appears that Gamble is attempting to obtain a release of all claims that could be asserted against him, including claims by Opus and the Opus investors, in exchange for providing merely $3.8 million of new financing, the majority of which (if any) will not be used for the benefit of Opus. The Equity Committee submits that such releases are wholly inappropriate, particularly under the circumstances of this case, and should only be granted, if at all, under a confirmed plan subject to the standards set forth in applicable law. See In re Cont'l Airlines, 203 F.3d 203 (3d Cir. 2000); In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999). In the alternative, the Proposed Final DIP Order should provide the right for individual investors to seek standing to bring claims against Gamble and should not be – as it is now – limited to the Official Committee, a Chapter 7 Trustee or a Chapter 11 Trustee. Otherwise, the claims of individual investors are effectively released upon entry of the Final DIP Order.

### d. Provisions Abrogating Equitable Doctrines Such as Marshaling Are Inappropriate and Must Be Stricken.

30. In addition to the objections set forth above, the Equity Committee objects to all provisions of the Interim DIP Order and any Proposed Final DIP Order that purport to insulate the Gamble Trust from the equitable doctrine of marshaling.

31. Paragraph 9 of the Interim DIP Order provides that "Lender shall not be required to marshal the Collateral, and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Term Sheet, in any manner or order in the Lender's sole and absolute discretion." In the event of a default under the DIP Credit Agreement, it may be appropriate for the Bankruptcy Court to apply the equitable doctrine of marshaling (or any similar equitable doctrine) to prevent an unjust dismantling of the Debtors. The Bankruptcy Court's equitable power to invoke such doctrines cannot simply be revoked by the Debtors.

32. Accordingly, any provisions in the Interim DIP Order and any Proposed Final DIP Order that would infringe upon the Bankruptcy Court's power to marshal the Debtors' assets, or to apply any other similar equitable principles to the disposition of the Debtors' assets, must be stricken.

### RESERVATION OF RIGHTS

33. The Equity Committee reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during any further hearings, including but not limited to, a final hearing on the DIP Motion.

## CONCLUSION

**WHEREFORE**, the Equity Committee respectfully requests that the Court (a) sustain this Objection; (b) deny the entry of a final DIP Order as to Opus or, in the alternative, deny entry of a final DIP Order absent the modifications discussed herein; and (c) grant to the Equity Committee such other and further relief as this Court deems just and appropriate.

Dated:  September 24, 2012                          **ASHBY & GEDDES, P.A.**

/s/ Don A. Beskrone
Don A. Beskrone (I.D. #4380)
Gregory A. Taylor (I.D. #4008)
Amanda M. Winfree (I.D. #4615)
Leigh-Anne M. Raport (I.D. #5055)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile:  (302) 654-2067

*Proposed Counsel to the Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P.*