# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | Ref Nos. 8, 29, 79, 92, 122, and 185 |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION; (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this omnibus reply (the "Reply") to objections to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection; (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "DIP Motion").[2]  In support of this Reply, the Debtors respectfully represent as follows:

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and Tri-Valley Opus 1 Drilling Program L.P. (0334).  The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion.

## PRELIMINARY STATEMENT

These Chapter 11 Cases have been pending for seven weeks. From the very inception of these cases—and even before—the Debtors have worked diligently to resolve issues regarding the financing the Debtors require in order to maximize value for their creditors and other stakeholders. As set forth in greater detail, below, the Debtors have engaged in an extensive pre- and postpetition marketing effort in order to secure postpetition financing on the best possible terms—which they have done. The Debtors have negotiated and re-negotiated the terms of the DIP Facility with the Gamble Trust—for example, the Gamble Trust is no longer receiving fees until the DIP Facility matures and has agreed to intercompany secured claims in connection with the DIP Facility, as set forth below in detail—but the Debtors have been unable to obtain additional concessions, and the Gamble Trust has insisted that the DIP Facility, including the Roll-Up Loan, be secured by all of the Debtors' assets. Given the facts and circumstances of this case and the unavailability of any other financing, which is necessary to maximize the value of the Debtors' assets, the Debtors believe in their business judgment that the terms of the DIP Facility are fair and reasonable. All of the Debtors' stakeholders—including the Opus investors—stand to benefit from the approval of the DIP Facility on the terms proposed.

In addition, shortly following the appointment of the Creditors' Committee, the Debtors worked extensively (straight through Labor Day weekend) to resolve the Creditors' Committee's concerns, as well as issues raised by the Opus Special Committee, regarding the proposed DIP Facility. These negotiations were fruitful, enabling the Debtors, the Creditors' Committee and the Gamble Trust to reach an agreement that the Debtors believe is fair and equitable and provides the best available protection of all parties' rights and interests with respect to the DIP Facility. Specifically, and as described in greater detail below, concerns regarding the Roll-Up

Loan and perceived unfairness in the allocation of security therefor will be mitigated by inter-Debtor liens securing each Debtor's allocated fair share of the DIP Obligations.

But even without this agreement, the Debtors believe that the DIP Facility is fair and appropriate given the facts and circumstances of these cases. Opus benefits from the DIP Facility as it allows the Debtors to continue their ongoing operations and the now extended sale process to maximize the value of Opus' assets. Without the DIP Facility, the sale process would necessarily be truncated and would result in a fire sale to the detriment to Opus' creditors and partners. The fact that Tri-Valley, as managing partner of Opus, entered into the DIP Facility on Opus' behalf does not affect the benefits received by Opus thereunder. The Opus investors knowingly and voluntarily delegated to Tri-Valley the authority to manage its affairs, to borrow money on Opus' behalf and to pledge Opus assets as security therefor.

The Equity Committee's objection misses the factual realities of this case – Opus is intertwined with Tri-Valley pursuant to their contractual arrangements. What is couched as a DIP Objection, is essentially a plea to put all of the Debtors' assets, including Opus', at significant risk while the Equity Committee sees if it can "reorganize Opus as a standalone entity." Although at first blush, a two week extension appears to be a reasonable request, the Equity Committee's end game, a desire for Opus to be a standalone entity, cannot be accomplished in two weeks. Pursuant to the binding Partnership Agreement, Tri-Valley manages Opus' assets, including the perceived crown jewel – the Pleasant Valley Assets (defined below). Opus has no employees and no ability to manage the Pleasant Valley Assets. Thus, unless Tri-Valley has sufficient funding to operate the Pleasant Valley Assets – all value will be lost because Tri-Valley will cease to operate the assets, all revenue would cease as there would be no gas produced, and Pleasant Valley leases would lapse in as soon as 30 days pursuant to

their terms. In other words, Opus' business does not operate as a standalone entity and is inextricably tied to Tri-Valley and its ownership and operation of the Pleasant Valley Assets. In order to achieve its goal, among other things, the Equity Committee would need to raise sufficient funds to buy Tri-Valley's ownership interest in the Pleasant Valley Assets and find an operator for the Pleasant Valley Assets and do so within that incredibly short time frame. Thus, essentially what the Equity Committee is requesting is that Opus not receive any of the burdens of the DIP Facility while reaping substantial benefits.[3]

## BACKGROUND

### Debtors' Organizational Relationship and Existing Indebtedness

1.      Tri-Valley Corporation ("Tri-Valley"), a debtor in the Chapter 11 Cases, is the parent corporation of two wholly-owned subsidiaries, Tri-Valley Oil & Gas Co. ("TVOG") and Select Resources Corporation, Inc. ("Select," and together with TVOG, the "Tri-Valley Subsidiaries"). Tri-Valley is also the managing partner of TVC Opus 1 Drilling Program, L.P. ("Opus"), another debtor in the Chapter 11 Cases.

2.      Opus is a limited partnership organized pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act. Opus is governed by that certain Agreement of Partnership (the "Partnership Agreement") dated May 16, 2002 (as amended) by and among Tri-Valley as "Managing Partner," F. Lynn Blystone, as "Organizational Partner," and those persons adopting the Partnership Agreement as "Investor Partners." A true and correct copy of the Partnership Agreement is attached hereto as Exhibit A.[4] The Partnership Agreement provides Tri-Valley with essentially plenary authority to manage and control the Opus business.

---

[3] The Equity Committee Objection seems to confuse the issues between the approval of DIP Financing and whether or not Opus could reorganize as a standalone basis. The only matter before the Court is whether the DIP Financing is reasonable and appropriate – not the sale of Opus' assets or Opus' plan of reorganization.
[4] In a Certificate of Limited Partnership recorded by the Delaware Secretary of State on May 16, 2002, Tri-Valley Corporation was named as a general partner of Opus.

Specifically, Partnership Agreement section 5.01 provides as follows:

> 5.01. Power and Authority of Managing Partner. The Partners hereby designate [Tri-Valley] as the Managing Partner of the Partnership and, except as provided by Section 5.02 and elsewhere in this Agreement and except as otherwise provided by applicable law, hereby delegate to the Managing Partner **full and exclusive power and authority** on behalf of the Partnership to manage, control, administer, and operate the properties, business, and affairs of the Partnership and to do or cause to be done any **and all acts deemed by the Managing Partner to be necessary or appropriate** thereto. The scope of such power and authority shall encompass all matters in any way connected with such business or incident thereto . . . .

Partnership Agreement, § 5.01 (emphasis added). Partnership Agreement subsections 5.01(a)-(t) enumerate several non-exclusive examples of the authority possessed by Tri-Valley as Managing Partner. Section 5.01(c) provides that the Managing Partner has the power

> [t]o **borrow monies** for the business of the Partnership and from time to time to draw, make, execute, and issue promissory notes and other negotiable or nonnegotiable instruments and evidences of indebtedness; **to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the property of the Partnership**; to assign any monies owing or to be owing to the Partnership; and to engage in any other means of financing customary in the oil and gas industry; provided that any such financing shall provide that the lender has recourse only against Partnership assets and not against any Investor Partner Individually.

*Id.* at §5.01(c) (emphasis added).[5]

3. As of the Petition Date, Tri-Valley and the Tri-Valley Subsidiaries were obligors and guarantors, respectively, on certain prepetition indebtedness to the George T. Gamble 1991 Trust (the "Gamble Trust") in the aggregate amount of approximately $7,198,078.55 (the "Existing Indebtedness"). The Existing Indebtedness is secured by a lien on the capital stock of the Tri-Valley Subsidiaries and certain of their assets, but is not secured by a lien against Opus'

---

[5] Tri-Valley's authority is limited by certain exceptions provided by Partnership Agreement section 5.02, including a cap on borrowing of "20% of the Capital Contributions of the Investor Partners." *See id.* at § 5.02(a). The DIP Facility falls well within the restrictions imposed by the Partnership Agreement and the Partnership Agreement otherwise fully authorizes Tri-Valley to enter into the DIP Facility on Opus' behalf.

assets. In addition, the Existing Indebtedness is secured by a lien against certain of the Debtors' assets, including the cash proceeds thereof (the "Cash Collateral").

**DIP Financing—Selection of Gamble Trust,**
**DIP Motion and Need for Postpetition Capital**

4.      Prior to the Petition Date, after consultation with the Debtors' major stakeholders, including the Gamble Trust, the Opus Special Committee (as defined below) and their respective advisors, and an examination of the Debtors' current operating cash flow issues and critical need for additional financing, the Debtors determined that the best (and perhaps the only feasible) way to maximize the value of their assets was to commence the Chapter 11 Cases and proceed with a sale of the Debtors' assets, the procedure for which has now been approved by the Court. [*See* D.I. 130.] However, the Debtors' existing capital resources are insufficient to fund the sale process the Court has approved. The sale will be possible only if the Debtors are able to obtain postpetition financing and the use of cash collateral.

5.      To that end, prior to the Petition Date, the Debtors' financial advisor contacted eighteen (18) potential funding sources, of which eight (8) declined immediately and ten (10) requested non-disclosure agreements. *See* Cunningham Decl'n ¶ 77. Of those ten (10), eight (8) of them executed non-disclosure agreements and received diligence information, but none of them ultimately expressed an interest in providing financing. *See id.* Ultimately, it was only the Gamble Trust who agreed to provide debtor-in-possession financing.

6.      On the Petition Date the Debtors filed the DIP Motion in order to seek approval of the DIP Facility with the Gamble Trust. As detailed in the DIP Motion, the DIP Facility provides postpetition financing of approximately $11 million, which includes a Roll-Up Loan of approximately $7.2 million to be used to satisfy the Existing Indebtedness. Approximately $3.8 million of the DIP Facility will be available to the Debtors as new money funding to support,

*inter alia*, the sale process. The DIP Facility provides that each of the Debtors will be jointly and severally liable thereunder and that the DIP Facility will be secured by DIP Liens on substantially all of Debtors' assets, including the previously unencumbered assets of Opus. Importantly, the relief requested by the DIP Motion will also allow the Debtors to use Cash Collateral, which is critical to the Debtors' ability to continue to operate their businesses during the sale period.

7.      Following its appointment,[6] the Creditors' Committee raised initial concerns regarding the DIP Motion, particularly the adequacy of the marketing efforts that resulted in the selection of the DIP Facility.  In that regard, the Creditors' Committee's provided additional potential postpetition lenders to the Debtors.  The Debtors' financial advisor immediately followed up with these additional potential lenders and attempted to solicit a competing offer of financing.  However, none of the additional potential lenders provided by the Creditors' Committee expressed any interest in providing financing on any basis.

8.      The Creditors' Committee also expressed concerns regarding the Roll-Up Loan, and specifically the use of previously unencumbered Opus assets to secure the same. Following extensive negotiations with the Creditors' Committee and the Opus Special Committee over the Labor Day weekend, the Debtors were pleased to announce to the Court at the hearing held in these cases on September 5, 2012, that the parties had reached an agreement that resolved the Creditors' Committee's concerns with respect to the Roll-Up Loan. The resolution is embodied in the proposed Final DIP Order (attached hereto as <u>Exhibit B</u>), which provides as follows:

> <u>Intercompany DIP Claims</u>. Without limiting the obligations of any Debtor to the Lender, each Debtor shall be obligated, solely with respect to each

---

[6] On August 27, 2012, the Office of the United States Trustee (the "<u>UST</u>") appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "<u>Creditors' Committee</u>") [D.I. 80].  On September 15, 2012, the UST also appointed an official committee of equity holders (the "<u>Equity Committee</u>").  [D.I. 161]

other Debtor, to satisfy its fair allocated share of the DIP Obligations (the "Intercompany DIP Claims"), which amount shall be determined as of the Maturity Date by the Court unless otherwise agreed to in writing by the Debtors and each Committee.    Solely to secure payment of these Intercompany DIP Claims, each Debtor hereby receives liens, subordinate in priority and in right of payment only to the DIP Superpriority Claims and the DIP Liens and to the Carve Out, on all Collateral of all other Debtors.

Proposed Final DIP Order, ¶ 15.  Thus, to the extent of any amount of the Roll-Up Loan that is allocated to Opus, Opus will have a secured lien against each other Debtor's assets to satisfy any monies paid in excess of its fair allocated share of the DIP Obligations, mitigating Opus' exposure on the DIP Facility and mitigating any perceived unfairness regarding the security for the Roll-Up Loan.

9.      As explained in the Cunningham Declaration and DIP Motion, it is critical that the Debtors obtain financing on the terms proposed by the DIP Motion in order to continue operating as a going concern and to ensure that the proposed sale process will be sufficiently robust to ensure the highest and best offer for the Debtors' assets.  Without the continued use of Cash Collateral, as well as proceeds of the DIP Facility, the Debtors will not have the funds necessary to continue their operations and continue the sale process.

### Bifurcated Sale Procedures

10.      On August 31, 2012, the Debtors filed a motion (the "Sale Motion") to approve, *inter alia,* (a) the sale of substantially all of their assets and (b) procedures related thereto [D.I. 51].  The Debtors' assets consist primarily of (1) the oil and gas properties located in and around the Edison Oil Field near Bakersfield, California in which the Debtors hold leasehold interests (the "Edison Assets"); (2) the properties located in the Richardson and Tolovana Districts of Alaska in which the Debtors hold mineral rights and mining claims (the "Mineral Assets"); and (3) oil and gas properties located in the Oxnard Oil Field near Oxnard, California in which the

Debtors hold leasehold interests (the "Pleasant Valley Assets"). The Edison and Mineral assets are owned primarily by the non-Opus Debtors, while Opus holds a seventy-five percent (75%) interest in the Pleasant Valley Assets.

11.    The Creditors' Committee and the Opus Special Committee responded informally to the Sale Motion by raising concerns regarding the timeline proposed for the sale process. To address these concerns, the Debtors agreed to a bifurcated procedure by which the Edison and Mineral Assets, on the one hand, and the Pleasant Valley Assets, on the other, would be sold on different timeframes. Specifically, the Debtors agreed to set the deadline to bid for the Edison and/or Mineral Assets for October 10, 2012, and the deadline to bid for the Pleasant Valley Assets for November 30, 2012, with related auctions, objections, approvals, etc. to key off of these dates. This agreement is memorialized in the bidding procedures (the "Bidding Procedures") approved by the Court on September 5, 2012 (the "Bid Procedures Order") [D.I. 130]. The extended marketing period for the Pleasant Valley Assets—which are more valuable than the other asset classes to be sold—is intended to maximize the value realized from the sale of the Pleasant Valley Assets to the greatest extent possible. This adjustment was made possible only by the agreement of the Gamble Trust to make accommodations in the DIP Facility that are necessary to support the extended sale timeline.

## Opus Matters

12.    Since the onset of the Chapter 11 Cases, Debtors' counsel has been sensitive to the perceived structural issues regarding Tri-Valley's management authority with respect to Opus. However, pursuant to the Opus Partnership Agreement, Tri-Valley does in fact have "full and exclusive power and authority" on behalf of Opus to "manage" and "control" Opus and to perform "any and all acts deemed by [Tri-Valley] to be necessary or appropriate" in furtherance

of those ends, including—but not limited to—borrowing money on behalf of Opus and encumbering its assets. Partnership Agreement, § 5.01. Given the Opus investors' explicit consent to this degree of control *via* the Partnership Agreement, and also the prevailing alignment of interests between Opus and the non-Opus Debtors,[7] the Debtors believe that Opus has been fully protected throughout the process.

13.    However, in recognition of perceived structural issues, in an abundance of caution and in an effort to alleviate any concerns held by the Court and/or other parties in interest concerning the potential for conflict, Young Conaway Stargatt & Taylor, LLP ("Young Conaway") has been selected as special conflicts counsel to advise Opus with regard to (i) debtor-in-possession financing; (ii) intercompany claims, asset and liability allocation among the debtors' estates, including, without limitation, the allocation of sale proceeds and distribution thereof in connection with any plan of reorganization or liquidation for the Debtors; (iii) such other matters involving an actual or potential conflict as between Opus and the other Debtors, as the same may be determined by the Debtors or otherwise ordered by the Bankruptcy Court (the "Opus Conflict Matters").

**DIP Objections**

**The Opus Special Committee**

14.    Peter Marguglio, George Bean, Peter Huggins, and Todd Garrett, as Limited Partners, and George Robert Miller, as a General Partner, of Opus (collectively, the "Opus Special Committee") has objected to the DIP Motion on several grounds. [*See* D.I. 79.] These grounds include that (1) the Roll-Up Loan is improper, (2) the adequate protection granted to the Gamble Trust exceeds anticipated decreases in collateral value and is unnecessary because the Existing Indebtedness is over-secured, (3) the facility fee is unreasonable, and (4) the sale

---

[7] Opus has a 75% working interest in the Pleasant Valley leases, whereas Tri-Valley has a 25% working interest.

milestones provided in the DIP Facility are on an unreasonable time frame.

**The UST**

15.     The UST has objected to the DIP Motion on the principal ground that there is "no economic justification for the Roll-Up Loan." [*See* D.I. 92, ¶ 35.] The UST contends that the Roll-Up Loan "is being provided at the expense of the general unsecured creditors and the equity holders" and that if the Court grants the DIP Motion, "the Court should not authorize the Debtors to grant additional collateral to secure the Roll-Up Loan." *Id.* at ¶¶ 35-36.

**The Equity Committee**

16.     The Equity Committee has objected to the DIP Motion (the "Equity Objection"). [D.I. 185.] The Equity Committee first contends that consideration of the Final DIP Order be postponed for two weeks in order to allow the Equity Committee to "*attempt* to find DIP financing for Opus on a standalone basis and to consider the prospects of promulgating a chapter 11 plan for Opus." Equity Objection, ¶2. Secondly, the Equity Committee argues that the DIP Motion should be denied or that the relief requested should be modified for essentially four reasons: (i) it is improper to secure the Roll-Up Loan with Opus assets; (ii) the Budget and Carve-Outs for the Committees' investigations are inadequate; (iii) the release of claims against Gamble is improper and violates the "Board Tolling Agreement," as defined in the Equity Committee's objection; and (iv) any provision in the Final DIP Order that would infringe upon the Bankruptcy Court's power to marshal the Debtors' assets, or to apply any other similar equitable principles to the disposition of the Debtors' assets, is improper.

## OMNIBUS REPLY

17.    As these Chapter 11 Cases are about to enter their third month, the time has come to finally resolve impediments to a value-maximizing sale process and exit from chapter 11 protection.  A value-maximizing sale process is only possible with the DIP Facility proposed. With anything less—including without the Roll-Up Loan—the Gamble Trust has been adamant that it will not lend, in which case the Chapter 11 Cases will collapse and all interest-holders will be worse off, including the Opus investors.  Indeed, by funding a sale process that has been specifically elongated with respect to Opus' prize assets, the DIP Facility inures to the particular benefit of Opus.

18.    Bankruptcy Code section 364(c) provides that a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets.  *See* 11 U.S.C. § 364(c);[8] *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

19.    As set forth herein and as the evidence will demonstrate the Debtors could not have obtained postpetition financing on the terms and of the type and magnitude required in

---

[8] Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt — (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

these cases on an unsecured basis; or, indeed, without offering terms largely similar to those of the DIP Facility.

20.     A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

21.     Both pre- and postpetition, the Debtors endeavored to identify potential sources of financing and explored various financing alternatives. However, no lender other than the Gamble Trust has proposed to extend credit to the Debtors. Indeed, the only lender that even discussed the prospect of DIP financing for the Debtors indicated that if a DIP loan were possible, they would insist upon refinancing the entire Existing Indebtedness.

22.     While the Debtors believe the Roll-Up Loan is appropriate under the circumstances, in an effort to resolve the issues raised with regard thereto, the Debtors, the Creditors' Committee and the Gamble Trust negotiated the addition of paragraph 15 to the proposed Final DIP Order. The Debtors submit that this is an equitable resolution of the concerns surrounding the Roll-Up Loan and that the overall terms of the DIP Facility and Roll-

Up Loan are fair and, in any event, are clearly preferable to the only other alternative, which is to fail to secure necessary financing and collapse into a fire sale of the Debtors' property that would put all creditors and interest holders in a worse position.

23.    Given that the DIP Facility will enable an extended sale process that has been specifically negotiated and engineered to provide a maximum benefit for Opus' principal assets—the Pleasant Valley Assets—approving the DIP Motion is in Opus' best interests. While this benefit alone is sufficient to counterbalance any perceived inequity in the cross-collateralization of the Existing Indebtedness, the allowance of inter-Debtor liens as contemplated in paragraph 15 of the proposed Final DIP Order will even further protect Opus' interests.

24.    In addition, the Equity Committee fails to recognize the realities of this case. Opus does not standalone – it has no employees and has contracted the management of the Pleasant Valley Assets to Tri-Valley. Opus cannot operate or manage the Pleasant Valley Assets and two weeks is not going to change this fact. Although the proposed budget may show that Opus does not have immediate funding needs, that does not mean that funds are not necessary to ensure Tri-Valley's ability to continue to operate and preserve the Pleasant Valley Assets. Absent such funding, Tri-Valley will cease to operate and the Pleasant Valley leases will be lost leaving Opus without any assets.

25.    Without the relief requested in the DIP Motion, the Debtors will be unable to continue operating their businesses and unable to fund the sale process contemplated in the Bid Procedures Order, which would result in lost opportunities, lost jobs and a destruction of value to the detriment of all of the Debtors and their creditors. The terms of the DIP Facility, which have been negotiated extensively and at arms' length, are fair, reasonable, and adequate given the

Debtors' circumstances.

WHEREFORE, the Debtors respectfully request that this Court (a) overrule the objections to the DIP Motion, (b) enter the Final DIP Order and (c) grant such other and further relief as the Court deems just and proper.

Dated: September 26, 2012
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
         mumford@lrclaw.com
         brown@lrclaw.com

- and -

Charles A. Dale III
Mackenzie L. Shea
**K&L Gates LLP**
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Telephone: (617) 261-3100
Facsimile: (617) 261-3175
E-mail: chad.dale@klgates.com
         mackenzie.shea@klgates.com

_Counsel to Tri-Valley Corporation, Tri-Valley Oil & Gas Co., and Select Resources Corporation, Inc., and Proposed Counsel to TVC Opus 1 Drilling Program, L.P_

# **EXHIBIT A**

# AGREEMENT OF PARTNERSHIP
## TVC OPUS I DRILLING PROGRAM, L.P.

THIS AGREEMENT OF PARTNERSHIP (the "Agreement") dated May 16, 2002, as amended July 14, 2003, November 8, 2004, and September 27, 2006 is made by and among Tri-Valley Corporation, a Delaware corporation ("TVC" or the "Managing Partner" when acting in its capacity as Managing Partner of the Partnership), F. Lynn Blystone, a resident of Bakersfield, California (the "Organizational Partner"), and those persons who execute or adopt this Agreement or counterparts hereof as Investor Partners and become such (herein called the "Investor Partners"). In consideration of the mutual covenants and agreements contained herein, the parties hereto do hereby agree as follows:

## ARTICLE 1
## FORMATION OF PARTNERSHIP

1.01.   Formation. Subject to the provisions of this Agreement, the parties hereto do hereby form a limited partnership (herein called the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act.

1.02.   Name. The name of the Partnership shall be TVC Opus I Drilling Program, L.P. Subject to all applicable laws, the business of the Partnership may be conducted under such other name or names (including the name of the Managing Partner) as the Managing Partner shall determine to be necessary or desirable. The Managing Partner shall cause to be filed on behalf of the Partnership such partnership or assumed or fictitious name certificate or certificates or similar instruments as may from time to time be required by law.

1.03.   Business. The business of the Partnership shall be the following: (a) to become a party to the Program Agreement; (b) to acquire Leases from TVOG and its Affiliates and from third parties in accordance with the terms of the Program Agreement; (c) to explore, drill, develop, operate, and dispose of such Leases; (d) to produce, collect, store, treat, deliver, market, sell, or otherwise dispose of oil, gas, and related minerals from such Leases; and (e) to take all such actions which may be incidental thereto as the Managing Partner may determine. The Partnership may also purchase or acquire equipment, processing facilities, and other property associated with such Leases and acquire interests in and invest in joint ventures and other partnerships (including affiliated joint ventures or affiliated partnerships) or other entities (including corporations) that hold or are formed to acquire Leases in Prospects if, in the judgment of the Managing Partner, such acquisitions or investments are necessary or desirable to the acquisition by the Partnership of Leases in Prospects or the drilling and completion of wells thereon. In addition, the Partnership may participate in any other type of transaction relating to Leases or Prospects or the drilling and completion of wells thereon if the economic effect of such transactions is the same as the ownership of such Leases or Prospects by the Partnership.

1.04.   Principal Office. The location of the principal place of business of the Partnership shall be 4550 California Avenue, Suite 600, Bakersfield, California 93309. The Managing Partner, at any time and from time to time, may change the location of the Partnership's principal place of business and may establish such additional place or places of business of the Partnership as the Managing Partner shall determine to be necessary or desirable, provided notice thereof is given to the Investor Partners within 30 days of such change or establishment. The registered

office of the Partnership in the State of Delaware shall be at Corporation Trust Center, 1209 Orange Street, Wilmington, County of Newcastle, Delaware, and its registered agent for service of process on the Partnership at such registered office shall be Corporation Trust Corporation.

1.05.    Names and Addresses of Partners. TVC is the sole Managing Partner of the Partnership and its address is 4550 California Avenue, Suite 600, Bakersfield, California 93309. The Organizational Partner's name is F. Lynn Blystone and his address is 4550 California Avenue, Suite 600, Bakersfield, California 93309. Upon admission of Investor Partners to the Partnership, the Organizational Partner will withdraw from the Partnership and his contribution to the capital of the Partnership will be returned without interest. The name and business, residence, or mailing address of each Investor Partner will be maintained in the Partnership records. The date upon which each such person became an Investor Partner shall be the date set forth in Partnership records. The address of each Investor Partner for the purpose of receiving notices and all other communications hereunder shall be the address shown in the Subscription Agreement executed by such Investor Partner or such other address as may be supplied by such Investor Partner to the Managing Partner in the manner specified in Section 11.01.

1.06.    Term. The Partnership shall commence upon the completion of filing for record of an initial Certificate of Limited Partnership for the Partnership in accordance with the Delaware Act and shall continue until terminated in accordance with ARTICLE 9.

1.07.    Filings. Upon the request of the Managing Partner, the parties hereto shall immediately execute and deliver all such certificates and other instruments conforming hereto as shall be necessary for the Managing Partner to accomplish all filing, recording, publishing, and other acts appropriate to comply with all requirements for the formation and operation of a limited partnership under the laws of the State of Delaware and for the formation, qualification, and operation of a limited partnership (or a partnership in which the Investor Partners have limited liability) in all other jurisdictions where the Partnership shall propose to conduct business.

1.08.    Title to Partnership Property. All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property. The Partnership shall hold its assets in its own name, except that its interests in Leases may be held in the name of the Program Manager as contemplated by the Program Agreement.

1.09.    Conversion of General Partner Interests into Limited Partner Interests. Each General Partner may convert their Interests to Limited Partner Interests by notifying the Managing Partner in writing of their desire to do so and by executing any consents, agreements or other documents as may reasonably required by the Managing Partner to accomplish such conversion. As soon as practicable after the completion of the Partnership's drilling activities, the Interests held by the General Partners will be converted to Limited Partner Interests. In order to accomplish such conversion, the Managing Partner will (a) file an amended certificate of limited partnership with the Secretary of State of the State of Delaware removing the General Partners as general partners of the Partnership and (b) take such other actions as are necessary or appropriate to accomplish conversion of the General Partner Interests held by the General Partners to Limited Partner Interests. Notwithstanding the foregoing, the Managing Partner shall not be obligated to cause the conversion of the General Partner Interests held by the General Partners to Limited Partner Interests, or may delay such conversion, if the Managing Partner

determines that such conversion at that time would not be in the best interests of the Investor Partners or the Partnership; provided that if the Managing Partner determines that such conversion would not be in the best interests of the Investor Partners or the Partnership, the insurance coverage limits, including umbrella policy limits, will not be reduced unless such coverage becomes unobtainable or is only available at premiums which are prohibitively more expensive than the premiums now being paid for such policies; and provided further, that the Managing Partner shall not be obligated to file amendments to the certificate of limited partnership with the Secretary of State of the State of Delaware removing General Partners as general partners of the Partnership more often than semi-annually, during June and December of each year. If conversion is so delayed, the Managing Partner will continue to have the power and authority to cause such conversion at any time during the term of the Partnership if the Managing Partner determines that conversion is in the best interests of the General Partners and the Partnership. Upon filing the amended certificate of limited partnership reflecting the conversion of the General Partner Interests held by General Partners to Limited Partner Interests, the conversion will be effective and thereafter each General Partner will have the rights and obligations of a Limited Partner and will be entitled to limited liability to the extent provided by the Delaware Act; provided that those General Partners will remain liable to the Partnership for their proportionate shares of Partnership obligations and liabilities arising prior to the conversion of their General Partner Interests to Limited Partner Interests.

## ARTICLE 2
## DEFINITIONS AND REFERENCES

2.01.  Defined Terms. When used in this Agreement and unless the context otherwise requires, the following terms shall have the respective meanings set forth below:

a.  "Administrative Costs" shall mean all customary and routine expenses incurred by the Managing Partner or its Affiliates for the conduct of the administration of the Partnership or the Drilling Program, including: legal, finance, accounting, secretarial, travel, office rent, telephone, data processing, and other items of a similar nature.

b.  "Adjusted Capital Account" shall mean the capital account maintained for each Partner as provided in Section 7.01.c as of the end of each fiscal year, (1) increased by (A) an amount equal to such Partner's allocable share of the Partnership's Minimum Gain, as computed on the last day of such fiscal year in accordance with Treasury Regulations Section 1.704-2(g), and (B) the amount of Partnership indebtedness allocable to such Partner under Section 752 of the Code with respect to which such Partner is personally liable, and (2) reduced by (A) depletion deductions reasonably expected to be allocated to such Partner in subsequent years and charged to such Partner's capital account as provided in Section 7.01.c, (B) the amount of all losses and deductions reasonably expected to be allocated to such Partner in subsequent years under Section 704(e)(2) or 706(d) of the Code and Treasury Regulations Section 1.751-1(b)(2)(ii), and (3) the amount of all distributions reasonably expected to be made to such Partner to the extent that they exceed offsetting increases in such Partner's capital account that are reasonably expected to occur during (or prior to) the year in which such distributions are reasonably expected to be made.

c.  "Affiliate" shall mean with respect to another person, (1) any person directly or indirectly owning, controlling, or holding with power to vote 10% or more of the outstanding voting securities of or equity interests in such other person; (2) any person 10% or

more of whose outstanding voting securities or equity interests are directly or indirectly owned, controlled, or held with power to vote by such other person; (3) any person directly or indirectly controlling, controlled by, or under common control with such other person; (4) any employee, officer, director, or partner of such other person; and (5) any company for which any such officer, director, or partner acts in any such capacity. For purposes of this Agreement an Affiliate of TVC shall include Affiliated Programs.

        d.     "Affiliated Program" shall mean a drilling, producing property, income, royalty, or other program (whether in the form of a partnership, joint venture, or otherwise) for or of which the Managing Partner or an Affiliate thereof serves as manager or managing partner or acts in a similar capacity.

        e.     "Agreement" shall mean this Agreement of Partnership, as amended from time to time.

        f.     "Capital Contribution" shall mean for any particular Partner the total dollar amount of the contribution to the capital of the Partnership made by such Partner.

        g.     "Capital Contributions" shall mean the aggregate amount of the Capital Contribution paid by all Partners to the Partnership.

        h.     "Capital Expenditures" shall mean those costs associated with property acquisition and the drilling and completion of oil and gas wells which are generally accepted as capital expenditures pursuant to the provisions of the Code.

        i.     "Closing Date" means the earlier of (i) the date that subscriptions for 100 interests have been accepted, (ii), the date that TVC declares the offering terminated, or (iii) December 31, 2005, unless TVC decides to extend the offering to a later date in its sole discretion (*amended 11-8-04*).

        j.     "Code" shall mean the Internal Revenue Code of 1986, as amended.

        k.     "Delaware Act" shall mean the Delaware Revised Uniform Limited Partnership Act, as amended from time to time, and any successor to such act.

        l.     "Direct Costs" shall mean all actual and necessary costs directly incurred for the benefit of the Drilling Program and generally attributable to the goods and services provided to the Drilling Program by parties other than the Managing Partner or its Affiliates. Direct costs shall not include any cost otherwise classified as Organization and Offering Expenses, Administrative Costs, Operating Costs, or Lease Acquisition Costs. Direct Costs include Reporting and Legal Expenses and may include the cost of services provided by the Managing Partner or its Affiliates if such services are provided pursuant to written contracts and in compliance with the terms set forth under Section 5.10 hereof.

        m.     "Drilling Program" shall mean the drilling program to be conducted by the Partnership, TVC, and TVOG pursuant to the Program Agreement and the rights, interests, and properties of TVC and the Partnership under or subject to the Program Agreement.

        n.     "General Partner" shall mean each person who executes or adopts this Agreement or a counterpart hereof as a General Partner and is accepted by the Managing Partner

as such and any person who becomes a substituted General Partner in accordance with the terms hereof. General Partner shall not include the Managing Partner except to the extent that the Managing Partner owns General Partner Interests or fraction thereof.

o.    "General Partner Interest" shall mean a General Partner's unit of interest in the Partnership representing a $1,000,000 Capital Contribution.

p.    "Horizon" shall mean a zone of a particular formation; that part of a formation of sufficient porosity and permeability to form a petroleum reservoir.

q.    "Independent Expert" shall mean a person with no material relationship to the Managing Partner or its Affiliates who is qualified and who is in the business of rendering opinions regarding the value of oil and gas properties based upon the evaluation of all pertinent economic, financial, geologic, and engineering information available to the Managing Partner.

r.    "Interest" shall mean an Investor Partner's unit of interest in the Partnership representing a $1,000,000 Capital Contribution.

s.    "Investor Partners" shall mean the General Partners and the Limited Partners and shall not include the Managing Partner, except to the extent that the Managing Partner owns Interests or fractions thereof.

t.    "Lease" shall mean an oil and gas lease or an oil, gas, and mineral lease; a Working Interest; an interest (including certain non-consent interest) arising under a pooling order or operating agreement; an interest acquired under a farmout; operating rights under governmental tracts; a mineral interest, royalty, or other interest in and to oil, gas, and related hydrocarbons (or a contractual right to acquire or earn such an interest) or an undivided interest therein or portion thereof (including those covering only certain Horizons or depths), together with all easements, permits, licenses, servitudes, and rights-of-way situated upon or used or held for future use in connection with the exploration, development, or operation of such interest.

u.    "Lease Acquisition Costs" shall mean, when used to describe the costs of any Lease, the sum of (1) all monetary consideration paid or given for such Lease to a non-Affiliate of the Managing Partner, including but not limited to lease bonuses and advance rentals paid to a non-Affiliate of the Managing Partner, (2) all costs of lease acquisition and title examination, including but not limited to curing or defending title, title insurance or examination costs, brokerage commissions, the fees and wages of landmen and lease brokers and their expenses, filing fees, recording costs, transfer taxes, and like charges paid in connection with the acquisition of such Lease, (3) all delay rentals and other similar payments and ad valorem taxes paid with respect to such Lease, (4) such portion as may be allocated to such Lease in accordance with generally accepted accounting principles and industry standards of all reasonable, necessary, and costs and expenses of TVOG or its Affiliates for geological, geophysical, seismic, land, engineering, drafting, accounting, legal, and other like services together with related administrative and general overhead costs involved in lease acquisition and Prospect evaluation including such costs and expenses which could otherwise be classified hereunder as Administrative Costs, (5) such portion as may be allocated to such Lease in accordance with generally accepted accounting principles and industry standards of all costs and expenses incurred in the acquisition of farmouts, subleases, pooling orders, or other oil and gas interests, and (6) interest and points actually incurred on funds borrowed to pay any of the costs and

expenses described in clauses (1) through (5) above calculated from the date of their incurrence until the date of their reimbursement by the Drilling Program at the time a Lease is acquired by the Drilling Program.

v.    "Limited Partner" shall mean each person who executes or adopts this Agreement or a counterpart hereof as a Limited Partner and is accepted by the Managing Partner as such and any person who becomes a substituted Limited Partner in accordance with the terms hereof. Limited Partner shall not including the Managing Partner, except to the extent that the Managing Partner owns Limited Partner Interests.

w.    "Limited Partner Interest" shall mean a Limited Partner's unit of interest in the Partnership representing a $1,000,000 Capital Contribution.

x.    "Majority in Interest" shall mean, with respect to any agreement or vote of the Investor Partners, Investor Partners whose combined Interests, at the time of determination thereof, exceed 50% of the total Interests held of record by Investor Partners who are eligible to participate in such agreement or vote.

y.    "Managing Partner" shall mean TVC which will serve as the initial managing partner of the Partnership, and any person who becomes a substituted Managing Partner in accordance with the terms hereof.

z.    "Minimum Gain" shall mean the amount of gain that would be realized by the Partnership if it disposed of (in a taxable transaction) all Partnership properties which are subject to non-recourse liabilities of the Partnership in full satisfaction of such liabilities, computed in accordance with the provisions of Treasury Regulations Section 1.704-2(b)(2).

aa.    "Operating Agreement" shall mean a Model Form Operating Agreement based upon the American Association of Petroleum Landmen Form 610-1989 and among the other attached exhibits thereto, an accounting procedure for joint operations issued by the Council of Petroleum Accountants Societies of North America, each of which containing modifications that are customary and usual for the geographic area in which the Partnership intends to conduct operations.

bb.    "Operating Costs" shall mean all expenditures made and costs incurred in producing and marketing oil and gas from completed wells, including, in addition to labor, fuel, repairs, hauling, materials, supplies, utility charges, and other costs incident to or therefrom, ad valorem and severance taxes, insurance and casualty loss expense, and compensation to well operators or others for services rendered in conducting such operations.

cc.    "Organizational Partner" shall mean F. Lynn Blystone, a resident of Bakersfield, California, who has agreed to serve as an initial limited partner.

dd.    "Partners" shall mean the Managing Partner and the Investor Partners.

ee.    "Person" shall refer to any natural person, partnership, corporation, association, trust, or other legal entity.

ff.    "Program Agreement" shall mean the Program Agreement by and among the Partnership, TVOG, and TVC.

gg.    "Program Manager" shall mean TVOG and any person who becomes the successor Program Manager in accordance with the Program Agreement.

hh.    "Program Well" shall mean any oil and gas well in which the Participants have an interest pursuant to the Program Agreement.

ii.    "Prospect" shall mean an area covering lands which, in the opinion of the Program Manager, contains subsurface structural or stratigraphic conditions making it susceptible to the accumulation of oil or gas in commercially productive quantities at one or more Horizons. The area, which may be different for different Horizons, shall be designated by the Program Manager in writing prior to the conduct of Partnership operations and shall be enlarged or contracted from time to time on the basis of subsequently acquired information to define the anticipated limits of the associated oil and gas reserves and to include all acreage encompassed therein. A "Prospect" with respect to a particular Horizon may be limited to the minimum area permitted by state law or local practice, whichever is applicable, to protect against drainage from adjacent wells if the well to be drilled by the Partnership is to a Horizon containing proved reserves.

jj.    "Reconstituted Partnership" shall mean the Partnership, as reconstituted by a Majority in Interest of the Investor Partners pursuant to Section 9.03.

kk.    "Reporting and Legal Expenses" shall mean all third party accounting fees, costs, and expenses associated with obtaining audits of books and records, third party engineering fees, costs, and expenses associated with annual reserve reports and third party attorney's fees and other legal fees, costs, and expenses associated with matters that are attributable to the Drilling Program's or the Partnership's business.

ll.    "Securities Act" shall mean the Securities Act of 1933, as amended.

mm.    "Sharing Ratio" shall mean for any Partner the proportion obtained by dividing (1) the amount of such Partner's Capital Contribution to the Partnership by (2) the sum of all Capital Contributions paid by the Partners to the Partnership; provided that in the event of an assignment (voluntarily, by operation of law or this Agreement, or otherwise) by an Investor Partner of Interests in the Partnership (other than an assignment solely of an interest in distributions of Partnership revenues), the Sharing Ratio of such Investor Partner shall be proportionately reduced, based upon the number of Interests assigned compared to the total number of Interests owned by such Investor Partner prior to such assignment, and the assignee of such Interests shall succeed to a proportionate share of the Sharing Ratio of his assignor that is attributable to the Interests transferred to such assignee.

nn.    "Simulated Basis" shall have the meaning assigned to such term in subsection 7.01.c.

oo.    "Simulated Depletion" shall have the meaning assigned to such term in subsection 7.01.c.

pp.    "Simulated Gain" shall have the meaning assigned to such term in subsection 7.01.c.

qq.    "Simulated Loss" shall have the meaning assigned to such term in subsection 7.01.c.

rr.    "Sponsor" shall mean any person directly or indirectly instrumental in organizing, wholly or in part, the Partnership, or any person who will manage or is entitled to manage or participate in the management or control of the Partnership. "Sponsor" includes the Managing Partner and any other person who actually controls or selects any person who controls 25% or more of the exploratory, developmental, or producing activities of the Partnership, or any segment thereof, even if that person had not entered into a contract at the time of formation of the Partnership. "Sponsor" does not include wholly independent third parties such as attorneys, accountants, and underwriters whose only compensation is for professional services rendered in connection with the offering of the Interests. Whenever the context of this Agreement so requires, the term "Sponsor" shall be deemed to include Affiliates of the person deemed to be a Sponsor.

ss.    "Subscription Agreement" shall mean, with respect to an Investor Partner, the subscription agreement executed and delivered by such Investor Partner in connection with his subscription to purchase Interests and containing certain representations, warranties, covenants, and agreements of such Investor Partner.

tt.    "Super Majority in Interest" shall mean, with respect to any agreement or vote of Investor Partners, Investor Partners whose combined Interests, at the time of the determination thereof, exceed 66% of the total Interests held by Investor Partners who are eligible to participate in such agreement or vote.

uu.    "TVC" shall mean Tri-Valley Corporation, a Delaware corporation.

vv.    "TVOG" shall mean Tri-Valley Oil and Gas Co., Inc., a California corporation.

ww.    "Working Interest" shall mean an interest in an oil and gas leasehold which is subject to some portion of the costs of development, operation, or maintenance.

2.02.    References and Titles. All references in this Agreement to articles, sections, subsections, and other subdivisions refer to corresponding articles, sections, subsections, and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Agreement," "this instrument," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Pronouns in masculine, feminine, and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

## ARTICLE 3
## CAPITALIZATION

3.01.    Capital Contributions of Investor Partners. Each subscriber shall be accepted as an Investor Partner only after (a) such subscriber has deposited or has had deposited on its behalf in

a segregated account at Merrill Lynch, Pierce, Fenner & Smith, Inc., Beverly Hills, California, or a federally insured institution designated by TVC, the full amount of the Capital Contribution of such subscriber in cash and (b) the Managing Partner has approved and accepted the Subscription Agreement executed by such subscriber. By executing and delivering the Subscription Agreement, upon its acceptance, each Investor Partner shall be irrevocably committed to contribute to the capital of the Partnership the amount stated in such Investor Partner's Subscription Agreement as the Capital Contribution of such Investor Partner. There is no minimum offering amount or minimum investment; once the Managing Partner has approved and accepted the Subscription Agreement of a Subscriber, the Subscriber's investment in the Partnership shall be irrevocable.

3.02.   Contributions of Managing Partner. The Managing Partner shall not be required to make any contribution to the capital of the Partnership. Although the Managing Partner is liable under applicable laws for the debts and obligations of the Partnership, all such debts and obligations shall be paid or discharged first with Partnership assets (including insurance proceeds) before the Managing Partner shall be obligated to pay or discharge any such debt or obligation with its personal assets.

3.03.   Return of Contributions. Except as otherwise provided in this Agreement, no interest shall accrue on any Capital Contributions to the Partnership. No Partner shall have the right to withdraw or to be repaid any capital contributed by such Partner except as otherwise specifically provided in this Agreement or required by law.

3.04.   Additional Contributions. No Investor Partner shall be required or obligated (a) to contribute any capital to the Partnership other than as provided in Section 3.01 hereof or (b) to lend any funds to the Partnership. The Interests are nonassessable; however, General Partners are liable, in addition to their Capital Contributions, for Partnership obligations and liabilities represented by their ownership of interests as general partners, in accordance with the Delaware Act.

3.05.   Additional Wells. The Partnership was initially organized for the principal purpose of drilling, re-entering, recompleting and testing up to 18 prospects containing up to 26 well locations. The Partnership may also participate in drilling, re-entering, recompleting and testing of additional development projects selected by the Operator and the General Partner. TVOG, as operator, will designate areas of mutual interest ("AMI") in and around the various projects commencing with the date of formation of the Partnership. The Partnership will invest in drilling and development projects in the AMIs designated by TVOG. *(amended 9-27-06)*

## ARTICLE 4
## ALLOCATIONS AND DISTRIBUTIONS

4.01.   Allocation Among Partners. Except as provided in Section 4.02 below, each Partner shall share Partnership items of costs, expenditures, deductions (other than depletion), credits, income, revenues, gain, loss, and distributions allocated, charged, or credited to the Partners hereunder in accordance with the proportion that the Sharing Ratio of such Investor Partner bears to the aggregate Sharing Ratios of all Partners.

4.02.   Allocations.

a.     Except as provided in subsections b through h below, all costs and revenues (including without limitation, revenues derived by the Partnership from, and distributed to the Partnership by, the Drilling Program) of the Partnership and all items of income, gain, amount realized, loss, deduction, recapture, and credit for purposes of any applicable federal, state, or local income tax law, rule, or regulation shall be allocated to the Partners in accordance with their respective Sharing Ratio.

b.     All costs incurred by the Partnership in connection with the performance of any special services requested by a Partner and any tax deductions relating thereto shall be allocated 100% to the Partner requesting such services.

c.     All interest income directly or indirectly resulting from the investment of the Investor Partners' Capital Contributions following the payment thereof to the Partnership shall be allocated 100% to the Investor Partners, and shall be allocated among such Investor Partners proportionately based on each Investor Partner's respective cash contributions actually paid to the Partnership.

d.     This subsection d shall apply to allocation of costs incurred with respect to Program Wells that are begun prior to the Closing Date.

i.     If the Partnership executes an Operating Agreement and incurs Lease Acquisition costs and drilling, testing and development costs for a Program Well prior to the Closing Date, all Lease Acquisition, drilling, testing and development costs incurred with respect to that well shall be allocated to those Investor Partners who have become Investor Partners on or before the date that the Operating Agreement for that Program Well is executed. All such costs shall be allocated among the Investor Partners *pro rata* according to the amounts of their Capital Contributions, as a percentage of the total amount of Capital Contributions to the Partnership on the date the Operating Agreement is executed.

ii.     The Partnership shall establish a sub-capital account for each Investor Partner who is allocated costs of Program Wells prior to the Closing Date. All amounts paid from each Investor Partner's capital account on account of Program Wells prior to the Closing Date shall be deducted from such Investor Partner's capital account and credited to the Investor Partner's sub-capital account, and each Investor Partner's *pro rata* share of all expenses and costs associated with the development of the Program Well will be allocated to his sub-capital account.

iii.     If the Partnership executes second and subsequent Operating Agreements with respect to additional Program Wells prior to the Closing Date, Investor Partners' funds will be invested, and their capital accounts will be charged, as follows:

A.     First, all Investor Partners for whom sub-capital accounts have previously been established on account of prior Program Wells shall have the amounts remaining in their capital accounts (after deduction of all amounts previously allocated to their sub-capital account) charged with the costs and expenses of the second or subsequent well, on a first-in, first-out basis, until the amounts remaining in each of those Investor Partners' capital accounts,

unallocated among Program Wells, is reduced to zero, and such amounts will be credited to their sub-capital accounts.

        B.     If, after funds have been allocated from the capital accounts of all Investor Partners whose capital accounts are allocated to Program Wells pursuant to subsection A, any unallocated expenses remain with respect to a second or subsequent Program Well, sub-capital accounts shall be established for the remaining Investor Partners who have made Capital Contributions on or prior to the date of execution of the Operating Agreement for such second or subsequent Program Well, and their capital accounts shall be charged, and their sub-capital accounts will be credited, with the amounts required for Lease Acquisition, drilling, testing and development of the second or subsequent well, *pro rata* according to the amounts of their Capital Contributions, as a percentage of the total amount of Capital Contributions to the Partnership by all such Investor Partners on the date the Operating Agreement is executed.

        iv.     The following example illustrates the operation of the allocation of Program Well costs contemplated by this subsection d. Suppose that the following investments and Program Wells are made prior to the Closing Date:

        A.     On June 1, investors A, B, C and D make Capital Contributions of $1,000,000 each.

        B.     On June 15, the Partnership executes an Operating Agreement for Well I, with a total cost for turnkey drilling and for completion of $3,000,000.

        C.     On July 1, investors E, F and G make Capital Contributions of $3,000,000 each.

        D.     On July 15, the Partnership executes an Operating Agreement for Well II, with a a total cost for turnkey drilling and for completion of $2,500,000.

In this example, investors A, B, C and D will bear all costs of Well I according to their *pro rata* share of Capital Contributions on June 15 (25% each). Thus, each of them will have $750,000 allocated to their individual sub-capital accounts for Well I, and $250,000 will remain unallocated in their capital account. On July 15, each of investors A, B, C and D (who invested on the same date) will have the remaining funds left in their capital accounts allocated to their sub-capital accounts for expenditure on Well II ($250,000 each). The remaining $1,500,000 to be expended on Well II will be allocated among investors E, F and G according to their *pro rata* share of Capital Contributions that have not previously been allocated to any investor's sub-capital account ($500,000 each).

        e.     Additional Operations. If TVOG determines to conduct additional drilling, re-entry, re-completion or other development operations on a Prospect or in an AMI which require additional capital contributions to the Partnership after the Closing Date, it shall first offer to the Investor Partners the right to purchase, *pro rata* according to the amounts of their Capital Contributions, additional Interests in the Partnership. *(amended 9-27-06)*

i.  The General Partner shall give each Qualified Investor Partner (defined in subsection iii below) written notice of the proposed additional operations and the price and terms on which any additional Interests are to be offered pursuant to this subsection e. Each Qualified Investor Partner will have twenty (20) days from the date of receipt of the Notice to agree to purchase up to its respective *pro rata* share of the additional Interests so offered. Failure of any Qualified Investor Partner to respond to the notice required by this subsection within the twenty day offering period shall be deemed to constitute a notification to the company of such Qualified Purchaser's decision not to exercise the right and option to purchase its respective *pro rata* share of such additional Interests. *(amended 9-27-06)*

ii.  If any Qualified Investor Partner fails to exercise their right to purchase any of its *pro rata* share of the additional Interests offered under this subsection (e), the General Partner may offer and sell the additional Interests which have not been purchased to other Investor Partners and to other prospective investors (who must be accredited investors as defined in Rule 501 of the Securities Act of 1933) on prices and terms no less favorable than those terms offered to the Investor Partners. *(amended 9-27-06)*

iii.  In this subsection, "Qualified Investor Partner" means an Investor Partner who, at the time of the purchase of additional Interests pursuant to this subsection e, is an accredited investor as defined in Rule 501 of the Securities Act of 1933. *(amended 9-27-06)*

iv.  All Lease Acquisition costs and drilling, testing and development costs incurred for additional operations conducted pursuant to this subsection e shall be allocated to the Investor Partners *pro rata* according to the amounts of their Capital Contributions, as a percentage of the total amount of Capital Contributions including any Capital Contributions received in respect of such additional operations, subject to the adjustments provided in subsections f through h of this Section 4.02. *(amended 9-27-06)*

f.      Cost and percentage depletion deductions and the gain or loss on the sale or other disposition of property the production from which is or would be (in the case of nonproducing properties) subject to depletion (herein sometimes called "depletable property") shall be computed separately by the Partners rather than the Partnership. For purposes of making such computations the Partnership's adjusted basis in each depletable property shall be allocated under Section 613A(c)(7)(D) of the Code to the Partners in accordance with their respective Sharing Ratio. The amount realized on the sale or other disposition of each such property shall be allocated to the Partners in proportion to each Partner's respective share of the revenues from the sale or other disposition of such property provided for in subsection a. For purposes of allocating amounts realized upon any such sale or disposition which are deemed to be received for federal income tax purposes and which are attributable to Partnership indebtedness or indebtedness to which the depletable property is subject at the time of such sale or disposition, such amounts shall be allocated in the same manner as Partnership revenues used for the repayment of such indebtedness would have been allocated under subsection h.

g.      Notwithstanding any other provision of this Section 4.02 to the contrary, if during any taxable year of the Partnership the allocation of any loss or deduction (net of any

income or gain) to any Partner (the "Deficit Partner") would cause or increase a deficit balance in the Deficit Partner's Adjusted Capital Account as of the end of such taxable year, only the amount of such loss or deduction that reduces the balance to zero shall be allocated to the Deficit Partner and the remaining loss or deduction shall be allocated to the Partners whose Adjusted Capital Accounts have positive balances remaining at such time in proportion to such positive balances. After any such allocation, any Partnership income or gain (or amount realized in excess of Simulated Basis) that would otherwise be allocated to the Deficit Partner for any fiscal year under this Section 4.02 which is in excess of the cash distributions to the Deficit Partner for such fiscal year shall be allocated instead to the Partners to whom the Deficit Partner's share of losses and deductions were allocated under the preceding sentence until the amount of such income or gain (or amount realized) so allocated equals the amount of loss or deduction previously so allocated to such other Partner.

      h.     Notwithstanding the foregoing provisions of this Section 4.02, prior to making any other allocation under this Section 4.02, the Partnership shall allocate the following items of income to the Partners:

           i.     Pursuant to Section 1.704-2(f) of the Treasury Regulations (relating to minimum gain chargebacks), if there is a net decrease in Minimum Gain for such year (or if there was a net decrease in Minimum Gain for a prior fiscal year and the Partnership did not have sufficient amounts of profit during prior years to allocate among the Partners under this subsection i, then items of Partnership income or revenue shall be allocated, before any other allocation is made pursuant to the preceding provisions of this Section 4.02 for such year, to each Partner in an amount equal to such Partner's share of the net decrease in such minimum gain (as determined under Section 1.704-2(g)(2) of the Treasury Regulations).

           ii.     Pursuant to Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations (relating to "qualified income offsets"), items of Partnership income or revenue shall be allocated, before any other allocation is made pursuant to the preceding provisions of this Section 4.02 for such year, among the Partners with deficit balances in their Adjusted Capital Accounts (as determined, after giving effect to all adjustments attributable to the allocations provided for in subsection i hereof and as increased by any amounts which such Partner is deemed obligated to restore under Sections 1.704-1 and 1.704-2 of the Treasury Regulations but before giving effect to any adjustment attributable to other allocations provided for in succeeding provisions of this Section 4.02) in amounts and the manner sufficient to eliminate such deficit balances as quickly as possible.

4.03.   Distributions.

      a.     All interest earned by the Partnership on invested assets may be distributed periodically to the Partners at such time or times as the Managing Partner shall in its discretion determine.

      b.     At least quarterly, cash funds of the Partnership (other than interest as described in subsection a above, borrowed funds, if any, and Capital Contributions) which the Managing Partner reasonably determines are not needed for the payment of existing or anticipated Partnership obligations and expenditures shall be distributed to the Partners. Cash

funds of the Partnership to be distributed to the Partners shall be distributed to the Partners in the same respective percentages as the revenues from which such cash funds are derived are allocated to such Partners pursuant to Section 4.02 (after deducting therefrom the costs charged to such Partners pursuant to Section 4.02). In addition to restrictions set forth in Section 5.02.a, in no event, shall funds be advanced or borrowed for purposes of distributions, if the amount of such distributions would exceed the Partnership's accrued and received revenues for the previous four quarters, less paid and accrued operating costs with respect to such revenues. The determinations of such revenues and costs shall be made in accordance with generally accepted accounting principles consistently applied. Cash distributions from the Partnership to the Managing Partner shall only be made in conjunction with distributions to Investor Partners and only out of funds properly allocated to the Managing Partner's account.

   c.  Any distribution in liquidation of a Partner's interest in the Partnership other than pursuant to Section 8.03, Section 9.03, or Section 9.04 shall be in an amount of cash or fair market value of property equal to the positive capital account balance of such Partner at the time his interest is liquidated, after such capital account balance has been adjusted in accordance with Section 7.1(c) and the applicable Treasury Regulations under Section 704(b) of the Internal Revenue Code and shall be made by the later of (i) the end of the Partnership taxable year in which such liquidation occurs or (ii) 90 days after the date of such liquidation. No Partner with a deficit balance in his or its capital account after a distribution in liquidation of such Partner's interest in the Partnership shall be liable to the Partnership for such deficit balance.

   d.  In the event an amount of Partnership funds equal to the total Capital Contributions of the Partners has not been expended or committed for expenditure within 36 months after the admission of the Investor Partners to the Partnership, the Managing Partner shall distribute, as a return of capital, to the Partners, proportionately in accordance with their respective Sharing Ratios as of the date of the Investor Partners' admission to the Partnership, the amount of such unexpended and uncommitted Partnership funds (together with a proportionate amount of the Management Fees), after deducting therefrom an amount that the Managing Partner reasonably determines will be equal to the operating capital to be required by the Partnership that will not be provided by anticipated revenues from Partnership operations.

  4.04. <u>Allocations on Transfers</u>. In the event of an assignment of a Partner's interest in the Partnership pursuant to ARTICLE 8, deductions, credits, and income of the Partnership for federal, state, and local income tax purposes shall, unless otherwise required by applicable Treasury Regulations, be allocated between the assignor and assignee based on the number of days of the year during which each party owned such interest.

## ARTICLE 5
## MANAGEMENT

  5.01. <u>Power and Authority of Managing Partner</u>. The Partners hereby designate TVC as the Managing Partner of the Partnership and, except as provided by Section 5.02 and elsewhere in this Agreement and except as otherwise provided by applicable law, hereby delegate to the Managing Partner full and exclusive power and authority on behalf of the Partnership to manage, control, administer, and operate the properties, business, and affairs of the Partnership and to do or cause to be done any and all acts deemed by the Managing Partner to be necessary or appropriate thereto. The scope of such power and authority shall encompass all matters in any

way connected with such business or incident thereto, including without limitation, the power and authority:

      a.     To enter into the Program Agreement and to purchase or otherwise acquire on behalf of the Partnership Leases as provided in the Program Agreement;

      b.     To purchase or otherwise acquire other real or personal property of every nature considered necessary or appropriate to carry on and conduct the business of the Partnership;

      c.     To borrow monies for the business of the Partnership and from time to time to draw, make, execute, and issue promissory notes and other negotiable or nonnegotiable instruments and evidences of indebtedness; to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the property of the Partnership; to assign any monies owing or to be owing to the Partnership; and to engage in any other means of financing customary in the oil and gas industry; provided that any such financing shall provide that the lender has recourse only against Partnership assets and not against any Investor Partner individually;

      d.     To enter into any agreement for the sharing of profits, joint venture, or partnership with any person, firm, corporation, or government or agency thereof engaged in any business or transaction in which the Partnership is authorized to engage, or any business or transaction capable of being conducted, so as to directly or indirectly benefit the Partnership, and to cause the obligations of the Partnership thereunder to be performed;

      e.     To explore and prospect by geological, geophysical, or other methods for the location of anomalies or other indications favorable to the accumulation of oil and gas, including specifically the power to contract with third parties for such purposes;

      f.     To maintain, explore, develop, operate, manage, and defend Partnership property and to drill, test, plug and abandon or complete and equip, rework, and recomplete any number of wells on Partnership Leases for the production of oil and gas located thereunder, and to contract with third parties for such purposes, to carry out a program or programs of secondary recovery on Partnership property, and to do any and all other things necessary or appropriate to carry out the terms and provisions of this Agreement which would or might be done by a normal and prudent operator in the exploration, development, operation, and management of its own property, including without limitation, making consent or non-consent elections under any applicable joint operating agreement;

      g.     To enter into and execute leases, drilling contracts, farmout agreements, farmin contracts, dry and bottom hole and acreage contribution letters, participation agreements, and any other agreements customarily employed in the oil and gas industry in connection with the acquisition, sale, exploration, development, or operation of oil and gas properties, agreements as to rights-of-way and any and all other instruments or documents considered by the Managing Partner to be necessary or appropriate to carry on and conduct the business of the Partnership, for such consideration and on such terms as the Managing Partner in its sole discretion may determine, and to cause the obligations of the Partnership thereunder to be performed;

h.    To sell the production accruing to the Leases acquired by the Partnership and to execute gas sales contracts, casinghead gas contracts, transfer orders, division orders, or any other instruments in connection with the sale of production from the Partnership's interest in any property;

i.    To farmout, sell, assign, convey, or otherwise dispose of, for such consideration and upon such terms and conditions as the Managing Partner in its sole discretion may determine, all or any part of the Partnership property, any interest therein, or any interest payable therefrom, and in connection therewith to execute and deliver such deeds, assignments, and conveyances containing such warranties as the Managing Partner may determine;

j.    To employ on behalf of the Partnership agents, employees, managers, consultants, accountants, lawyers, geologists, geophysicists, engineers, landmen, clerical help, and such other assistance and services as the Managing Partner may deem proper and to pay therefor such remuneration and compensation as the Managing Partner may deem reasonable and appropriate;

k.    To purchase, lease, rent, or otherwise acquire or obtain the use of machinery, equipment, tools, materials, and all other kinds and types of real or personal property that may in any way be deemed necessary, convenient, or advisable in connection with carrying on the business of the Partnership, and to incur expenses for travel, telephone, telegraph, insurance, and for such other things, whether similar or dissimilar, as may be deemed necessary or appropriate for carrying on and performing the business of the Partnership;

l.    To pay delay rentals, shut-in royalty payments, property taxes, and any other amounts necessary or appropriate to the maintenance or operation of any Partnership property;

m.    To make and enter into such agreements and contracts with such parties and to give such receipts, releases, and discharges with respect to any and all of the foregoing and any matters incident thereto as the Managing Partner may deem advisable or appropriate;

n.    To procure and maintain in force such insurance as the Managing Partner shall deem prudent to serve as protection against liability for loss and damage which may be occasioned by the activities to be engaged in by the Partnership and the Managing Partner on behalf of the Partnership;

o.    To pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend, or compromise on behalf of the Partnership, upon such terms as the Managing Partner may determine and upon such evidence as they may deem sufficient, any obligation, suit, liability, cause of action, or claim, including a suit or claim for taxes, in favor of or against the Partnership;

p.    To quitclaim, assign, convey, surrender, release, or abandon any Partnership property with or without consideration therefor;

q.    To make such classifications, determinations, and allocations as the Managing Partner may deem advisable, having due regard for any relevant generally accepted accounting principles;

r.    To enter into soliciting dealer agreements and to perform all of the Partnership's obligations thereunder, to issue and sell Interests pursuant to the terms and conditions of this Agreement and the Subscription Agreements, to accept and execute on behalf of the Partnership Subscription Agreements, and to admit original and substituted Investor Partners;

s.    To take such action as may be necessary for the safekeeping of all funds and assets of the Partnership, whether or not within the Managing Partner's control and to employ, or permit another person to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership; and

t.    To take such other actions, execute and deliver such other documents, and perform such other acts as may be deemed by the Managing Partner to be appropriate to carry out the business and affairs of the Partnership.

In accomplishing all of the foregoing and except as otherwise provided in this Agreement, the Managing Partner may, in its sole discretion, use its own personnel, properties, and equipment or those of any of its Affiliates; or the Managing Partner may hire or rent those of third parties and may employ on a temporary or continuing basis outside accountants, attorneys, consultants, and others on such terms as the Managing Partner deems advisable. No person, firm, or corporation dealing with the Partnership shall be required to inquire into the authority of the Managing Partner to take any action or make any decision.

5.02.    Certain Restrictions on Managing Partner's Power and Authority. Notwithstanding any other provisions of this Agreement to the contrary, the Managing Partner shall not have the power or authority to, and shall not do, perform, or authorize any of the following:

a.    Borrow any money in the name or on behalf of the Partnership or otherwise do any of the acts or things provided in subsection 5.01.c if the total amount of the borrowings or financings then outstanding made by the Managing Partner on behalf of the Partnership (including the amount outstanding under the Partnership's reimbursement obligation under Section 5.06 would exceed an amount equal to 20% of the Capital Contributions of the Investor Partners; provided, however, that the terms of any such financing shall provide that the lender has recourse only against Partnership assets and not against any Investor Partner individually; provided further, that the Managing Partner may borrow monies in the name and on behalf of the Partnership even if the Capital Contributions of the Partners have not yet been fully expended or committed for expenditure;

b.    Except for a sale of all or substantially all of the assets of the Partnership by the Managing Partner acting in its capacity as liquidator made in connection with the liquidation and termination of the Partnership as such is contemplated in Section 9.04, without having first received the prior consent of a Majority in Interest of the Investor Partners, sell all or substantially all of the assets of the Partnership other than in the ordinary course of business;

c.    Without having first received the prior consent of a Majority in Interest of the Investor Partners, assign the rights or obligations of the Partnership, or, except as otherwise provided in the Program Agreement, consent to the assignment by the Managing Partner or any

Affiliate thereof of its rights or obligations under the Program Agreement, prior to the substantial completion of the drilling activities of the Partnership;

      d.     Without having first received the prior consent of a Majority in Interest of the Investor Partners, agree to the termination or amendment of the Program Agreement or waive any rights of the Partnership thereunder, except for amendments to the Program Agreement which the Managing Partner believes are necessary or advisable to ensure that the Program Agreement conforms with any changes in or modifications to the Code or do not adversely affect the Investor Partners in any material respect;

      e.     Guarantee in the name or on behalf of the Partnership the payment of money or the performance of any contract or other obligation of any other person;

      f.     Bind or obligate the Partnership with respect to any matter outside the scope of the Partnership business;

      g.     Use the Partnership name, credit, or property for other than Partnership purposes;

      h.     Take any action, or permit any other person to take any action, with respect to the assets or property of the Partnership which does not primarily benefit the Partnership, including without limitation, the commitment of future production or the utilization of funds of the Partnership as compensating balances for its own benefit;

      i.     Benefit from any arrangement for the marketing of oil and gas production or other relationships affecting the property of the Managing Partner and the Partnership, unless such benefits are fairly and equitably apportioned among the Managing Partner and Affiliates thereof and the Partnership;

      j.     Invest Partnership funds in the securities of another person except in the following instances:

         i.     investments in working interests or undivided lease interests made in the ordinary course of the Partnership's business;

         ii.     temporary investments made in compliance with Section 7.03;

         iii.     investments involving less than 5% of program capital which are a necessary and incidental part of a property acquisition transaction; and

         iv.     investments in entities established solely to limit the Partnership's liabilities associated with the ownership or operation of property or equipment, provided, in such instances duplicative fees and expenses shall be prohibited; or

      k.     Take any action that will:

         i.     cause the Partnership to participate in any other partnership or joint venture that will result in a duplication or unreasonable increase in the amount of costs and expenses of the Partnership;

ii.    Substantively alter the fiduciary and contractual relationship between the Managing Partner and the Investor Partners as such exists pursuant to this Agreement; or

iii.    diminish the voting rights hereunder of the Investor Partners.

5.03.    Services of Managing Partner. During the existence of the Partnership, the Managing Partner shall devote such time and effort to the Partnership business as may be necessary to promote adequately the interests of the Partnership and the mutual interests of the Partners; however, it is specifically understood and agreed that the Managing Partner shall not be required to devote full time to Partnership business, and the Managing Partner and its Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description, independently or with others, including without limitation, the acquisition, ownership, exploration, development, operation, and management of oil and gas properties for themselves and other persons and the organization and management of other partnerships and joint ventures similar to the Partnership, and neither the Partnership nor any Investor Partner shall by virtue of this Agreement or the law of partnership opportunity have any right, title, or interest in or to such independent ventures. It is specifically recognized that the Managing Partner and its Affiliates are currently engaged in the exploration for and production of oil and gas both for their account and for others, and nothing herein contained shall be deemed to prevent any of them from continuing such activities, individually, jointly with others, or as a part of any other partnership or joint venture to which any of them is or may become a party, in any locale, and in fields or areas of operation in which the Partnership may likewise be active, or from dealing with the Partnership as an independent party, nor as requiring any of them to permit the Partnership to participate in any such operations in which any of them may be interested and each Investor Partner hereby waives, relinquishes, and renounces any such right or claim of participation. However, except as otherwise provided herein, the Managing Partner and any of its Affiliates may pursue business opportunities that are consistent with the Partnership's investment objectives for their own account only after they have determined that such opportunity either cannot be pursued by the Partnership because of insufficient funds or because it is not appropriate for the Partnership under the existing circumstances.

5.04.    Liability of Managing Partner and Its Affiliates. Neither the Managing Partner nor any of its Affiliates shall have any liability to the Partnership or to any Partner for any loss suffered by the Partnership which arises out of any action or inaction performed or omitted by the Managing Partner or such Affiliate, if the Managing Partner in good faith has determined, as of the time of the conduct or omission, that the course of conduct or omission was in the best interests of the Partnership, the Managing Partner or such Affiliate was acting on behalf of or performing services for the Partnership, and that such conduct or omission did not constitute negligence or misconduct.

5.05.    Indemnification of Managing Partner and Its Affiliates.

a.    The Partnership shall indemnify the Managing Partner and its Affiliates against any losses, judgments, liabilities, expenses, and settlements sustained or incurred by the Managing Partner or such Affiliate as a result of any threatened, pending, or completed claim, action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, any appeal in such a claim, action, suit, or proceeding, and any inquiry or investigation that could lead to such a claim, action, suit, or proceeding and which in any such case relates or which

otherwise arises from or is attributable to any acts, omissions, or operations performed or omitted by the Managing Partner or its Affiliates acting on behalf of or performing services for the Partnership that are within the scope of its authority as set forth in this Agreement or the Program Agreement or which otherwise relates to the activities and business affairs of the Partnership; provided that the Managing Partner has determined in good faith, as of the time of the conduct or omission, that the conduct or omission was in the best interests of the Partnership and that the conduct or omission did not constitute negligence or misconduct.

      b.     Notwithstanding anything to the contrary contained in Sections 5.04 and 5.05a, neither the Managing Partner, its Affiliates, nor any person acting as a broker-dealer shall be indemnified by the Partnership for any losses, liabilities, or expenses arising from or out of an alleged violation of federal or state securities laws unless (i) there has been a successful adjudication on the merits of each count involving alleged securities laws violations as to the particular indemnitee and the court approves indemnification of the litigation costs, (ii) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of the litigation costs, or (iii) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made.

      c.     The Partnership may purchase and maintain insurance on behalf of the Managing Partner and its Affiliates against any liabilities asserted against or expenses incurred by the Managing Partner and its Affiliates in connection with Partnership or Drilling Program activities, provided that the Partnership shall not incur the cost of that portion of any insurance, which insures the Managing Partner or its Affiliates against any liability with respect to which the Managing Partner and its Affiliates are denied indemnification under the provisions of Sections 5.04 and 5.05; provided, however, that nothing contained herein shall preclude the Partnership from purchasing and paying for such types of insurance including extended coverage liability and casualty and workers' compensation, as would be customary for any person owning comparable assets and engaged in a similar business, or from naming the Managing Partner and its Affiliates as additional insured parties thereunder, provided, that the naming of such additional insured parties does not add to premiums payable by the Partnership.

      d.     The termination of any claim, action, suit, or proceeding by judgment, order, settlement, conviction, or a plea of nolo contendere or its equivalent does not alone establish that a person seeking indemnification under this Section 5.05 is disqualified. Any person who is determined to be not entitled to indemnification under this Section 5.05 may petition a court of competent jurisdiction for a determination that in view of all facts and circumstances that such person is fairly and equitably entitled to indemnity and the Partnership shall provide such indemnity as may be determined proper by such court; provided, however, that the court has determined that such person has met the standard set forth in subsection a above.

      e.     Legal fees and expenses and other costs incurred as a result of a claim described in subsection a shall be paid by the Partnership from time to time in advance of the final disposition of such claim if: (i) the claim relates to the performance or non-performance of duties or services by the Managing Partner or its Affiliates on behalf of the Partnership; (ii) the claim is initiated by a third party who is not an Investor Partner, or the claim is initiated by an Investor Partner and a court of competent jurisdiction specifically approves such advancement; and (iii) the Managing Partner or such Affiliate undertakes to repay the advanced funds to the

Partnership, together with the applicable legal rate of interest thereon, in the event it is later determined that the Managing Partner or such Affiliate is not entitled to indemnification under the provisions of subsection a.

      f.      To the extent that the Managing Partner or its Affiliates are successful on the merits or in defense of any claim, issue, or matter therein, the Partnership shall indemnify the Managing Partner or its Affiliates, against the expenses, including attorneys' fees, actually incurred by the Managing Partner or such Affiliate in connection therewith.

      g.      The indemnification provided by this Section 5.05 shall continue as to the Managing Partner and its Affiliates in the event it ceases to be a managing partner of the Partnership with respect to claims relating to the period in which the Managing Partner was a managing partner of the Partnership and such indemnification shall inure to the benefit of the successors and assigns of the Managing Partner and such Affiliates.

      h.      The indemnification provided by this Section 5.05 shall be made, and shall be recoverable by the Managing Partner or its Affiliates, only out of the tangible net assets of the Partnership and not from the Investor Partners.

    5.06.   <u>Reporting and Legal Expenses</u>. The Partnership shall reimburse the Program Manager and the Managing Partner and its Affiliates for its share of the Reporting and Legal Expenses incurred by the Program Manager, the Managing Partner, or any Affiliate thereof in managing and conducting the business and affairs of the Drilling Program or of the Partnership, as applicable. The Reporting and Legal Expenses reimbursed by the Partnership shall be determined by the party seeking reimbursement in good faith and as being reasonable for such party. Such reimbursements shall be made periodically throughout the term of the Partnership.

    5.07.   <u>Administrative Costs</u>. The Partnership shall reimburse the Program Manager and the Managing Partner and its Affiliates for all Administrative Costs and other costs and expenses incurred by the Program Manager, the Managing Partner, or any Affiliate thereof in managing and conducting the business and affairs relating to the Partnership's interest in the Drilling Program or of the Partnership, as applicable, including expenses incurred in providing or obtaining such professional, technical, administrative, and other services and advice as the Program Manager, the Managing Partner, or such Affiliates may deem necessary or desirable. The general, administrative, and other costs reimbursed by the Partnership shall be determined by the party seeking reimbursement in good faith and as being reasonable for such party. The amount of Administrative Costs that are to be reimbursed by the Partnership shall be determined and allocated to the Partnership and its Drilling Program on a basis conforming with generally accepted accounting principles and must be supported in writing as to the application thereof and as to the amount charged. Such reimbursements shall be made periodically throughout the term of the Partnership. Such reimbursement obligation shall also apply to all Administrative Costs incurred by the Program Manager, the Managing Partner or any of its Affiliates on behalf of the Partnership or the Drilling Program from the beginning of the calendar year in which the Partnership is formed to the date of the admission of the Investor Partners. Regardless of the actual amount of Administrative Costs incurred by the Managing Partner or Program Manager in connection with the affairs of a Partnership, during any particular calendar year the total amount of Administrative Costs allocable to the Partnership shall not exceed the greater of (a) 3.5% of the Partnership's gross revenues from the sale of oil and natural gas production during such year (calculated without any deduction for Operating Costs or other costs and expenses) or (b) the

sum of $50,000 plus .25% of the Capital Contributions of the Investor Partners to the Partnership. The above limitation on Administrative Costs shall not be applicable to Administrative Costs otherwise allocable to the Partnership which are extraordinary and non-recurring or to the fixed overhead fee chargeable by an operator of Program Wells including the fixed overhead fee chargeable under the Operating Agreement by TVC with respect to the Program Wells operated by the Program Manager. No portion of the salaries of the directors or of the executive officers of TVC or TVOG may be reimbursed as Administrative Costs during the drilling phase of initial test wells.

     5.08.   Management Fee. This section is not applicable as no management fee is being charged by the Managing Partner.

     5.09.   Finders' Fees. The Partnership may engage selected broker-dealers to sell units, in which we may pay sales commissions of up to 12% of the offering price of the units for such sales.

(Intentionally left blank)

     5.10.   Restrictions on Certain Transactions.

     a.    The Partnership may enter into contracts and agreements with the Managing Partner and its Affiliates for the rendering of services and the sale, rental, or lease of supplies and equipment, provided that (i) such entity is engaged, independently of the Drilling Program and as an ordinary and ongoing business, in the business of rendering such services or selling or leasing such equipment and supplies to a substantial extent to other persons in the industry in addition to programs in which the Managing Partner or its Affiliates have an interest and (ii) the amount of the compensation, price, or rental that can be charged to the Partnership therefor must be no less favorable to the Partnership than that generally available (at the time the relevant contract or agreement was entered into) from unrelated third parties in the area engaged in the business of rendering comparable services or selling, renting, or leasing comparable equipment and supplies which could reasonably be made available to the Partnership. If the Managing Partner or its Affiliate is not engaged in the business as required by clause (i) of this subsection, then such compensation, price, or rental shall be the cost of such services, equipment, or supplies to such entity, or the competitive rate which could be obtained in the area, whichever is less. In addition, any drilling services rendered by the Managing Partner or its Affiliates to the Partnership shall be billed on a per foot, per day, or per hour rate, or some combination thereof. All services for which the Managing Partner or its Affiliates are to receive compensation shall be embodied in written contracts which precisely describe the services to be rendered and all compensation to be paid. Advance payments to the Managing Partner are prohibited, except where necessary to secure tax benefits of prepaid drilling costs. All contracts between the Partnership and the Managing Partner or its Affiliates shall be terminable by the Partnership (by a vote or written consent of a Majority in Interest of the Investor Partners) without penalty upon 60 days' written notice.

     b.    The Partnership may borrow money on a non-recourse basis from the Managing Partner or any of its Affiliates, provided that on any loans made available by the

Managing Partner or any of its Affiliates to the Partnership, the Managing Partner or such Affiliate shall not receive interest in excess of the lesser of (i) the maximum rate permitted by applicable law or (ii) the effective interest rate then being paid by the Managing Partner or such Affiliate for similar type borrowings. In no event shall any such loan bear interest in excess of the amount which would be charged to the Partnership (without reference to the Managing Partner's financial abilities or guaranties) by independent third parties for the same purpose. In connection with any loans to the Partnership by the Managing Partner or its Affiliates, the Managing Partner or its Affiliates shall not receive points or other financing charges or fees, regardless of the amount.

   c.  The Partnership shall acquire in certain instances interests in Prospects from the Managing Partner or its Affiliates on the terms and conditions set forth in the Program Agreement.

   d.  No Partnership Leases shall be farmed out by the Partnership unless the Managing Partner, exercising the standard of care of a normal and prudent operator in the management of its own property, shall determine that either (i) the Partnership lacks sufficient funds for the drilling of a well on such Lease and cannot obtain suitable alternative financing for such drilling, (ii) the Lease has been downgraded by events occurring after the acquisition thereof by the Partnership pursuant to the Program Agreement so that the drilling of a well on such Lease would no longer be desirable for the Partnership, (iii) drilling on such Lease would result in an excessive concentration of Partnership funds, creating in the opinion of the Managing Partner undue risk to the Partnership and the Investor Partners, or (iv) the best interests of the Partnership would be served by such farmout or other disposition. The Partnership may enter into a farmout agreement (in the capacity as either farmor or farmee) with the Managing Partner, any of its Affiliates, provided that the Managing Partner, exercising the standards of a normal and prudent operator in the management of its own property, shall determine that the farmout is in the best interests of the Partnership and that the terms of any such farmout are consistent with and in any case no less favorable to the Partnership than those utilized in the same geographic area for similar arrangements. The Partnership's ability to enter into a farmout agreement with the Managing Partner or an Affiliate thereof is subject to the same restrictions as its ability to purchase property from or sell property to the Managing Partner or an Affiliate thereof as provided in subsections c and f, respectively.

   e.  The Partnership shall make no loans to the Managing Partner or its Affiliates.

   f.  The Partnership may sell or transfer its Leases to the Managing Partner or its Affiliates, including Affiliated Programs, only pursuant to a transaction which is fair and reasonable to the Partnership.

   g.  No rebates or give-ups may be received by the Managing Partner or any Affiliate, nor may the Managing Partner or any Affiliate participate in any reciprocal business arrangements which do not primarily benefit the Partnership.

   h.  Neither the Managing Partner, nor any Affiliate thereof, including an Affiliated Program, shall be permitted to sell, transfer, or convey any Lease to the Partnership, directly or indirectly, except pursuant to a transaction which is fair and reasonable to the Partnership.

i.    If the Partnership participates in other partnerships or joint ventures (multi-tier arrangements), the terms of any such arrangements shall not result in the circumvention of any of the requirements or prohibitions contained in this Partnership Agreement, including the following:

i.    there will be no duplication or increase in the Managing Partner's compensation, Partnership expenses, or other fees and costs;

ii.    there will be no substantive alteration in the fiduciary and contractual relationship between the Managing Partner and the Investor Partners; and

iii.    there will be no diminishment in the voting rights of the Investor Partners.

5.11.    Restriction on Voting Interests Held by Managing Partner. Interests owned by the Managing Partner or its Affiliates shall have full voting rights under this Agreement, provided that during the time period that TVC or an Affiliate thereof is serving as the Managing Partner of the Partnership any Interests owned by TVC or its Affiliates which in the aggregate represent more than 20% of the total Interests held by Investor Partners shall not have any voting rights under this Agreement and shall not be counted for voting purposes or for purposes of determining a quorum. In addition, none of the Interests owned by the Managing Partner or its Affiliates shall be counted for voting purposes or for purposes of determining a quorum or have any voting rights under this Agreement concerning the removal of the Managing Partner or any transaction between the Partnership and the Managing Partner or its Affiliates.

5.12.    Tax Elections. The Managing Partner shall make the following elections on behalf of the Partnership:

a.    to elect, in accordance with Section 263(c) of the Code and applicable regulations and comparable state law provisions, to deduct as an expense all intangible drilling and development costs with respect to productive and nonproductive wells and the preparation of wells for the production of oil or gas;

b.    to elect the calendar year as the Partnership's fiscal year;

c.    to elect the accrual method of accounting;

d.    to elect, in accordance with Section 709(b) of the Code and applicable regulations and comparable state law provisions, to amortize and deduct organization expenses (as such term is defined in Section 709 of the Code) over a period of 60 months beginning with the month in which the Partnership begins business; and

e.    to elect with respect to such other federal, state, and local tax matters as the Managing Partner deems advantageous to the Partnership; provided that no election shall be made by the Partnership in accordance with Section 754 of the Code and applicable regulations and comparable state law provisions without the consent of the Managing Partner, the granting or denying of which consent shall be in its sole and absolute discretion.

5.13.    Tax Matters Partner. The Managing Partner shall be designated the tax matters partner (in this Section 5.13 called the "TMP") as defined in Section 6231(a)(7) of the Code with

respect to operations conducted by the Partners pursuant to this Agreement. The TMP is authorized to take such actions and to execute and file all statements and forms on behalf of the Partnership which may be permitted or required by the applicable provisions of the Code, or Treasury Regulations issued thereunder, and the Investor Partners will take all other action that may be necessary or appropriate to effect the designation of the Managing Partner as the TMP. In the event of an audit of the Partnership's income tax returns by the Internal Revenue Service, the TMP may, at the expense of the Partnership, retain accountants and other professionals to participate in the audit. All expenses incurred by the TMP in its capacity as such shall be expenses of the Partnership and shall be paid by or reimbursed to the TMP from Partnership funds.

## ARTICLE 6
## RIGHTS AND OBLIGATIONS OF INVESTOR PARTNERS

6.01.   Rights of Investor Partners. In addition to any other rights specifically set forth herein, all Investor Partners shall have the right to: (a) have the Partnership books kept at the principal place of business of the Partnership and upon adequate written notice at all reasonable times inspect and, at such Investor Partner's expense, copy any of them personally or through a representative; (b) have on demand true and full information of all things affecting the Partnership and a formal account of Partnership affairs, whenever permitted by law; and (c) have dissolution and winding up by decree of court as provided for in the Act.

6.02.   Access to and Confidentiality of Partnership Records. Each Investor Partner shall during the term of the Partnership have the right, after adequate notice, during normal business hours at the offices of the Partnership to obtain from the Managing Partner for any purpose reasonably related to the Investor Partner's interest as an Investor Partner:

a.   True and full information regarding the status of the business and financial condition of the Partnership;

b.   Promptly after becoming available, a copy of the Partnership's federal, state and local income tax returns for each year;

c.   A copy of any written partnership agreement and certificate of limited partnership and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the Partnership agreement and any certificate and all amendments thereto have been executed;

d.   True and full information regarding the amount of cash and a description or statement of the agreed value of any other property or services contributed by each Partner and which each Partner has agreed to contribute in the future, and the date on which each became a partner; and

e.   Other information regarding the affairs of the Partnership as is just and reasonable.

The Managing Partner may refuse for a reasonable period of time to grant a Investor Partner access to such data and information and studies, maps, evaluations, and reports which the Managing Partner (a) has agreed to keep confidential or (b) determines in good faith should be

kept confidential considering the interests of the Partnership and each of its Partners. The Managing Partner may require a requesting Investor Partner to execute a confidentiality agreement as a condition of providing any information requested pursuant of this Section in order to protect the Partnership's confidential information and trade secrets.

6.03.    Return of Capital Contribution. No Investor Partner shall be entitled to (a) withdraw from the Partnership except upon assignment by an Investor Partner of his Interests and the substitution of such Investor Partner's assignee as a substituted Investor Partner of the Partnership in accordance with Section 8.01 or as required by law, or (b) the return of his Capital Contribution except (i) as otherwise provided in this Agreement or as required by law, (ii) to the extent, if any, that distributions made pursuant to the express terms of this Agreement may be considered as such by law or by unanimous agreement of the Partners, or (iii) upon dissolution of the Partnership, and then only to the extent expressly provided for in this Agreement and as permitted by law.

6.04.    Meetings. Meetings of the Partners may be called by the Managing Partner at any time and from time to time or may be called by Investor Partners whose combined Sharing Ratios equal at least 50%. The Managing Partner shall, within 15 days after its receipt of a written request for any such call by Investor Partners for a Partners' meeting, give all Investor Partners written notice of the time, place, and purpose of such meeting. The meeting shall be held at a reasonable time and place on a date not less than 30 nor more than 60 days after the date of the mailing of such notice; provided that the date for notice of such a meeting may be extended for a period of up to 60 days, if in the opinion of the Managing Partner such additional time is necessary to permit preparation of proxy or information statements or other documents required to be delivered in connection with such meeting by the Securities and Exchange Commission, state securities administrators or other regulatory authorities. The Partners may conduct any Partnership business at such meeting which is permitted under this Agreement and is specified in such notice. Investor Partners may vote in person or by proxy at any such meeting, and the presence in person or by proxy of a Majority in Interest of the Investor Partners shall be necessary to constitute a quorum for the transaction of business at such meeting.

6.05.    Voting Rights of Investor Partners. Except as otherwise provided in Section 8.03.a, any vote, consent, approval, election, or other action by the Investor Partners on or with respect to any Partnership matter (including, without limitation, those matters set forth in Sections 5.02.b, 5.01.d, 9.01.b, 9.03.a and 11.02) shall be duly and validly made only if made by a Majority in Interest of the Investor Partners (without the necessity for the concurrence by the Managing Partner), and in the event of any such vote, consent, approval, or election, each Investor Partner that does not vote for, consent to, approve of, or elect with respect to such matter hereby agrees to be bound by the decision of a Majority in Interest of the Investor Partners and hereby approves such matter to the extent such approval is required for such matter to be effective under the Delaware Act or any other applicable law, rule, or regulation.

6.06.    Conduct of Meeting. The Managing Partner shall have full power and authority concerning the manner of conducting any meeting of the Investor Partners or solicitation of consents in writing, including without limitation, the determination of persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of Section 6.04, the conduct of voting, the validity and effect of any proxies, votes, or consents, and the determination of any controversies, votes, or challenges arising in connection with or during the meeting or voting. The Managing Partner shall designate a person to serve as chairman of any meeting and shall

further designate a person to take the minutes of any meeting, in either case, including without limitation, a partner or a director or an officer of the Managing Partner. All minutes shall be kept with the records of the Partnership maintained by the Managing Partner. The Managing Partner may make such other regulations consistent with applicable law and this Agreement as it may deem advisable concerning the conduct of any meeting of the Investor Partners or solicitation of consents in writing, including regulations in regard to the appointment of proxies, the appointment and duties of inspectors of votes and consents, the submission and examination of proxies and other evidence of the right to vote, and the revocation of consents in writing.

6.07.   <u>General Partners Not Agents</u>. Pursuant to Section 5.01 the General Partners have elected to delegate to the Managing Partner authority to manage, control, and administer and operate the property, business, and affairs of the Partnership. Each General Partner agrees that no General Partner or group of General Partners constituting less than a Majority in Interest may cause the Managing Partner on behalf of the Partnership to act as agent for the Partnership, execute documents on behalf of the Partnership, convey Partnership property, or take any other action binding on the Partnership. Each General Partner further agrees that in no circumstance will a Partner other than the Managing Partner have the right to act as agent for the Partnership, execute documents on behalf of the Partnership, convey Partnership property, or take any other action binding on the Partnership. Any General Partner who takes action contravening this Section 6.07 agrees to indemnify the Partnership and all other Partners from any loss, liability, or expense caused by such action.

6.08.   <u>Liabilities of Partners</u>.

a.      Pursuant to the Delaware Act, the General Partners are liable jointly and severally for all liabilities and obligations of the Partnership. Notwithstanding the foregoing, as among themselves, the General Partners hereby agree that each shall be solely and individually responsible only for his pro rata share (based on Capital Contributions made) of the liabilities and obligations of the Partnership, and any General Partner who incurs liability in excess of his pro rata share shall be entitled to contribution from the other General Partners. Pursuant hereto, the Managing Partner further agrees to indemnify each General Partner for any and all Partnership-related obligations and liabilities otherwise allocable to or paid by such General Partner which are in excess of such General Partner's share of the Partnership's undistributed assets. Under no circumstances shall any Partner be required to indemnify the Managing Partner, except to the extent of such Partner's (i) Capital Contribution and (ii) share of Partnership assets.

b.      The Partnership may purchase and maintain insurance on behalf of all Partners against any liabilities asserted against or expenses incurred by the Partners in connection with Partnership activities, provided that the Partnership shall not incur the costs of that portion of such insurance, if any, which insures the Managing Partner for any liability with respect to which the Managing Partner is denied indemnification under the provisions of this Agreement. Such insurance may be in such amounts as the Managing Partner shall determine is sufficient to protect the Partners from the maximum amount of such liabilities and expenses.

# ARTICLE 7
## BOOKS, RECORDS, CAPITAL ACCOUNTS, REPORTS, AND BANK ACCOUNTS

7.01.   <u>Books, Records, and Capital Accounts</u>.

a.      The Managing Partner shall keep just and true records and books of account with respect to the operations of the Partnership and shall maintain and preserve during the term of the Partnership and for four years thereafter all such records, books of account, and other relevant Partnership documents. The Managing Partner shall maintain for at least six years all records necessary to substantiate the fact that Interests were sold only to purchasers for whom such Interests were suitable. Such books shall be maintained at the principal place of business of the Partnership and shall be kept on the accrual method of accounting.

b.      Any records maintained by the Partnership in the regular course of its business, including the names and addresses of Investor Partners, books of account and records of Partnership proceedings, may be kept on or be in the form of magnetic tape, photographs, micrographics, or any other information storage device, provided that the records so kept are convertible into clearly legible written form within a reasonable period of time. An alphabetical list of the names, addresses, and business telephone numbers of the Investor Partners of the Partnership along with the number of Interests held by each of them (the "participant list") shall be maintained as a part of the books and records of the Partnership and shall be available for the inspection by any Investor Partner or his designated agent at the principal office of the Partnership upon the request of the Investor Partner. The participant list shall be updated at least quarterly to reflect changes in the information contained therein. A copy of the participant list shall be mailed to any Investor Partner requesting the participant list within ten days of the request. The copy of the participant list shall be printed in alphabetical order, on white paper, in a readily readable type size (in no event smaller than 10-point type). A reasonable charge for copy work may be charged by the Partnership. The purposes for which an Investor Partner may request a copy of the participant list include, without limitation, matters relating to voting rights under the Partnership Agreement and the exercise of Investor Partners' rights under federal proxy laws. If the Managing Partner of the Partnership neglects or refuses to exhibit, produce, or mail a copy of the participant list as requested, the Managing Partner shall be liable to any Investor Partner requesting the list for the costs, including attorneys' fees, incurred by that Investor Partner for compelling the production of the participant list, and for actual damages suffered by any Investor Partner by reason of such refusal or neglect. It shall be a defense that the actual purpose and reason for the requests for inspection or for a copy of the participant list is to secure the list of Investor Partners or other information for the purpose of selling such list or information or copies thereof, or of using the same for a commercial purpose other than in the interest of the applicant as an Investor Partner relative to the affairs of the Partnership. The Managing Partner may require the Investor Partner requesting the participant list to represent that the list is not requested for a commercial purpose unrelated to the Investor Partner's interest in the Partnership. The remedies provided hereunder to Investor Partners requesting copies of the participant list are in addition to, and shall not in any way limit, other remedies available to Investor Partners under federal law or the laws of any state.

c.      An individual capital account shall be maintained by the Partnership for each Partner as provided below:

i.      The capital account of each Partner shall, except as otherwise provided herein, be (A) credited by such Partner's Capital Contributions when made, (B) credited by the fair market value of any property contributed to the Partnership by such Partner (net of liabilities secured by such contributed property that the Partnership is considered to assume or take subject to under Section 752 of the Code), (C) credited with the amount of any item of taxable income or gain and the amount of any item of income

or gain exempt from tax allocated to such Partner, (D) credited with the Partner's share of Simulated Gain as provided in subsection 7.01cii, (E) debited by the amount of any item of tax deduction or loss allocated to such Partner, (F) debited by the Partner's share of Simulated Depletion and Simulated Loss as provided in Section 7.01cii, (G) debited by such Partner's allocable share of expenditures of the Partnership not deductible in computing the Partnership's taxable income and not properly chargeable as Capital Expenditures, including any non-deductible book amortizations of capitalized costs, and (H) debited by the amount of cash or the fair market value of any property distributed to such Partner (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to under Section 752 of the Code). Immediately prior to any distribution of property by the Partnership that is not pursuant to a liquidation of the Partnership, the Partners' capital accounts shall be adjusted by (A) assuming that the distributed assets were sold by the Partnership for cash at their respective fair market values as of the date of distribution by the Partnership and (B) crediting or debiting each Partner's capital account with its respective share of the hypothetical gains or losses resulting from such assumed sales determined in the same manner as gains or losses provided for under Sections 4.02 and 7.01cii for actual sales of such properties.

       ii.     The allocation of basis prescribed by Section 613A(c)(7)(D) of the Code and each Partner's separately computed depletion deductions shall not reduce such Partner's capital account, but such Partner's capital account shall be decreased by an amount equal to the product of the depletion deductions that would otherwise be allocable to the Partnership in the absence of Section 613A(c)(7)(D) of the Code (computed without regard to any limitations which theoretically could apply to any Partner) times such Partner's percentage share of the adjusted basis of the property with respect to which such depletion is claimed (herein called "Simulated Depletion"). The Partnership's basis in any oil or gas property as adjusted from time to time for the Simulated Depletion allocable to all Partners (and where the context requires, each Partner's allocable share thereof) is herein called "Simulated Basis." No Partner's capital account shall be decreased, however, by Simulated Depletion deductions attributable to any depletable property to the extent such deductions exceed such Partner's remaining Simulated Basis in such property. Upon the sale or other disposition of an interest in a depletable property, each Partner's capital account shall be credited with the gain ("Simulated Gain") or debited with the loss ("Simulated Loss") determined by subtracting from his allocable share of the amount realized on such sale or disposition his Simulated Basis, as adjusted by Simulated Depletion.

       iii.    Adjustments of basis of Partnership property provided for under Sections 734 and 743 of the Code and comparable provisions of state law (resulting from an election under Section 754 of the Code or comparable provisions of state law) and elections by individual Partners under Section 59(e)(4) of the Code to capitalize and amortize such Partner's share of intangible drilling and development costs shall not affect the capital accounts of the Partners, and the Partners' capital accounts shall be debited or credited pursuant to the terms of this Section 7.01 as if no such election had been made, unless otherwise required by applicable Treasury Regulations.

       iv.    Capital accounts shall be adjusted, in a manner consistent with this Section 7.01, to reflect any adjustments in items of Partnership income, gain, loss, or