deduction that result from amended returns filed by the Partnership or pursuant to an agreement by the Partnership with the Internal Revenue Service or a final court decision.

       v.     In the case of property contributed to the Partnership by a Partner, the Partners' capital accounts shall be debited or credited for items of depreciation, cost recovery, Simulated Depletion, amortization, and gain or loss with respect to such property computed in the same manner as such items would be computed if the adjusted tax basis of such property were equal to its fair market value on the date of its contribution to the Partnership, in lieu of the capital account adjustments provided above for such items, all in accordance with Treasury Regulations Section 1.704-1(b)(2) (iv)(g).

       vi.     It is the intention of the Partners that the capital account of each Partner be kept in the manner required under Treasury Regulations Section 1.704-1(b)(2)(iv). To the extent any additional adjustment to the capital accounts is required by such regulation, the Managing Partner is hereby authorized to make such adjustment after notice to the General Partners.

       vii.     In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its fair market value at the time of contribution, pursuant to the provisions of Treasury Regulations Section 1.704-3, as reasonably applied by the Managing Partner using the traditional method with curative allocations as provided in Treasury Regulations Section 1.704-3(c).

     7.02.   <u>Reports</u>. The Managing Partner shall deliver to each Investor Partner the following financial statements and reports at the times indicated below:

       a.     Semi-annually within 45 days after the end of the first half of each fiscal year and annually within 90 days after the end of each fiscal year, financial statements, including a balance sheet and statements of income, Partners' equity, and cash flow, all of which shall be prepared in accordance with generally accepted accounting principles.

       b.     Annually by March 15 of each year or as soon thereafter as is reasonably possible, a report containing such information as may be needed to enable each Investor Partner to prepare and file his federal income tax return and any required state income tax return.

       c.     Daily during any period when the Partnership is participating in the drilling, testing and completing wells in which it has an interest until the end of such activity, status reports to each Investor Partner on the drilling, testing and completing of any well for which such operations are ongoing.

       d.     Such other reports and financial statements as the Managing Partner shall determine from time to time.

     7.03.   <u>Bank Accounts</u>. The Managing Partner shall cause one or more accounts to be maintained in a state or federally chartered bank or savings and loan association, which accounts

shall be used for the payment of the expenditures incurred by the Managing Partner in connection with the business of the Partnership, and in which shall be deposited any and all receipts of the Partnership. All such amounts shall be and remain the property of the Partnership and shall be received, held, and disbursed by the Managing Partner for the purposes specified in this Agreement. There shall not be deposited in any of said accounts any funds other than funds belonging to the Partnership, and no other funds shall in any way be commingled with such funds. The Managing Partner may invest Partnership funds which they deem untimely or inappropriate to use or commit for Partnership purposes or to distribute to the Partners in such United States Treasury Bills, other short-term governmental obligations or bank certificates of deposit or other certificates, securities or evidences of indebtedness on such terms and for such security, if any, as they may deem necessary or desirable. The Managing Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in the Managing Partner's possession or control, and shall not employ or permit another to employ such funds or assets in any manner except for the benefit of the Partnership.

## ARTICLE 8
## ASSIGNMENT AND PURCHASE OF INTERESTS; SUBSTITUTION

8.01.   Assignments by Investor Partners.

a.      The interest of any Investor Partner in the Partnership shall be assignable, in whole or in part, subject to the following:

i.      No such assignment shall be made if, in the opinion of counsel to the Partnership, such assignment would cause the termination of the Partnership for federal income tax purposes under Section 708 of the Code or might result in a change in the status of the Partnership to a "publicly traded partnership" within the meaning of Section 7704 of the Code, unless the Managing Partner consents to such assignment, or if in the opinion of counsel to the Partnership such assignment may not be effected without registration under the Securities Act of 1933, as amended, or would result in the violation of any applicable state securities laws;

ii.     The Partnership shall not be required to recognize any such assignment until the instrument conveying such interest has been delivered to the Managing Partner for recordation on the books of the Partnership;

iii.    Unless an assignee becomes a substituted Investor Partner in accordance with the provisions set forth below, such assignee shall not be entitled to any of the rights granted to an Investor Partner hereunder, other than the right to receive all or part of the share of the profits, losses, cash distributions, or returns of capital to which his assignor would otherwise be entitled;

iv.     except by will, intestate succession, or gift or, in unusual circumstances when consented to by the Managing Partner, the assigning Investor Partner (A) may not assign fewer than a whole Interest to any person other than the Partnership, the Managing Partner, an Affiliate thereof, or a third person designated by the Managing Partner in its sole discretion, unless such Investor Partner owns less than a whole Interest and transfers all his Interest to one person, and (B) must retain at least a whole Interest, in

the event fewer than all such Investor Partner's Interests are assigned to any person other than the Partnership, Managing Partner, an Affiliate thereof, or a third person designated by the Managing Partner in its sole discretion; and

        v.      The assignor shall notify the Managing Partner of such assignment and provide the Managing Partner with such information regarding the transferee and the transfer (including without limitation, the name, address, and taxpayer identification number of the transferor and transferee and the date of the transfer) as is required under Section 6050K of the Code (if the transfer is a sale or exchange described in Section 751(a) of the Code) and Section 6112 of the Code (relating to tax shelter investor lists) and Treasury Regulations promulgated thereunder by the Internal Revenue Service in the manner and at the time prescribed by law.

An assignment by an Investor Partner in violation of clause (i) or clause (ii) of this subsection a shall be void and ineffectual and shall not bind the Partnership or any other Partner. The assignee of an Investor Partner's interest in the Partnership shall pay all costs and expenses incurred by the Partnership in connection with such assignment, which costs and expenses shall not be less than $50. In the discretion of the Managing Partner, such costs and expenses may be collected out of revenues otherwise allocable to such assignee under this Agreement.

        b.      An assignee of the interest of an Investor Partner, or any portion thereof if permitted hereunder, shall become a substituted Investor Partner entitled to all the rights of an Investor Partner if, and only if:

        i.      The assignor gives the assignee such right;

        ii.      The Managing Partner consents to such substitution, the granting or denying of which consent shall be in the Managing Partner's sole and absolute discretion;

        iii.      The assignee pays to the Partnership all costs and expenses incurred in connection with such substitution; including without limitation, costs incurred in amending filings referred to in Section 1.07, which costs and expenses, in the discretion of the Managing Partner, may be collected out of revenues otherwise allocable to such substituted Investor Partner under this Agreement;

        iv.      The assignee executes and delivers such instruments, in form and substance satisfactory to the Managing Partner, as the Managing Partner may deem necessary or desirable to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement; and

        v.      The assignee delivers to the Managing Partner a written representation as to each of the matters set forth in the Subscription Agreement.

The consent of the Investor Partners shall not be required for admission to the Partnership of a substituted Investor Partner who meets the above requirements. The Partnership and the Managing Partner shall be entitled to treat the record owner of any Partnership interest as the absolute owner thereof in all respects, and shall incur no liability for

distributions of cash or other property made in good faith to such record owner until such time as a written assignment of such interest has been received and accepted by the Managing Partner and recorded on the books of the Partnership. In no event shall any Partnership interest, or any portion thereof, be sold, transferred, or assigned to a minor or incompetent or any other person not qualified to become an Investor Partner hereunder, and any such attempted sale, transfer, or assignment shall be void and ineffectual and shall not bind the Partnership or the Managing Partner. Unless an assignee becomes a substituted Investor Partner, any assignment by the assigning Investor Partner of the right to receive Partnership distributions shall not release such Investor Partner of any obligations connected with the interest in the Partnership being assigned. In no event shall any purported transfer, by operation of law or otherwise, require the accounting by the Managing Partner to more than one person with respect to the Partnership interest transferred unless the transfer is consented to by the Managing Partner in accordance with the foregoing and the Partnership interest transferred represents a whole number of Interests owned by the Investor Partner. The effective date of any assignment shall be the date on which all of the prerequisites to the assignment specified in this Section 8.1 have been met. The Partnership will amend its records at least once each calendar quarter to effect the substitution of substituted partners. In the case of assignments where the assignee does not become a substituted Investor Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of the notice of assignment and the required documentation.

8.02. Assignment by Managing Partner.

a. The interest of the Managing Partner in the Partnership shall not be assignable, in whole or in part, except in the event of the following assignments:

i. A disposition by the Managing Partner of all or any portion of its Partnership interest to one or more Affiliates of the Managing Partner that agree to assume all or a proportionate part of the obligations of the Managing Partner with respect to such interest in the Partnership;

ii. A disposition by the Managing Partner of all or any part of its Partnership interest to one or more persons that have as the result of a merger, consolidation, corporate reorganization, or other transaction acquired all or substantially all of the assets of the Managing Partner and have assumed the obligations of the Managing Partner hereunder; or

iii. An assignment or transfer by the Managing Partner of all or any portion of its Partnership interest by way of mortgage, pledge, or charge as security for an advance of monies to it, provided that the mortgagee or pledgee shall hold such interest subject to all of the terms of this Agreement.

b. In the event of a disposition, assignment, or transfer referred to in clause (i) or clause (ii) of subsection a, such successor, assignee, or transferee shall be and become a substituted Managing Partner and shall continue the business of the Partnership without the occurrence of any dissolution and the assigning Managing Partner shall be released from all of its obligations thereafter arising hereunder; and each Investor Partner (and any person who hereafter becomes a substituted Investor Partner by his execution, adoption, or acceptance of this

Agreement) does hereby consent to the admission of such successor, assignee, or transferee as a substituted Managing Partner to the extent required by the Delaware Act and to the continuance of the business of the Partnership by such substituted Managing Partner, and authorizes the Managing Partner or substituted Managing Partner to ratify on his behalf pursuant to the power of attorney granted in Section 10.02 such Investor Partner's consent to the admission of the new Managing Partner as a Managing Partner of the Partnership.

c.    The Partnership shall take such actions as the Managing Partner in its sole discretion deems necessary or appropriate to effect or facilitate a disposition, assignment, or transfer referred to in Section 8.2(a), including without limitation, providing notice thereof to the Investor Partners and entering into appropriate escrow arrangements; provided, however, that no such disposition, assignment, or transfer (in the absence of the bankruptcy, withdrawal, removal, or dissolution of a Managing Partner) shall result in dissolution of the Partnership.

d.    Except as otherwise provided in subsection b, Section 8.03 or Section 9.03, no assignee or transferee of a Managing Partner shall become a substituted Managing Partner without the written consent of all of the Investor Partners.

8.03.    Removal of Managing Partner.

a.    A Majority in Interest of the Investor Partners shall have the right to remove the Managing Partner only for acts of gross negligence or intentional misconduct in managing the affairs of the Partnership and, in such event, to elect and substitute a new Managing Partner. In such event, the removed Managing Partner shall be required to offer to sell a minimum of 20% of, and shall have the right to offer to sell up to the remaining 80% of, its interest in the Partnership to the new Managing Partner for cash at a price and on such other terms and conditions as are mutually agreeable to the new Managing Partner. If after the new Managing Partner and the removed Managing Partner have agreed on the amount of the removed Managing Partner's Partnership interest that is to be sold to and purchased by the new Managing Partner (which agreement must be reached within 10 days of the removal of the Managing Partner), such parties are unable to agree within 10 days on the purchase price of such interest, the new Managing Partner and the removed Managing Partner shall select a mutually agreeable Independent Expert to determine such purchase price. Such Independent Expert, in determining such price, shall take into account appropriate discount factors in light of the risk of recovery of the oil and gas reserves attributable to the Partnership. The closing of the purchase of such Partnership interest shall take place at the office of the removed Managing Partner within 15 days following the agreement upon or determination of the purchase price for the interest to be acquired by the new Managing Partner, or at such other time or place as the removed Managing Partner and the new Managing Partner may agree upon in writing. In the event the new Managing Partner agrees to purchase less than all of the offered interest of the removed Managing Partner in the Partnership, the removed Managing Partner shall have the right to have distributed to it in kind such Partnership assets and properties attributable to the Partnership interest not purchased by the new Managing Partner as it would have been entitled to receive if the Partnership were dissolved and terminated pursuant to Section 9.4 at such time. The removed Managing Partner shall cause, to the extent legally possible, all of its contractual rights, obligations, and duties as Managing Partner of the Partnership to be assigned to the new Managing Partner, and the new Managing Partner shall continue the business of the Partnership without the occurrence of any dissolution and shall accept all responsibilities of the removed Managing Partner and make arrangements satisfactory to the removed Managing Partner to

release it from and indemnify it against personal liability for any Partnership indebtedness and liabilities. This Agreement shall thereafter be duly amended to delete the removed Managing Partner and to name the new Managing Partner. Each Investor Partner (and any person who hereafter becomes a substituted Investor Partner by his execution, adoption, or acceptance of this Agreement) hereby consents to the admission of the new Managing Partner as the substituted Managing Partner and to the continuance of the business of the Partnership by such substituted Managing Partner, and authorizes such Managing Partner to certify on his behalf pursuant to the power of attorney granted in Section 10.02 such Investor Partner's consent to the admission of such new Managing Partner as the Managing Partner of the Partnership and to execute any amendments to this Agreement required for such purpose. If, under the laws of any jurisdiction to which the Partnership or this Agreement is subject, the removal or withdrawal of the Managing Partner pursuant to this subsection results in the Partnership being dissolved, then the Partnership shall be deemed dissolved and reconstituted. Each Investor Partner (and any person who hereafter becomes a substituted Investor Partner by his execution, adoption, or acceptance of this Agreement) hereby consents to the continuation or reconstitution of the Partnership pursuant to this subsection and authorizes the substituted Managing Partner to certify on his behalf pursuant to the power of attorney granted in Section 10.02, such Investor Partner's consent to the continuation or reconstitution of the Partnership and to execute any amendments to this Agreement required for such purpose. *(amended 9-27-06)*

## ARTICLE 9
## DISSOLUTION, RECONSTITUTION, LIQUIDATION, AND TERMINATION

9.01.    Dissolution. The Partnership shall be dissolved upon the occurrence of any of the following:

a.    December 31, 2040;

b.    the vote at a duly held meeting or consent in writing of a Majority in Interest of the Investor Partners at any time;

c.    the sale, disposition, or termination of all or substantially all of the Leases then owned by the Partnership;

d.    the bankruptcy, insolvency, or dissolution (except dissolution as a consequence of merger, consolidation, recapitalization, or other reorganization effected in accordance with Section 8.02) of the Managing Partner or the occurrence of any other event which would permit a trustee or receiver to acquire control of the property or affairs of the Managing Partner; provided that neither the Managing Partner's filing of a voluntary petition or answer seeking reorganization or similar relief under bankruptcy law, nor the Managing Partner's reorganization or obtaining similar relief under such law shall cause the dissolution of the Partnership;

e.    the adjudication of insolvency or bankruptcy of the Partnership, or an assignment by the Partnership for the benefit of creditors;

f.    the withdrawal or retirement of the Managing Partner; or

g.    except as otherwise provided in this Section 9.01, the occurrence of any other event which, under the laws of the State of Delaware, causes the dissolution of a limited partnership.

The death, retirement, insanity, legal disability, insolvency, dissolution, or withdrawal of any Investor Partner will not result in the dissolution or termination of the Partnership, and, upon the occurrence of any such event, the estate, personal representative, guardian, or other successor in interest of any such Investor Partner or the Investor Partner, as the case may be, (i) will continue to be liable for all of the debts and obligations of such Investor Partner pursuant to this Agreement, (ii) may become a substituted Investor Partner only pursuant to the provisions of Section 8.01, (iii) may transfer the Partnership interest of such Investor Partner only pursuant to the provisions of ARTICLE 8 hereof, and (iv) will not have any right to withdraw the Capital Contribution of such Investor Partner except as expressly set forth in Section 9.03 of this Agreement.

9.02.    Covenant Not to Withdraw. Except as permitted by subsection 9.03.c, each Partner covenants and agrees that it shall not cause the dissolution of the Partnership by its voluntary withdrawal therefrom, either directly, by dissolution or by any other voluntary act, provided that the Managing Partner may withdraw upon the later to occur of (i) the completion of a Partnership's primary drilling activities under the Drilling Program and (ii) the fifth anniversary of the date that Investor Partners were admitted to the Partnership. In order to exercise its right of withdrawal, the Managing Partner must give the Investor Partners at least 120 days' advance written notice. In the event the Managing Partner assigns its interest in the Partnership to a person who becomes a substituted Managing Partner of the Partnership pursuant to Section 8.02, the subsequent dissolution of the old Managing Partner shall not terminate the Partnership and shall not be deemed to constitute a breach or violation of the covenant contained in this Section 9.02.

9.03.    Reconstitution.

a.    In addition to the other rights and remedies the Investor Partners may have hereunder or otherwise, in the event the Managing Partner withdraws or retires from the Partnership (directly or as a result of the events causing dissolution under Section 9.01.e) and such withdrawal or retirement causes dissolution of the Partnership, a Majority in Interest of the Investor Partners, acting at a meeting of the Investor Partners to be held within 90 days following receipt of written notice of such event from the Managing Partner, shall be entitled to reconstitute the Partnership (the Partnership, as reconstituted, is referred to herein as the "Reconstituted Partnership") and elect and substitute a new Managing Partner (which may be the retiring Managing Partner). Such new Managing Partner shall be entitled to acquire the Partnership interest of the retiring Managing Partner on the same basis and in the same manner as is set forth in Section 8.03. In connection with such acquisition the actions described in Section 8.03 shall be taken by the new Managing Partner and the retiring Managing Partner, and each Investor Partner (and any person who hereafter becomes a substituted Investor Partner by his execution, adoption, or acceptance of this Agreement) hereby consents to the admission of such new Managing Partner as a substituted Managing Partner of the Partnership in the same manner, and with the same effect, as consent is provided by the Investor Partners in Section 8.03. The retiring Managing Partner will pay all expenses concerning the valuation of its Partnership Interest and expenses associated with transferring management control incurred as a result of its withdrawal or retirement from the Partnership.

     b.     In the event a Majority in Interest but less than all of the Investor Partners elect to reconstitute the Partnership pursuant to this Section 9.03, the Partners' capital accounts shall be adjusted by (i) assuming the sale of all assets of the Partnership for cash at their respective fair market values (as determined by an appraiser selected by the new Managing Partner) and the payment of all Partnership debts and liabilities as of the date of the reconstitution of the Partnership and (ii) debiting or crediting each such capital account (other than the new Managing Partner's capital account, but including the retiring Managing Partner's capital account (to the extent that the retiring Managing Partner's Partnership interest was not purchased by the new Managing Partner pursuant to subsection a above)) with its respective share of the hypothetical gains or losses resulting from such assumed sales and the hypothetical deductions or losses, if any, resulting from the assumed payment of such debts and liabilities in the same manner as such capital account would be debited or credited on the actual sales of such assets and the actual payment of such debts and liabilities.

The new Managing Partner shall then sell for cash an amount of Partnership oil and gas properties having a fair market value (as determined by such appraiser) equal to the fair market value (so determined) of all Partnership oil and gas properties times the ratio of the aggregate of the positive capital account balances, as so adjusted, of the Investor Partners that have not elected to reconstitute the Partnership and the retiring Managing Partner (to the extent that the retiring Managing Partner's Partnership interest was not purchased by the new Managing Partner pursuant to subsection a above) to the positive capital account balances, as so adjusted, of all Partners. The new Managing Partner shall then distribute such cash to the Investor Partners that have elected not to reconstitute the Partnership and to the Managing Partner (to the extent provided above) in proportion to the positive balances of their respective capital accounts, as so adjusted. Such distribution shall take place by the later of (i) the end of the Partnership taxable year in which the reconstitution occurs or (ii) 90 days after the date of such reconstitution. Neither the retiring Managing Partner nor any Investor Partner that has elected not to reconstitute the Partnership shall be liable to the Partnership or any other Partner for the amount of any deficit balance in his or its capital account after a distribution in liquidation of his or its interest in the Partnership.

Notwithstanding the foregoing, the retiring Managing Partner shall have the right to elect to receive a distribution in kind of oil and gas properties having a fair market value (as determined by such appraiser) equal to the fair market value (so determined) of all Partnership oil and gas properties times the ratio of the positive balance in its capital account, adjusted as provided above, to the positive capital account balances, as so adjusted, of all Partners, subject to an obligation to become a party to the Program Agreement and any operating agreements to which such properties are subject. Any interest in Partnership properties distributed to the retiring Managing Partner shall be subject to such liens, encumbrances, and restrictions as affect the properties on the date of such distribution and will be subject to and operated in accordance with the operating agreements then in effect.

All gain, loss, and amounts realized on the sale of Partnership oil and gas properties by the new Managing Partner to provide cash for distribution to such Investor Partners and to the retiring Managing Partner shall be allocated to such Investor Partners and the retiring Managing Partner in the same proportions as the proceeds of such sale are distributed; provided that if the retiring Managing Partner or any Investor Partner elects to receive a distribution of Partnership properties in kind, all gain, loss, and amounts realized on such sales shall be allocated solely to

               37

the Partners receiving cash in the same proportions as the proceeds of such sale are distributed.

The new Managing Partner, on behalf of the Investor Partners that have elected to form the Reconstituted Partnership, shall retain for the benefit of the Reconstituted Partnership all oil and gas properties of the Partnership remaining after the distribution provided for above, and all other Partnership assets, and the Reconstituted Partnership shall assume all debts and liabilities of the Partnership. The Partnership oil and gas properties retained by the Reconstituted Partnership shall be subject to such liens, encumbrances, and restrictions as affect such properties on the date of the reconstitution of the Partnership and will be subject to and operated in accordance with the operating agreements then in effect. If the amount of property as of the date of the reconstitution of the Partnership is not sufficient to satisfy the positive balances in all of the Partners' capital accounts, as so adjusted, Partnership property shall be sold (or distributed) and retained by the new Managing Partner in the manner described above in proportion to the positive balances of the Partners' respective capital accounts.

c.    In the event an Investor Partner withdraws from the Partnership, the remaining Investor Partners hereby agree that the Partnership is to be reconstituted immediately. The remaining Investor Partners hereby authorize the Managing Partner to take such action as the Managing Partner deems necessary or appropriate to effect such reconstitution and to continue the business of the Partnership without interruption, including use by the Managing Partner of the power of attorney granted by each remaining Investor Partner pursuant to Section 10.02 to execute on behalf of each such remaining Investor Partner any amendments to this Agreement required for such purpose. The withdrawing Investor Partner will pay all expenses incurred as a result of his withdrawal from the Partnership. The withdrawing General Partner shall remain subject as a General Partner with respect to any liabilities or obligations of the Partnership arising prior to such withdrawal. Upon withdrawal from the Partnership, a General Partner is entitled to continue to receive any distributions to which he is otherwise entitled under this Agreement for the period prior to his withdrawal; however, such General Partner shall not be entitled to receive the fair value of his interest in the Partnership as of the date of such withdrawal based upon his right to share in distributions from the Partnership, and neither the Partnership nor the Managing Partner has any obligation to repurchase any interest in the Partnership from the withdrawing General Partner. The withdrawing General Partner will no longer be entitled to receive any distributions nor shall such General Partner have any rights as an Investor Partner under this Agreement. The Sharing Ratios will be recalculated among the Investor Partners without regard to the withdrawing General Partner's Capital Contribution.

d.    In the event the Partnership is reconstituted pursuant to subsection c, the Partners' capital accounts shall be adjusted by (i) assuming the sale of all assets of the Partnership for cash at their respective fair market values (as determined by the Managing Partner or an appraiser selected by the Managing Partner) and the payment of all Partnership debts and liabilities as of the date of the reconstitution of the Partnership and (ii) debiting or crediting each such capital account with its respective share of the hypothetical gains or losses resulting from such assumed sales and the hypothetical deductions or losses, if any, resulting from the assumed payment of such debts and liabilities in the same manner as such capital account would be debited or credited on the actual sales of such assets and the actual payment of such debts and liabilities.

e.    The distribution of cash or property to the Investor Partners that have elected not to reconstitute the Partnership in accordance with the provisions of this Section 9.03

shall constitute a complete return to each such Investor Partner of his Capital Contributions, to which each Investor Partner (and any person who hereafter becomes a substituted Investor Partner by his execution, adoption or acceptance of this Agreement) hereby consents, and a complete distribution to such Investor Partner of his interest in the Partnership and all Partnership property, and no such Investor Partner shall have any recourse against the new or the retiring Managing Partner, the Reconstituted Partnership or any other Investor Partner if the cash or property so distributed or received shall be insufficient to return in full his Capital Contributions.

      f.      In the event of the bankruptcy of a General Partner which pursuant to the Delaware Act results in the dissolution of the Partnership, each of the remaining Partners hereby agrees that the Partnership shall be reconstituted immediately, and authorizes the Managing Partner to take the actions described in subsection c above. The trustee, receiver, or other successor in interest of the bankrupt General Partner (i) will continue to be liable for all of the debts and obligations of such General Partner pursuant to this Agreement, (ii) may become a substituted General Partner only pursuant to the provisions of Section 8.01, (iii) may transfer the Partnership interest of such General Partner only pursuant to the provisions of ARTICLE 8 hereof, and (iv) will not have any right to withdraw the Capital Contribution of such General Partner except as expressly set forth in Section 9.04 of this Agreement.

      9.04.   Liquidation and Termination. Upon dissolution of the Partnership (unless it is reconstituted in accordance with Section 9.03), no further business shall be conducted except for the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distribution of its assets to the Partners. The Managing Partner shall act as liquidator or may appoint in writing one or more liquidators who shall have full authority to wind up the affairs of the Partnership and make final distribution as provided herein; provided, however, that, if the Managing Partner is not able to serve as liquidator and does not appoint a liquidator within a reasonable time after dissolution, the liquidator shall be a person selected in writing by a Majority in Interest of the Investor Partners. The liquidator shall proceed diligently to wind up the affairs of the Partnership and make final distribution as provided herein. Until final distribution, the liquidator shall continue to operate the Partnership properties with all of the power and authority of the Managing Partner. The liquidator is hereby authorized to take the following action without the further consent or joinder of any Partner:

      a.      As promptly as possible after dissolution and again after completion of the liquidation and termination of the Partnership, the liquidator shall cause a proper accounting to be made of the Partnership's assets, liabilities, and operations through the last day of the month in which the dissolution or termination occurs.

      b.      The liquidator shall pay all of the debts and liabilities of the Partnership (including all expenses incurred in liquidation) or otherwise make adequate provision therefor (including but not limited to the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may determine). To the extent cash required for this purpose is not otherwise available, the liquidator may sell assets of the Partnership for cash.

      c.      After making payment or provision for all debts and liabilities of the Partnership, the liquidator shall sell all properties and assets of the Partnership for cash as promptly as is consistent with obtaining the best price therefor. All gain, loss and amount realized on such sales shall be allocated to the Partners as provided in this Agreement, and the

capital accounts of the Partners shall be adjusted accordingly. The liquidator shall then distribute the proceeds of such sales to the Partners to satisfy any positive balances in their capital accounts, as so adjusted.

d.    Notwithstanding subsection c, in the event of a dissolution and liquidation of the Partnership pursuant to an exchange or tender offer, the liquidator may, after making provision for all debts and liabilities of the Partnership, first adjust the capital account of each Partner by (i) assuming the sale of all remaining assets of the Partnership for cash at their respective fair market values (as determined by the liquidator in a manner consistent with the terms of such exchange or tender offer) as of the date of the dissolution of the Partnership and (ii) debiting or crediting each such capital account with such Partner's respective share of the hypothetical gains or losses resulting from such assumed sales in the same manner as such capital account would be debited or credited on the actual sales of such assets. If such exchange or tender offer is conducted pursuant to a disposition of all or substantially all of the assets of the Partnership or is otherwise binding on the Partners, the liquidator shall distribute all securities or other assets received from the disposition of the Partnership assets to the Partners proportionately based on the Partners' positive capital account balances, as so adjusted.

In the event of an exchange or tender offer that is not binding upon all Partners, the liquidator shall then exchange for securities offered in the exchange or tender offer oil and gas properties having a fair market value (as determined by the liquidator as provided above) equal to the sum of the positive balances in the capital accounts, as so adjusted, of the Partners who elect to accept the exchange or tender offer. The liquidator shall then distribute such securities to such accepting Partners on a basis reflecting the Partners' respective positive balances, as so adjusted. The Managing Partner shall have, with respect to its Interests, the right to elect to receive a distribution in kind of Partnership oil and gas properties having a fair market value (as determined by the liquidator as provided above) equal to the positive balance in its capital account, adjusted as provided above. The liquidator shall then sell the remaining property and distribute to the Investor Partners who elect not to accept the exchange or tender offer all remaining cash in amounts proportionate to any positive balances in such Partners' capital accounts, as so adjusted. All gain, loss and amount realized on the sale of Partnership oil and gas properties by the liquidator to provide cash for distribution to such Investor Partners shall be allocated to such Investor Partners in the same proportions as the proceeds of such sale are distributed.

e.    Any distributions to the Partners in liquidation of the Partnership shall be made by the later of (i) the end of the taxable year in which the liquidation (as such term is defined in Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) occurs, or (ii) 90 days after the date of such liquidation. No Partner with a deficit balance in his or its capital account after such distribution shall be liable to the Partnership or any other Partner for the amount of such deficit balance.

f.    Notwithstanding the foregoing, if upon dissolution of the Partnership any Partner shall be indebted to the Partnership as a result of the failure to make a Capital Contribution required under this Agreement or otherwise, the liquidator shall retain such Partner's share of cash or property that would otherwise be distributed and apply such cash or property and the income therefrom to the liquidation of such indebtedness and the cost of the operation of such assets during the period of such liquidation; provided, if the amount of such indebtedness has not been liquidated pursuant to the above procedure or otherwise paid by such

Partner within six months of the dissolution of the Partnership, the liquidator may sell all or any portion of such property at a public or private sale for what is in the sole judgment of the liquidator the best price obtainable. The proceeds of such sale shall be applied to the liquidation of the indebtedness then owing by such Partner, and the balance of such proceeds, if any, shall be distributed to such Partner.

      g.    The liquidator shall comply with any requirements of the Delaware Act and all other applicable laws pertaining to the winding up of the affairs of the Partnership and the final distribution of its assets. The distribution of cash or property to the Partners in accordance with the provisions of this Section shall constitute a complete return to the Partners of their Capital Contributions and a complete distribution to the Partners of their interests in the Partnership and all Partnership property, and no Partner shall have any recourse against the Managing Partner or any other Partner if the cash so distributed shall be insufficient to return in full his Capital Contributions.

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES OF THE MANAGING PARTNER AND POWER OF ATTORNEY

      10.01.  <u>Representations and Warranties of the Managing Partner</u>. The Managing Partner hereby represents, warrants, and agrees as follows:

      a.    The organization and operation of the Partnership are and will continue to be in accordance with all applicable state statutes related to limited partnerships.

      b.    No election will be made by the Partnership to be excluded from the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code.

      c.    The Managing Partner now has and will continue to have substantial assets (in addition to its interest in the Partnership) which can be reached by creditors of the Partnership and is acting and will continue to act as Managing Partner on its own behalf and in no way merely as the agent of the Investor Partners.

      10.02.  <u>Power of Attorney</u>. Each Investor Partner by his execution or adoption of this Agreement or a counterpart hereof irrevocably constitutes and appoints the Managing Partner or its authorized agents and successors, each with full power of substitution, the agent and attorney-in-fact of each Investor Partner in the name, place, and stead of such Investor Partner to do any act necessary or, in the opinion of the Managing Partner, appropriate to qualify the Partnership to do business under the laws of any jurisdiction in which it is necessary to file any instrument in writing in connection with such qualification, and to make, execute, swear to, verify, acknowledge, amend, file, record, deliver, and publish any instrument or document which may be necessary or appropriate to carry out the provisions of this Agreement, including without limitation, (a) a counterpart of this Agreement and a certificate of limited partnership, (b) upon conversion of the General Partner Interests in accordance with Section 1.09 any amended certificate of limited partnership or amendments to any certificate of limited partnership required or permitted to be filed or recorded under the statutes relating to limited partnerships under the laws of any jurisdiction in which the Partnership shall engage or seek to engage in business, (c) a counterpart of any amendment to this Agreement for the purpose of (i) converting the General Partner Interests to Limited Partner Interests as contemplated by Section 1.09, or (ii) admitting

any substituted Managing Partner or original or substituted Investor Partner or effecting any amendment of this Agreement permitted to be made solely by the Managing Partner pursuant to Section 9.03 and 11.02, (d) a counterpart of this Agreement or any amendment hereto for the purpose of filing or recording such counterpart in any jurisdiction in which the Partnership may own property or transact business, (e) all certificates and other instruments necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein the Limited Partners have limited liability, in the jurisdictions where the Partnership may own property or be doing business, (f) any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Partnership, (g) any other instrument which is now or which may hereafter be required by law to be filed for or on behalf of the Partnership which does not increase the obligations of the Investor Partners, (h) any offers to lease, Leases, assignments, and requests for approval of assignments, statements of citizenship, interest and holdings, and any other instruments or communications now or hereafter required or permitted to be filed on behalf of the Partnership or the several Partners of the Partnership in their capacities as such under any law relating to the leasing of government land for oil and gas exploration or production, (i) an authorized certificate or other instrument evidencing the dissolution or termination of the Partnership when such shall be appropriate, in each jurisdiction in which the Partnership shall own property or do business, (j) all ballots, consents, approvals, or certificates and other instruments appropriate or necessary, in the judgment of the Managing Partner, to make, evidence, give, confirm, or certify any vote, consent, approval, election, agreement, or other action which is made or given hereunder or which is deemed to be made or given hereunder or is consistent with the terms of this Agreement or appropriate or necessary, in the judgment of the Managing Partner, to effectuate the terms or intent of this Agreement, and all amendments to this Agreement giving effect to, implementing, adopting or reflecting any such vote, consent, approval, election, agreement, or other action; provided, however, that when any such vote, consent, approval, election, agreement, or other action may be made or given only by a Majority in Interest of the Investor Partners, the Managing Partner may exercise the power of attorney granted in this clause (j) only after a Majority in Interest of the Investor Partners has so acted, and (k) any other instruments necessary to conduct the operations of the Partnership which do not increase the obligations of the Investor Partners, and to perform any other duty or function necessary to conduct the business and operations of the Partnership pursuant hereto. The existence of such power of attorney shall not preclude execution of any such instrument by an Investor Partner individually on any such matter. The power of attorney granted herein is irrevocable and shall survive the assignment or transfer by an Investor Partner of all or any part of his interest in the Partnership and, being coupled with an interest, shall survive the death, incompetency, incapacity, dissolution or termination of any Investor Partner. Any person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument executed by such agent and attorney-in-fact is authorized, valid and binding without further inquiry. This Agreement shall be controlling in the event of any conflict between the terms and provisions of this Agreement and any document executed, filed or recorded by the Managing Partner pursuant to the power of attorney granted herein.

<h3 style="text-align:center">ARTICLE 11<br>MISCELLANEOUS</h3>

11.01. <u>Notices</u>. All notices, elections, demands, or other communications required or permitted to be made or given pursuant to this Agreement shall be in writing and shall be considered as properly given or made if given by (i) personal delivery, (ii) expedited delivery

service with proof of delivery, (iii) registered or certified United States mail, postage prepaid, or (iv) prepaid telegram, telex, or telecopier facsimile (provided that such telegram, telex, or telecopier facsimile is confirmed by expedited delivery service or by mail in the manner previously described), sent to the respective addresses specified in Section 1.05, and shall be deemed to have been given either at the time of personal delivery or, in the case of delivery service or mail, as of the date of delivery at the address and in the manner provided herein. Any Investor Partner may change his address by giving notice in writing to the Managing Partner of his new address, and the Managing Partner may change its address by giving notice in writing of its new address to the Investor Partners.

11.02.  Amendment. In addition to the right of the Managing Partner to amend this Agreement as provided below, any change, modification, or amendment to this Agreement shall be effective if made by an instrument in writing duly executed by a Majority in Interest of the Investor Partners. Notwithstanding the foregoing, with respect to any change, modification, or amendment to this Agreement which would (a) increase the liability or duties of any of the Partners, (b) change the contributions required of any of the Partners, (c) provide for any reallocation of profits, losses, or deductions to the detriment of a Partner, (d) establish any new priority in one or more Partners as to the return of Capital Contributions or as to profits, losses, deductions, or distributions to the detriment of a Partner, or (e) cause the Partnership to be taxed as a corporation, such change, modification or amendment shall not be binding on such Partner unless contained in a written instrument duly executed by such Partner. With respect to any change, modification, or amendment to this Agreement which would change the name of the Partnership or the location of the principal place of business of the Partnership or of the Managing Partner, admit new or substituted Investor Partners, modify the Managing Partner's interest in the Partnership as the result of a transfer of a portion thereof pursuant to Section 8.02, Section 8.03 or Section 9.03, or cure any ambiguity, formal defect, or omission or correct or supplement any provision contained herein that may be inconsistent with any other provision contained herein, any change, modification or amendment which the Managing Partner determines does not adversely affect the Investor Partners in any material respect, and any change, modification, or amendment which the Managing Partner believes is necessary or advisable to ensure that the Partnership is not and will not be treated as an association taxable as a corporation for federal income tax purposes or to conform with changes in applicable tax law (provided such changes do not have a material adverse effect on the Investor Partners), and any other changes, modifications, or amendments similar to any one or more of the foregoing, such change, modification, or amendment may be contained in a written instrument executed solely by the Managing Partner, provided that the Managing Partner notifies the Investor Partners of such change, modification, or amendment

11.03.  Partition. Each of the Partners hereby irrevocably waives for the term of the Partnership any right that such Partner may have to maintain any action for partition with respect to Partnership property.

11.04.  Entire Agreement. This Agreement, the Program Agreement, the Joint Operating Agreements entered with respect to each prospect, and the Subscription Documents executed by the Investor Partners constitute the full and complete agreement of the parties hereto with respect to the subject matter hereof, and supersedes all previous oral and written and all contemporaneous oral negotiations, commitments, writings, and understandings. In the event of a conflict between the provisions of the is Agreement, the Program Agreement or the Joint

Operating Agreements entered with respect to each prospect, the provisions of the respective Joint Operating Agreements will control the terms of all such agreements.

11.05. <u>Severability</u>. Every provision in this Agreement is intended to be severable. If any term or provision hereof is determined to be invalid, illegal, or unenforceable for any reason whatsoever, such invalidity, illegality, or unenforceability shall not affect the validity, legality, and enforceability of the remainder of this Agreement.

11.06. <u>No Waiver</u>. The failure of any Partner to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Partner's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

11.07. <u>Evidence of Interest</u>. At the sole option of the Managing Partner, an Interest may be evidenced by a certificate in a form approved by the Managing Partner. The Managing Partner shall not be required to issue any such certificates, and, if such certificates are issued to any Investor Partner, the Managing Partner shall not be required to issue similar certificates to all Investor Partners.

11.08. <u>Applicable Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed, and enforced in accordance with the laws of the State of Delaware, except that (a) any laws of the State of Delaware regarding choice or conflicts of law shall not be applied if the result would be the application of a procedural or substantive law of another state or other jurisdiction and (b) certain rights of the Investor Partners may be governed by the laws of their state of residence.

11.09. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, and assigns; provided, however, that no Partner may sell, assign, transfer, or otherwise dispose of all or any part of his rights or interest in the Partnership or under this Agreement except as provided in ARTICLE 8.

11.10. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute but one and the same document. The signature of any Investor Partner on the Subscription Documents shall constitute the execution of this Agreement by such Investor Partner.

(INTENTIONALLY LEFT BLANK)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Tri-Valley Corporation,** Managing Partner

By: 
_____
F. Lynn Blystone, President

**Organizational Partner**


_____
F. Lynn Blystone, Organizational Partner

# DRILLING PROGRAM AGREEMENT

THIS DRILLING PROGRAM AGREEMENT (this "Agreement"), dated as of, May 16, 2002, and amended September 27, 2006 is made by and among Tri-Valley Oil & Gas Company, Inc., a California corporation ("TVOG"), Tri-Valley Corporation, a Delaware corporation ("TVC"), and Tri-Valley Opus I Drilling Program, L.P., a Delaware Limited Partnership ("Partnership") of which TVC is the managing general partner.

WHEREAS, TVC and the Partnership desire to participate in a drilling program (the "Program"), whereunder TVC and the Partnership will (a) jointly acquire interests in certain Prospects and (b) participate as non-operators in the development of such Prospects by TVOG as operator and Program Manager, on the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the premises and mutual covenants herein contained, the parties hereto do hereby agree as follows:

1.      Certain Defined Terms and References.

        (a)      Certain Defined Terms. When used in this Agreement, the following terms shall have the respective meanings:

                (i)      "Administrative Costs" shall mean customary and routine expenses incurred by TVC or its Affiliates for the conduct of the administration of a Partnership or a Program, including, legal, finance, accounting, secretarial, travel, office rent, telephone, data processing, and other items of a similar nature.

                (ii)      "Agreement" shall mean this Drilling Program Agreement, as amended from time to time.

                (iii)      "Code" shall mean the Internal Revenue Code of 1986, as amended.

                (iv)      "Lease" shall mean an oil and gas lease or an oil, gas and mineral lease, a Working Interest, an interest (including certain non-consent interest) arising under a pooling order or operating agreement, an interest acquired under a farmout, operating rights under governmental tracts, a mineral interest, royalty, or other interest in and to oil, gas, and related hydrocarbons (or a contractual right to acquire or earn such an interest), or an undivided interest therein or portion thereof (including those covering only certain Horizons or depths), together with all easements, permits, licenses, servitudes, and rights-of-way situated upon or used or held for future use in connection with the exploration, development, or operation of such interest.

                (v)      "Lease Acquisition Costs" shall have the meaning ascribed to it in the Partnership Agreement.

                (vi)      "Managing Partner" shall have the meaning ascribed to it in the Partnership Agreement.

                (vii)      "Offering Memorandum" shall mean the Private Placement Memorandum dated May 16, 2002, as amended March 20, 2003, July 14, 2003,

November 8, 2004, and September 27, 2006 describing the TVC Opus I Drilling Program, L.P.

      (viii)   "Operating Agreement" shall have the meaning ascribed to it in the Partnership Agreement.

      (ix)   "Operating Costs" shall have the meaning ascribed to it in the Partnership Agreement.

      (x)   "Participants" shall mean TVC and the Partnership, and "Participant" shall mean TVC or the Partnership, individually.

      (xi)   "Partners" shall mean the partners of the Partnership.

      (xii)   "Partnership" shall have the meaning assigned to such term in the preamble to this Agreement.

      (xiii)   "Partnership Agreement" shall mean the Agreement of Partnership dated, May 16, 2002 creating the Partnership and designating TVC as the Managing Partner of the Partnership.

      (xiv)   "Person" shall mean any natural person, partnership, corporation, association, trust, or other legal entity.

      (xv)   "Program" shall have the meaning assigned to such term in the preamble to this Agreement.

      (xvi)   "Program Manager" shall mean TVOG and any person who becomes the manager of the business and affairs of the Program in accordance with Section 7 of this Program Agreement.

      (xvii)   "Program Well" shall mean any well in which the Participants have an interest pursuant hereto.

      (xviii)   "Prospect" shall mean the Lease acreage designated by the Program Manager for transfer to the Program for development of a Program Well.

      (xix)   "Reporting and Legal Expenses" shall mean all third party accounting fees, costs, and expenses associated with obtaining audits of books and records, third party engineering fees, costs, and expenses associated with annual reserve reports, and third party attorney's fees and other legal fees, costs, and expenses associated with matters that are attributable to the Drilling Program's or the Partnership's business.

      (xx)   "Working Interest" shall have the meaning ascribed to it in the Partnership Agreement.

    (b)   Other Defined Terms. Capitalized terms not otherwise defined in this Agreement shall have the meanings assigned to them in the Partnership Agreement and the Offering Memorandum – in that order.

(c)    References. All references in this Agreement to sections, subsections, and other subdivisions refer to corresponding sections, subsections, and other subdivisions of this Agreement unless expressly provided otherwise. The words "this Agreement," "this instrument," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

2.    Acquisition of Interests in Prospects.

(a)    Prospects Subject to this Agreement. Subject to the terms and conditions hereof, the Participants shall acquire undivided interests in well bores within Prospects selected by the Program Manager in its sole discretion from time to time. At the time any Lease within a Prospect is acquired, the Program Manager shall designate the area comprising the Prospect in the manner provided in the definition of such term (if the Prospect has not been previously so designated). Prospects may be limited to certain stated depths and may include areas in which Leases may or may not have been acquired. The Program Manager shall maintain records showing the Prospects (and depths if limited by depth) so designated. Prospects may be directly adjacent or in close proximity to other Prospects. Leases on lands which are contiguous or in the vicinity of each other may constitute more than one Prospect, and a zone or horizon under an area may constitute a Prospect separate and apart from another zone or horizon which lies in whole or in part under the same area.  The Program Manager and its Affiliates shall have no obligation to assign to any of the Participants any Lease held as of the date hereof by the Program Manager or any such Affiliate or any Lease acquired by the Program Manager or any such Affiliate after the date hereof *(amended 9-27-06)*.

(b)    Participation in Subsequent Wells. TVOG will designate areas of mutual interest ("AMI") in and around the various Prospects developed by the partnership commencing with the date of formation of the partnership and ending December 31, 2007. Investor Partners shall have the right but not the obligation to participate in subsequent wells drilled by TVOG within an AMI as provided in this subsection.

(i)    If TVOG determines that one or more subsequent well should be developed in an AMI after the initial Program Well has been drilled on the Prospect, TVOG shall offer each Investor Partner the opportunity to invest in each such subsequent well *pro rata* according to their Sharing Ratio in the Partnership.

(ii)    The cost and terms of participation in subsequent wells may be determined by TVOG in its discretion, including whether TVOG will offer to enter into a turnkey drilling contract with respect to any well *(amended 9-27-06)*.

(iii)    If less than all of the Investor Partners elect to participate in any subsequent well to be drilled in an AMI, TVOG will offer the remaining well interest to Investor Partners who have elected to participate in such subsequent well and to Investor Partners have not previously been offered an interest in such subsequent well *pro rata* according to all such Investor Partners' Sharing Ratios in the Partnership.  In the event that any interest in a subsequent well remains unpurchased after the offers contemplated

by subsection (iii), such interests may be retained by TVOG or its affiliates or sold to unaffiliated third parties *(amended 9-27-06)*.

      (c)      <u>Interest of the Program Manager</u>.

          (i)      The amount of the undivided interest in Leases to be assigned to the Participants by the Program Manager shall be determined solely by the Program Manager and the Managing Partner of the Partnership, taking into account the nature of the risks associated with the drilling of wells on such Leases, the estimated costs of such drilling, the amount of funds available from the Partnership for such drilling and such other factors as the Program Manager and the Managing Partner shall in good faith determine. The Program shall have no right to acquire the entire interest in any such Lease, and the Program Manager and Affiliates thereof shall have the right to acquire or retain a portion of such interest in their own name, for their own account, or for the account of others. Any such interest so acquired or retained by the Program Manager or such Affiliate shall be held independently and not as a part of the Program and shall not be subject to the terms and provisions of this Agreement.

          (ii)      Subject to subsection (i), the Program Manager will use its best efforts to assign to the Program a sufficient Working Interest in Leases which it designates as Prospects to entitle the Program to a 75% net revenue interest in each Lease. To the extent that the total Working Interest owned by the Program Manager represents more than 75% of the net revenue interest from a Lease, the Program Manager intends to retain an overriding royalty interest sufficient to reduce the net revenue interest represented by the Working Interest assigned to the Program to 75%. In the event that the net revenue interest represented by a Working Interest in a Lease is less than 75% of the net revenue interest in the Prospect, the Program Manager will not receive or retain any overriding royalty interest in that Lease.

          (iii)      The Program Manager shall receive a 25% Working Interest in each Program Well carried to the tanks including pipelines enabling the well to deliver product for sale, with the remaining 75% of the Working Interest to be assigned to the Partnership.

      3.      <u>Allocation of Costs</u>. The costs of activities and operations conducted pursuant to this Agreement shall be allocated to an paid by the parties hereto as follows:

      (a)      <u>Organization and Offering Expenses, Management Fees</u>. All sales commissions and finders' fees shall be allocated entirely to the Partnership.

      (b)      <u>Intangible Drilling Costs and Lease Acquisition Costs</u>. All Intangible Drilling Costs shall be allocated entirely to the Partnership.

      (c)      <u>Tangible Costs</u>. All Tangible Costs shall be allocated entirely to the Partnership.

      (d)      <u>Lease Acquisition Costs</u>. All Lease Acquisition Costs shall be allocated entirely to TVOG.

(e)     Operating Costs and Reporting and Legal Expenses. All Operating Costs and Reporting and Legal Expenses incurred with respect to Program Wells shall be allocated between the Partnership and TVOG *pro rata* according to their working interest ownership in each respective Program Well in respect of which the cost is incurred.

4.     Allocation of Revenues. Except as provided in Attachment A attached hereto, all revenues attributable to the activities and operations conducted pursuant to this Agreement shall be allocated to and received by the parties hereto as follows:

(a)     Revenues from Program Wells. Subject to subparagraph (b) below, all revenues from Program Wells, including without limitation, all revenues directly or indirectly resulting from the investment of revenues from Program Wells, shall be allocated between TVOG and the Partnership *pro rata* according to their respective ownership in the Working Interests for each respective Program Well.

(b)     Revenues from Disposition of Program Assets.

(i)     Revenues resulting from the sale or other taxable disposition of an oil and gas property (as such term is defined in Section 614 of the Code) shall be allocated, (A) to the extent such revenues constitute a recovery of the Program's simulated tax basis in such property, to the parties in the same percentages as the simulated tax basis of the property sold was allocated up to an amount equal to the Program's simulated tax basis in such property at the time of such sale, and (B) thereafter, to the parties in a manner which will cause the aggregate of all revenues allocated to the parties from such sale or disposition and from all prior sales (to the extent possible) to equal the amounts which would have been allocated to the parties if all such revenues had been allocated between TVOG and the Partnership according to their *pro rata* ownership in the Working Interests for each respective Program Well to which the asset relates For purposes of computing the simulated tax basis of any such property, depletion deductions shall be computed as provided in Attachment A without regard to depletion deductions actually claimed by the parties under Attachment A.

(ii)     All revenues resulting from the rental, sale or other disposition of any item of depreciable property shall be allocated (A) to the extent such revenues constitute a recovery of the Program's adjusted tax basis in such property, to the parties in the same percentages as the adjusted tax basis of the property sold was allocated up to an amount equal to the Program's adjusted tax basis in such property at the time of such sale, and (B) thereafter, to the parties in a manner which will cause the aggregate of all revenues allocated to the parties from such rental, sale or other disposition and from all prior rentals or sales (to the extent possible) to equal the amounts which would have been allocated to the parties if all such revenues had been allocated 25% to TVOG and 75% to the Partnership.

(iii)     All revenues resulting from the disposition of any other property shall be allocated 25% to TVOG and 75% to the Partnership.

5.     Ownership of Production.

Each Participant shall have the right to take in kind or separately dispose of its proportionate

share of all oil and gas produced from any Lease subject to the Program pursuant to the terms of this Agreement. Any extra expenditure incurred in the taking in kind or separate disposition by any party hereto of its proportionate share of production shall be borne by such party. Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from any such Lease. The proceeds from the sale of all production produced, saved, and sold from any Prospect herein shall be paid to TVOG by all purchasing companies purchasing such production, and by the execution of this Agreement, TVOG and the Participants covenant and agree to hold harmless all purchasing companies from any and all liability by reason of paying any such proceeds to TVOG. Further, the Participants authorize and direct TVOG to deduct from their proportionate share of such proceeds from such sales all Operating Costs and other expenses and costs of all types owed to TVOG provided for under the terms of this Agreement and remit the balance from the sale to the Participants. In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of oil and gas produced from any such Lease, the Program Manager shall have the right, but not the obligation, subject to the revocation at will by the party owning such production, to purchase such oil and gas or sell it to others at any time and from time to time for the account of such party at a price competitive with the best price obtainable in the area for such production. Any such purchase or sale by the Program Manager shall be subject to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Any purchase or sale by the Program Manager of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances.

6.    <u>Management of Program.</u>

   (a)    <u>Program Affairs.</u> The Participants hereby designate TVOG as the Program Manager who shall have the full and exclusive power and authority to manage, control and administer the business and affairs of the Program and the properties of the parties subject to this Agreement, except to the extent otherwise set forth herein and in the Partnership Agreement.

   (b)    <u>Well Operations.</u> The Participants, hereby designate TVOG, and TVOG agrees to act, as operator with respect to the drilling, testing, and any attempted completion and equipping and operating (or plugging and abandoning, if necessary) of any Program Well to be drilled or developed hereunder, except in those instances in which (i) the Leases on which such Program Well is to be drilled is already subject to an existing operating agreement under which a third party (not TVOG) has already been designated as operator, (ii) the requisite number of third parties being joint working interest owners in such Program Well decline to approve TVOG as operator or (iii) a good faith determination is made by TVOG that it is not in the best interests of the Participants and of TVOG for it to act as operator. In conducting operations on a Prospect, TVOG may use its own personnel (including consultants retained by TVOG), properties and equipment and may subcontract with any other Affiliate of TVOG to perform such operations. The charge to TVC and the Partnership for the use of TVOG's personnel (including consultants retained by TVOG), properties and equipment, the basis of pricing materials purchased by TVC and the Partnership from TVOG or any Affiliate thereof and the basis of pricing materials purchased by TVOG or any Affiliate thereof from TVC and the Partnership shall be as provided in the Operating Agreement, subject to the terms of the Partnership Agreement.

(c)    <u>Joint Operating Agreement</u>. With respect to each Program Well for which TVOG is to serve as operator as contemplated in subsection (c), all operations relating to such Program Well, including without limitation, all costs and expenditures of drilling, testing, completing, and equipping and operating such Program Well shall be conducted pursuant to a Joint Operating Agreement between TVOG as operator, and the Participants as non-operator. In the event, at the time of acquisition of a Lease by the Participants, such Lease is subject to another operating agreement or if TVOG enters into an operating agreement with third parties that are joint operating interest owners in such Program Well, nevertheless, the Joint Operating Agreement between TVOG and the Participants shall govern operations as between them, provided that TVOG and the Managing Partner shall have the right to amend the Joint Operating Agreement between TVOG and the Participants covering certain of the Leases to conform to such other operating agreement (provided, the Joint Operating Agreement may not be amended as provided above in any manner that the Managing Partner determines will adversely affect the Partnership or the Partners in any material respect) and TVOG shall have the right to charge the Joint Account under the Joint Operating Agreement between TVOG and the Participants a share attributable to the Participants' interest of any costs or expenses incurred by TVOG under such other operating agreement which are not otherwise provided for herein or in the Joint Operating Agreement between TVOG and the Participants. To the extent that the terms of this Agreement and the terms of the Joint Operating Agreement attached hereto conflict, this Agreement governs and takes precedence over the Joint Operating Agreement.

(d)    <u>Program Funds; Distributions</u>. Funds held by the Program Manager on behalf of the Program, subsequent to their allocation to the Program, shall not be commingled with funds of any other entity. All such distributions shall be made to the Participants in the same percentages as the Participants are allocated revenues of the Program pursuant to Section 4. At no time shall the Program or the Program Manager on behalf of the Program retain in its accounts funds required to be distributed to the Participants pursuant to the preceding sentence. At least semi-annually, any cash funds of the Program which the Program Manager reasonably determines are not needed for the payment of existing or anticipated Program obligations and expenditures shall be distributed to the Participants.

(e)    <u>Access to Records</u>. Each Participant and the Partners thereof shall have access during normal business hours to all books and records relating to the business and operations of the Program as provided in the Operating Agreement, provided that the Program Manager may refuse for a reasonable time to grant any Participant or any Partner thereof access to such books and records as the Program Manager (i) has agreed shall be kept confidential or (ii) has determined in good faith should be kept confidential considering the interests of the Program and the Participants.

(f)    <u>Liability and Indemnification of Program Manager</u>.

(i)    Neither the Program Manager nor its Affiliates shall have any liability to the Participants for any loss suffered by a Participant that arises out of any action or inaction performed or omitted relating to its duties or obligations or services rendered or to be rendered pursuant to this Agreement or the Operating Agreement, if the Managing Partner in good faith has determined, as of the time of the conduct or omission, that the Program Manager's or its Affiliate's course of conduct or omission was in the best interest of the Participants, that the Program Manager or such Affiliate was acting on behalf of or performing services for the Participants, and that such conduct or omission

did not constitute gross negligence or misconduct. Termination of any action, suit or proceeding will not create a presumption that the Managing Partner or its Affiliate did not act in the best interest of the Partnership.

(ii)      The Partnership shall indemnify the Program Manager and its Affiliates against any losses, judgments, liabilities, expenses, and settlements sustained or incurred by the Program Manager or such Affiliates as a result of any threatened, pending or completed claim, action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, any appeal in such claim, action, suit, or proceeding, and any inquiry or investigation that could lead to such a claim, action, suit, or proceeding and which in any such case relates or which otherwise arises from or is attributable to (a) the fact that the Program Manager is serving in such capacity or in the capacity as the operator under the Operating Agreement or (b) any acts, omissions or operations performed or omitted by the Program Manager or such Affiliate on behalf of the Program or the Partnership or which otherwise relates to the activities and business affairs of the Program or the Partnership; provided that the Managing Partner has determined in good faith, as of the time of the conduct or omission, that the conduct or omission was in the best interest of the Partnership and that the conduct or omission did not constitute gross negligence or misconduct. Any such indemnity will be satisfied only out of the assets of the Partnership and in no event will the Investor Partners be liable therefor.

(iii)     The Program Manager, acting on behalf of the Program, may purchase and maintain insurance on behalf of the Program Manager and its Affiliates against any liabilities asserted against or expenses incurred by the Program Manager or its Affiliates in connection with Program activities; provided, however, that the Participants (other than TVC) shall not incur the cost of that portion of such insurance, if any, which insures the Program Manager or its Affiliates against any liability with respect to which the Program Manager or its Affiliates are denied indemnification under the provisions of this Agreement; provided, however, that nothing contained herein shall preclude the Program Manager from purchasing and paying for such types of insurance including without limitation, extended coverage liability and casualty and workers' compensation, as would be customary for any person owning comparable assets and engaged in a similar business, or from naming the Program Manager and its Affiliates as additional insured parties thereunder, provided, that the naming of such additional insured parties does not add to premiums payable by the Program.

(iv)     The termination of any claim, action, suit, or proceeding by judgment, order, settlement, conviction, or a plea of nolo contendere or its equivalent does not alone establish that a person seeking indemnification under this subsection is disqualified. Any person who is determined to be not entitled to indemnification under this Section 6(f) may petition a court of competent jurisdiction for a determination that in view of all facts and circumstances that such person is fairly and equitably entitled to indemnity and the Partnership shall provide such indemnity as may be determined proper by such court; provided, however, that the court has determined that such person has met the standard set forth in Section 6(f)(ii) above.

(v)      Legal fees and expenses and other costs incurred as a result of a claim described in this Section 6(f) shall be paid by the Partnership from time to time in advance of the final disposition of such claim if: (a) the claim relates to the performance

or non-performance of duties or services by the Program Manager or its Affiliates rendered on behalf of the Program and the Participants, (b) the claim is initiated by a third party who is not an Investor Partner, or the claim is initiated by an Investor Partner and a court of competent jurisdiction specifically approves such advancement, and (c) the Program Manager or its Affiliate undertakes to repay the advanced funds to the Partnership in the event it is later determined that the Program Manager or such Affiliate is not entitled to indemnification under the provisions of this Section 6(f).

(vi)    To the extent that the Program Manager or its Affiliates are successful on the merits or otherwise in defense of any claim, action, suit, or proceeding referred to in this Section 6(f) or in defense of any claim, issue, or matter therein, the Partnership shall indemnify the Program Manager or its Affiliates, against the expenses, including attorneys' fees, actually incurred by the Program Manager or such Affiliate in connection therewith.

(vii)    The indemnification provided by this Section 6(f) shall continue as to the Program Manager and its Affiliates in the event the Program Manager ceases to act in the capacity of manager of the Program or as operator under the Operating Agreement with respect to events occurring prior to the time such Program Manager or its Affiliate ceased to act in such capacity and shall inure to the benefit of the successors and assigns of the Program Manager and such Affiliates.

7.    Removal of the Program Manager.

The Partnership shall have the right to remove TVOG as Program Manager and to elect and substitute a successor to act in the capacity as Program Manager; provided, the Partnership shall not have the right to remove TVOG as Program Manager and to elect and substitute a successor to act in such capacity during the term that TVC or any of its Affiliates serve in the capacity of Managing Partner.

8.    Reimbursement of the Program Manager.

As may be requested by the Program Manager from time to time, the Program Manager shall be reimbursed by the Participants for their respective share of all General and Administrative Expenses and other costs and expenses incurred by the Program Manager or any of its Affiliates in managing and conducting the business and affairs of the Program, including expenses incurred in providing or obtaining such professional, technical, administrative, and other services and advice as the Program Manager may deem necessary or desirable.

9.    Tax Partnership.

This Agreement and Attachment A attached hereto are not intended and shall not be construed to create a joint venture, mining or other partnership (general, limited, or otherwise) or association or to render the parties hereto liable as partners. The parties expressly agree that no party hereto shall be responsible for the obligations of the other parties, each party being severally responsible only for its obligations arising hereunder and liable only for its allocable share of the costs and expenses incurred hereunder. Each of the Participants hereby agrees that this Agreement creates a partnership for federal and state income tax purposes only, which tax partnership shall function and exist as set forth in Attachment A attached hereto.

10.    Sales of Interests by TVOG.

Subject to Attachment A, TVOG shall have the right to sell or otherwise dispose of the ownership interests in Leases held by it as part of the Program and subject to this Agreement without obtaining the consent of the Partnership. TVOG, TVC, and their Affiliates shall have the right to sell or otherwise dispose of the ownership interests in Leases held by them for their own account outside the Program and not subject to this Agreement on terms more or less favorable to the party or parties acquiring such interests than those terms contained in this Agreement with respect to the acquisition of interests in such Leases by the Partnership, and the Partnership shall not have any claim or right to any consideration or benefits derived therefrom.

11.    Assignment.

Except as otherwise provided herein, no party hereto shall have the right to assign its rights or obligations under this Agreement without the express written consent of the other parties, except in the event of the following assignments:

    (a)    disposition by TVC of all or any portion of its rights or obligations hereunder to one or more Affiliates of TVC that also receive an assignment of a proportionate part of TVC's Managing Partner interest in the Partnership pursuant to the terms of the Partnership Agreement;

    (b)    A disposition by TVC or any Affiliate thereof of all or any part of its rights or obligations hereunder to one or more persons that have as a result of a merger, consolidation, corporate reorganization, or other transaction acquired all or substantially all of the assets of TVC and have assumed the obligations of TVC hereunder; or

    (c)    A disposition by TVC or any Affiliate thereof of all or any portion of its rights or obligations hereunder after the cessation of substantially all drilling activities of the Program.

Any assignment shall be subject to Attachment A. Notwithstanding anything in this Agreement to the contrary, TVC shall have the right at any time to mortgage, pledge, or encumber the oil and gas properties and interests of TVC under or subject to this Agreement to secure any debts or obligations of TVC or its Affiliates (whether or not such debts or obligations are related to the Program). If TVC receives a bona fide offer from an unrelated third party to purchase an interest in any Lease in which the Partnership has interests pursuant to this Agreement, TVC shall request the offeror to make a similar offer available to the Partnership

12.    Term and Amendment of Agreement.

    (a)    This Agreement shall terminate upon the occurrence of any of the following: (i) the dissolution of the Partnership, or (ii) upon the election of TVC after the cessation of substantially all drilling activities of the Program, provided, in the case of clause (ii), that TVC shall have given at least 120 days' notice to the Investor Partners of the Partnership prior to such termination. Upon the occurrence of any of the foregoing events, the provisions of Attachment A shall be applicable and the Participants shall be subject to the terms of the Operating Agreement or such other operating agreements as may then be in effect.

(b)     This Agreement and Attachment A may only be amended, modified or changed by a writing duly executed by TVC, and the Partnership; provided that, to the extent required under the terms of the Partnership Agreement, the Partnership shall execute or have executed on its behalf such a writing only if the amendment, modification, or change shall have been approved or consented to by a Majority in Interest of the Investor Partners thereof, to the extent required by the Partnership Agreement, and, provided further, the consent of the Partnership shall not be required if TVC determines that the amendment, modification, or change is necessary or advisable to ensure that the Program Agreement conforms with any changes in or modifications to the Code or does not adversely affect in a material manner the Investor Partners of the Partnership.

13.    Insurance.

The Program Manager or Affiliates thereof shall carry for the benefit of the Participants insurance coverage in such amounts, with provisions for such deductible amounts and for such purposes as are customarily carried by the Program Manager or such Affiliates in its operations. To the extent practical, all of the Participants shall be added as additional co-insureds under such coverage. The Program Manager shall notify the Participants of any adverse material change in the insurance coverage of the Program as soon as possible after learning of such change. If possible, such notice shall be given 30 days in advance of the change in insurance coverage.

14.    *Force Majeure.*

(a)     If TVOG or Participant is rendered unable, wholly or in part, by *force majeure* or any other cause of any kind not reasonably within its control, to perform or comply with any obligation or condition of this Agreement (except the payment of money), upon giving notice and reasonably full particulars to the other party, such obligation or condition will be suspended during the continuance of the inability so caused. Such party will be relieved of liability and will suffer no prejudice for failure to perform the same during such period, and the cause of suspension (other than strikes or walk-outs) will be remedied as far as possible with reasonable dispatch. Settlement of strikes and walkouts will be wholly within the discretion of the affected party.

(b)     The term "*force majeure*" as used herein will include, without limitation, the following: acts of God, public enemies, forces of nature including fire and flood, earthquakes, accidents, mechanical breakdowns, blowouts, strikes and other industrial, civil or public disturbances, inability to obtain drilling rigs, pipe, materials, supplies, pipelines, surface use agreements, leases, permits, rights-of-way, labor, or any other act or omission by third parties, or other circumstances not reasonably within the control of the affected party, and any law, order, rule, regulation, act or restraint of any government or governmental body of authority, whether civil or military.

15.    Partnership Agreement.

In the event of conflict between the provisions of this Agreement and the provisions of the Partnership Agreement or the provisions of Attachment A, the provisions of this Agreement shall control.

16.    Entire Agreement.

This Agreement, together with Attachment A attached hereto, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all previous oral and written and all contemporaneous oral negotiations, commitments, writings and understandings.

17.    Headings.

The headings of the various sections, subsections, and other subdivisions of this Agreement have been inserted for convenient reference only and shall not be construed to enlarge, diminish, or otherwise change the express provisions hereof.

18.    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflict of law provisions.

19.    Attachments.

Attachment A, the form of joint operating agreement, is attached hereto. Such Attachment is incorporated herein by reference and made a part hereof for all purposes, and references to this Agreement shall also include such Attachments unless the context in which such references are used shall otherwise require.

20.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Tri-Valley Corporation**                           **TVC Opus I Drilling Program, L.P.**

By:    F. Lynn Blystone                          By:    F. Lynn Blystone
Title:  President & CEO                           Title:  Managing Organizational Partner

**Tri-Valley Oil and Gas Co., Inc.**

By:    Joseph R. Kandle
Title:  President

Attachment A:         Form of Joint Operating Agreement

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 8, 29, 49, 79, 92, 122** |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION, AND (D) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court for a final hearing on the motion dated August 7, 2012 (the "DIP Motion") of Tri-Valley Corporation ("TVC"), Tri-Valley Oil & Gas Company, Inc. ("TVOG") , Select Resources Corporation, Inc. ("Select"), and TVC Opus I Drilling Program, L.P. ("Opus", and collectively with TVC, TVOG, and Select, the "Debtors" or "Borrowers"), in the above-captioned chapter 11 cases (collectively, the "Cases") pursuant to Sections 105, 361, 362, 363, 364(c), 364(d) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"), including Local Rule 4001-2, seeking, among other things:

(i)        authorization for the Debtors to obtain a secured post-petition debtor-in-possession financing facility (the "DIP Facility") from George T. Gamble 1991 Trust or an affiliated

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334).  The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

designee ("Lender") pursuant to the terms and conditions of the Debtor-in-Possession Credit Agreement between the Debtors and Lender dated September [•], 2012 (the "DIP Credit Agreement");

(ii)    authorization for the Debtors to execute and deliver all final documentation consistent with that certain term sheet attached as Exhibit A to the DIP Motion (the "DIP Term Sheet") for the DIP Facility (all such final documentation, together with the DIP Credit Agreement, the "DIP Documents"), in form and substance satisfactory to Lender, and to perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Documents;

(iii)    authorization for the Debtors to draw on the DIP Facility, subject to the conditions precedent set forth in the DIP Term Sheet and in the DIP Documents, and to use proceeds of the DIP Facility and Cash Collateral (as defined below) to pay for, among other things, working capital and general corporate purposes of the Debtors and the administration of the Cases, but only in accordance with a budget to be approved by the Lender;

(iv)    the granting of adequate protection to the Lender on account of its liens and security interests being primed by the DIP Facility;

(v)    the granting to the DIP Facility and all obligations arising thereunder (collectively, the "DIP Obligations") of allowed superpriority administrative expense claim status in the Cases;

(vi)    the granting to the Lender of automatically perfected first-priority security interests in and liens on all of the Collateral (as defined below) to secure all DIP Obligations;

(vii)    modification of the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Documents;

(viii)  an interim hearing on the DIP Motion (the "Interim Hearing") before this Court to consider entry of an order providing for certain relief requested therein on an interim basis (as entered, the "Interim Order");

(ix)  a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider entry of this final order (the "Final Order") authorizing the balance of the credit available under the DIP Facility, all as set forth in the DIP Documents, and any requested relief not granted under the Interim Order on a final basis, including without limitation authorization to effectuate the Roll-Up Loan (as defined in the DIP Term Sheet), all as set forth in the DIP Motion and in the DIP Credit Agreement filed with this Court.

NOW THEREFORE, the Interim Hearing having been held by the Court on August 9, 2012; and the Court having entered the Interim Order [Dkt. No. 29]; and the Court having considered the DIP Motion, the Affidavit of Maston Cunningham, the Chief Executive Officer of Tri-Valley Corporation, in support of the Debtors' First Day Motions and Applications, the exhibits attached thereto, the DIP Term Sheet, the DIP Documents, and the evidence submitted at the Final Hearing; and due and appropriate notice of the DIP Motion, the final relief requested therein, the Final Hearing, the Interim Order, and the proposed Final Order, having been served by the Debtors in accordance with the Interim Order and Bankruptcy Rules 2002, 4001 and 9014; and the Final Hearing to consider the relief requested in the DIP Motion having been held on and concluded on September 5, 2012; and all objections to the final relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the final relief requested is fair and reasonable and in the best interests of the Debtors, their estates, their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are

unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1) or to obtain credit secured solely by the Debtors' unencumbered assets or by junior liens on previously-encumbered assets; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND AT THE FINAL HEARING BY THE DEBTORS AND OTHER PARTIES IN INTEREST, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*. On August 7, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court commencing its Case.

B.    *Debtors in Possession*. The Debtors are continuing to manage and operate their business and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

C.    *Jurisdiction and Venue*. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the Cases, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for these Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Creditors' Committee*. The Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Cases (the "UCC") on August 27, 2012, pursuant to Section 1102 of the Bankruptcy Code.

E.    *Notice*. The notice given by the Debtors of the DIP Motion, the relief requested therein, the Interim Hearing, the Interim Order, the Final Hearing, the proposed Final Order, and

the DIP Documents constitutes appropriate, due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

F.    *Debtors' Stipulations*.    Subject to Paragraph 19 of this Final Order, the Debtors each admit, stipulate and agree that:

(i)    As of the Petition Date, Tri-Valley Corporation, Tri-Valley Oil & Gas Company, Inc., and Select Resources Corporation, Inc. each are obligated, as borrowers or guarantors, to Lender pursuant to that First Gamble Senior Secured Note, Second Gamble Senior Secured Note, and Gamble Demand Note and related documentation (collectively, the "Prepetition Note Documentation"), in the amount (including interest, fees, and other costs) of $7,198,078.55 (the "Existing Indebtedness"), which obligations are secured by liens on and security interests (the "Existing Security Interests") in certain real and personal property of those Debtors pursuant to those security agreements, pledge agreements, mortgages, deeds of trust or other security documents executed prior to the Petition Date by any Debtor in favor of Lender;

(ii)    The Existing Indebtedness constitutes the legal, valid and binding obligation of the respective Debtors named in the Prepetition Note Documentation and is enforceable in accordance with its terms, other than in respect of the stay operating pursuant to Section 362 of the Bankruptcy Code;

(iii)    The Existing Security Interests constitute legal, valid, perfected, unavoidable, and enforceable liens and interests, other than in respect of the stay operating pursuant to Section 362 of the Bankruptcy Code;

(iv)    No portion of the Existing Indebtedness or the Existing Security Interests is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or claim of any kind pursuant to the Bankruptcy Code or other applicable law; and

(v)    Each Debtor hereby forever waives and releases any and all claims, counterclaims, causes of action, defenses, recoupment rights, or setoff rights against Lender, its officers, directors, principals, beneficiaries and affiliates (including G. Thomas Gamble), arising prior to the Petition Date, whether arising at law or in equity, including without limitation any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or similar provisions of applicable nonbankruptcy law.

G.    *Findings Regarding the Post-petition Financing.*

(i)    *Cause.*  Good cause has been shown for entry of this Final Order.

(ii)    *Need for Post-petition Financing.*  Without the financing proposed by the DIP Motion, the Debtors do not have the funds necessary to continue their operations.  The Debtors' ability to continue their operations, including to maintain oil and gas operations, to maintain business relationships, to make payroll, to pay the costs of administration of their estates and to satisfy other working capital and operational needs, depends on obtaining access to the DIP Facility and the use of cash collateral (as defined in the Bankruptcy Code) subject to the Existing Security Interests (the "Cash Collateral").  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations under the DIP Facility is vital for preserving and maintaining the going concern values of the Debtors and to a successful reorganization.  Failure to obtain the relief requested in the DIP Motion will harm (a) the

Debtors, their estates, creditors and equity holders, and (b) the possibility of a successful sale or reorganization.

(iii)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing on terms more favorable than those offered by the Lender under the DIP Facility and are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit under Sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the Lender under the DIP Facility. The Debtors have made more than an adequate showing of their efforts to obtain financing on more favorable terms, and have shown that no other lender even proposed to extend credit to the Debtors. A credit facility in the amount and under the terms provided under the DIP Facility is not available from Lender without (a) granting to the Lender, subject to the Carve-Out (as defined below), the DIP Liens and DIP Superpriority Claims (each as defined below), (b) a roll up of the Existing Indebtedness, and (c) the other protections set forth in this Final Order.

(iv)    *Additional Findings Concerning the Roll Up.* The Debtors have shown that despite a diligent effort to obtain alternative financing, no other lender proposed to extend credit to the Debtors. Indeed, the only lenders that even discussed the prospect of DIP financing for the Debtors indicated that if a DIP loan were possible, they would insist upon refinancing the entire Existing Indebtedness. The roll up and deemed refinancing of the Existing Indebtedness is a prudent exercise of the Debtors' business judgment consistent with their fiduciary duties in light of the benefits available with the DIP Facility and to avoid the harms of losing the DIP Facility, and the risk, expense and delay attendant to litigation that would have ensued had the

Debtors sought to impose new liens without this refinancing, and to avoid burdensome administration of segregating cash collateral.

(v)    *Use of Proceeds of the DIP Facility.* As a condition to the extension of credit under the DIP Facility, the Lender and the Debtors have agreed that proceeds of any advance made under the DIP Facility shall be used exclusively in a manner consistent with the terms of the DIP Facility and the Approved Budget (as defined below), including for ordinary and necessary operating costs and expenses arising after the Petition Date or other payments as may be agreed to by the Lender.  No portion of the proceeds of any advance under the DIP Facility shall be used, directly or indirectly, to make any payment or prepayment that is prohibited under the DIP Facility, including any payment or prepayment relating to pre-petition indebtedness of the Debtors to the extent prohibited thereunder.

(vi)    *Final Relief.* Absent the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility in accordance with the DIP Documents is therefore in the best interests of the Debtors and their estates, and is consistent with their fiduciary duties.

H.    *Good Faith of the Lender.*

(i)    *Willingness to Provide Financing.* The Lender is willing to provide financing to the Debtors subject to: (a) the entry of this Final Order; (b) the approval of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the Lender is extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the Lender's security interests, liens, superpriority administrative claims, and other protections granted pursuant to the Interim Order and this Final Order will have the protections provided in Section 364(e) of the

Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of the DIP Facility and the DIP Documents are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the DIP Documents were negotiated without collusion, in good faith and at arms' length among the Debtors and the Lender. Use of credit under the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by Section 364(e) of the Bankruptcy Code, and the Lender is therefore entitled to the full protection and benefits of Section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Financing Approved. The DIP Motion is granted in accordance with the terms of this Final Order.

2.    Objections Overruled. All objections to the DIP Motion to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

3.     <u>Authorization of the DIP Facility</u>. The Debtors are expressly and immediately authorized to incur and to satisfy the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and are expressly approved and incorporated herein by reference.  The DIP Credit Agreement is attached hereto as Exhibit A.  The DIP Facility is hereby approved upon the terms and conditions set forth herein and in the DIP Documents.  The DIP Obligations shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.

4.     <u>Authorization to Execute Documentation</u>.   The Debtors, to the extent not yet completed pursuant to the authority granted in the Interim Order, are hereby authorized to execute, enter into, and deliver the DIP Documents and all instruments and documents which may be required or reasonably necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) as described in and provided for by this Final Order and the DIP Documents, and the DIP Documents are hereby approved.  The DIP Documents and this Final Order shall evidence the validity and binding effect of the Debtors' DIP Obligations and shall govern the financial accommodations to be provided to the Debtors by Lender.   The Debtors and the Lender may make nonmaterial modifications to the DIP Documents.

5.     <u>Authorization to Borrow</u>.   Subject to the terms, conditions, limitations on availability set forth in the DIP Documents and this Final Order, the Debtors are hereby authorized to draw on the New Money Loan of the DIP Facility from the Lender, on the terms and conditions set forth in the DIP Documents.

6.     <u>No Obligation to Extend Credit</u>. The Lender shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making

of such extension of credit under the DIP Documents and this Final Order have been satisfied in full or waived by the Lender in its sole discretion.  Furthermore, and notwithstanding anything to the contrary contained in the DIP Documents or this Final Order, provided that (a) the Debtors submit a budget through the Maturity Date (absent acceleration) that is acceptable to the Lender and does not increase the need for borrowing beyond $3.85 million (the "Approved Budget", a copy of which is attached as Exhibit B to this Final Order), and (b) the Debtors operate within variances to that budget set forth in the DIP Documents and an event of default otherwise does not occur, the Lender will commit to fund through the Maturity Date against that budget.

7.    Effectiveness of Roll Up.  In accordance with the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, as a necessary inducement to, and material portion of the compensation for, Lender providing the New Money Loan, the Existing Indebtedness is hereby deemed refinanced and designated as the Roll Up Loan pursuant to the terms of the DIP Documents.

8.    Use of DIP Facility Proceeds.  The Debtors shall use advances under the DIP Facility only for the purposes specifically set forth in this Final Order or in the DIP Documents, and in compliance with the Approved Budget.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, in no event shall the proceeds of the DIP Facility be used (A) for any purpose that is not permitted under this Final Order; (B) in a manner not consistent with the Approved Budget; (C) to pay more than a total of $40,000 between all Committees (defined below) for the fees and expenses of any investigation or analysis of any claim or cause of action against Lender or any affiliate of the Lender [the UCC has raised an issue regarding allocation of this $40,000 limit as between committees which is not yet resolved]; and (D) for

any preparation or prosecution of any claim or cause of action against Lender or any affiliate of the Lender.

9. <u>Superpriority Claims</u>. Pursuant to Section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out (as defined below), all of the DIP Obligations shall constitute allowed superpriority administrative expense claim against each of the Debtors (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates in the Cases, at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code; and which shall at all times be senior to the rights of the Debtors and their estates, any successor trustee or other estate representative and any creditor or other party in interest to the fullest extent permitted by law; provided however that the DIP Superpriority Claims shall be paid from Avoidance Action Proceeds only to the extent that any amounts due to the Lender on account of post-petition new money advances under the DIP Facility plus unpaid interest on those advances, plus all other charges and expenses incurred post-petition have otherwise not been paid in full.

10. <u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected upon the date of this Final Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Lender or its agents over

any Collateral, the following security interests and liens are hereby granted by the Debtors to Lender (collectively, the "DIP Liens"):

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all currently-owned or hereafter acquired assets and property, including without limitation all real and personal property, plant and equipment, accounts receivable and inventory, intellectual property, claims and causes of action (but not claims and causes of action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law), and any proceeds of any claims and causes of action (including without limitation any proceeds of any claims or causes of action available under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar non-bankruptcy law (all such proceeds, the "Avoidance Action Proceeds")), and any rights to receive proceeds or distributions from any affiliates or subsidiaries, of the Borrowers (the "Collateral"), to the extent that such Collateral is not subject to valid, perfected, and non-avoidable liens as of the commencement of the Cases. Without limiting the generality of the foregoing, the Collateral shall include a fully perfected security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrowers, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, fixtures, leasehold interests and real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, investment property, commercial tort claims, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds. Notwithstanding anything to the contrary contained in in the DIP Documents or this Final Order, the Collateral will not include commercial tort claims other than commercial tort claims based on tortious interference with contract or that impact the value of any of the Collateral;

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien on all Collateral, subject only to valid, perfected and non-avoidable liens and in favor of third parties and in existence as of the commencement of the Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code; and

(c)     pursuant to section 364(d) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all Collateral to the extent such Collateral is subject to valid, perfected and non-avoidable liens in favor of

(i) third parties as of the commencement of the Cases, or (ii) securing the Existing Indebtedness.

Lender shall not be required to marshal the Collateral, and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Documents, in any manner or order in the Lender's sole and absolute discretion. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the amount secured by the liens granted herein to the Lender on any Avoidance Action Proceeds shall not exceed the amount of all post-petition advances under the DIP Facility, plus unpaid interest on those advances, plus all other charges and expenses incurred post-petition.

11. <u>Perfection of Liens</u>. This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted to the Lender herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the Lender to the priorities granted herein. Notwithstanding the foregoing, the Lender is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or recorded as of the Petition Date; *provided, however,* that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Lender all such financing statements, mortgages, notices and other

documents as the Lender reasonably request. The Lender in its discretion may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

12.    <u>Limitation on Charging Expenses Against Collateral</u>. Except to the extent of the Carve-Out (as defined below), no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the Cash Collateral against Lender pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of Lender.

13.    <u>Carve-Out</u>. Each of the liens and claims, including superpriority administrative expense claims granted to the Lender in connection with the DIP Facility under this Final Order shall be subject only to a carve-out (the "<u>Carve-Out</u>") for the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000.00; and (iii) after the occurrence and during the continuation of an Event of Default (as defined in the DIP Documents), a total amount not to exceed $225,000 to pay any fees or expenses incurred by counsel and financial advisors to the Borrowers and any statutory committee appointed in the Cases (each, a "<u>Committee</u>") that remain unpaid after allowance by the Bankruptcy Court and subsequent to the payment of such fees and expenses from existing retainers, if any, or available funds remaining in the Borrowers' estates for expense reimbursement or compensation as allowed by the Bankruptcy Court; provided, however, that nothing herein shall be construed to

affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described above. In addition, subject to Paragraph 8 of this Final Order but notwithstanding anything else to the contrary herein, to the extent that existing retainers or available funds remaining in the Borrowers' estates are insufficient to satisfy the allowed claims by counsel or financial advisors to the Borrowers or any Committee for fees and expenses incurred prior to the occurrence of an Event of Default, then the Lender shall fund these allowed claims, provided that in no event shall Lender be obligated to fund any claims exceeding the aggregate amount budgeted specifically for the Borrowers' professionals, the UCC's professionals, and any other Committee's professionals in the line items specifically provided for the foregoing professionals as set forth in the Approved Budget through the date that such fees and expenses were incurred, and provided further that in no event shall Lender be obligated to fund any claims if doing so would, when combined with the amounts advanced by the Lender under the DIP Facility (including without limitation the Roll-Up Loan and any amounts prepaid by the Borrowers), exceed the aggregate principal amount of the DIP Facility.

14.    Maturity.  All DIP Obligations shall be immediately due and payable on the Maturity Date, in full and in cash without deduction or setoff, and all of Lender's commitments under the DIP Facility will terminate, including any further obligation to extend credit; provided, however, that the Prepetition Balance (as defined in the DIP Documents) shall not be due and payable upon the closing of the Sale (as defined in the DIP Documents) but shall be set aside in the Carve-Out Reserve (as defined in the DIP Documents), and any plan of reorganization proposed by the Debtors in these Cases shall separately classify the Prepetition Balance and shall

provide that the Prepetition Balance shall be paid in full in cash (with interest) upon the effective

date of the plan, absent the affirmative vote of the Lender, who shall be entitled to vote to accept

or reject any alternative treatment of the Prepetition Balance in accordance with bankruptcy

majorities as set forth in section 1126 of the Bankruptcy Code, and such alternative treatment

shall be treated as an allowed prepetition secured claim.  For the avoidance of doubt, except as

provided above with respect to the Prepetition Balance, any confirmation order entered in the

Cases shall not discharge or otherwise affect any of the obligations of the Borrowers to the

Lender under the DIP Documents, which shall be joint and several obligations, other than after

the indefeasible payment, in full and in cash without deduction or setoff, to the Lender of all DIP

Obligations on or before the effective date of a plan of reorganization in the Cases or the

Maturity Date.  Notwithstanding anything to the contrary in the DIP Documents or this Final

Order, the definition of Maturity Date as used in the DIP Credit Agreement shall be as follows:

> "Maturity Date" means the earliest to occur of (a) January 4, 2013, (b)
> the effective date of a Reorganization Plan for one or more of the
> Debtors, (c) the date on which the Borrowers have consummated,
> pursuant to Section 363 of the Bankruptcy Code and a Final Order of
> the Bankruptcy Court in respect thereof, a sale or sales of all or
> substantially all of the Borrowers' assets; provided that except as
> expressly permitted pursuant to clauses (a) through (d) of Section 6.5,
> no Borrower may sell, transfer, lease, exchange, alienate or dispose of
> all or substantially all of its assets or properties, Capital Stock or other
> equity interests pursuant to Section 363 of the Bankruptcy Code or
> otherwise without the consent of the Required Lenders, (d)
> acceleration of any of the Obligations owed hereunder, including
> without limitation, an acceleration pursuant to Section 8.1, (e) the
> indefeasible payment in full of the Obligations, and (f) the date that is
> thirty (30) days following the Interim Order Entry Date if no Final
> Order shall have been entered in the Case by such.

15.    <u>Intercompany DIP Claims</u>.  Without limiting the obligations of any Debtor to the

Lender, each Debtor shall be obligated, solely with respect to each other Debtor, to satisfy its fair

allocated share of the DIP Obligations (the "<u>Intercompany DIP Claims</u>"), which amount shall be

determined as of the Maturity Date by the Court unless otherwise agreed to in writing by the Debtors and each Committee. Solely to secure payment of these Intercompany DIP Claims, each Debtor hereby receives liens, subordinate in priority and in right of payment only to the DIP Superpriority Claims and the DIP Liens and to the Carve Out, on all Collateral of all other Debtors.

16.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay</u>. The Lender has acted in good faith in connection with the DIP Facility and the DIP Documents, and its reliance on this Final Order is in good faith. Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the Lender is entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby. Any liens or claims granted to the Lender hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

17.    <u>Proofs of Claim</u>. The Lender will not be required to file proofs of claim in any of the Cases for any claim allowed herein in relation to the DIP Facility. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the to the contrary, the Lender is hereby authorized and entitled, but not required, in its sole discretion to file (and

amend and/or supplement, as it sees fit) a proof of claim in the Cases for any claim allowed herein in relation to the DIP Facility.

18.    <u>Limitations on the DIP Facility and the Collateral</u>. The DIP Facility and the Collateral may not be used in connection with: (a) preventing, hindering, or delaying any of the Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) using or seeking to use any cash Collateral or selling or otherwise disposing of the Collateral without the prior written consent of the Lender; (c) using or seeking to use any insurance proceeds constituting Collateral without the prior written consent of the Lender; (d) incurring indebtedness without the prior written consent of the Lender, except to the extent permitted under the DIP Documents; (e) objecting or challenging in any way any claims, liens, Collateral, as the case may be, held by or on behalf of the Lender; (f) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; or (g) prosecuting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other rights or interests of the Lender.

19.    <u>Effect of Stipulations on Third Parties</u>.    Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph F of this Final Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived

and relinquished all claims against Lender as of the date of entry of this Final Order. Notwithstanding the foregoing:

(a)    Any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until October 30, 2012 (the "First Challenge Period"), to object to, or file any affirmative claims or causes of action (including any avoidance claims) relating to, the amount, validity and/or priority of Lender's Existing Indebtedness and the liens or claims securing same against the Lender or any affiliate of the Lender (including G. Thomas Gamble), which claims may include claims derivative of the Debtors' estates notwithstanding the stipulations, admissions and agreements of the Debtors contained in this Final Order (collectively, "Possible Existing Indebtedness Claims"). Standing is hereby conferred on each Committee, without further order of the Court, to institute and to prosecute Possible Existing Indebtedness Claims before the expiration of the First Challenge Period. Failure to do so prior to the expiration of the First Challenge Period shall be deemed a waiver of any and all such objections or claims and causes of action as against the Lender and its affiliates (including G. Thomas Gamble), and the Existing Indebtedness shall be an allowed claim not subject to any further challenge;

(b)    Any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until the earlier of (V) 120 days from the closing of the sales of substantially all of the Debtors' assets or (W) April 30, 2013, to seek standing to prosecute any claims or causes of action other than Possible Existing Indebtedness Claims against Lender or its affiliates, which claims may include claims derivative of the Debtors' estates notwithstanding the stipulations, admissions and agreements of the Debtors contained in this Final Order, and, if standing is conferred, until the earlier of (X) two weeks after standing is conferred on a Committee or (Y) May 15, 2013, to initiate an action on any such claim or cause of action (the "Second Challenge Period," and together with the First Challenge Period, the "Challenge Periods"). Failure to obtain standing or to commence an action on claims other than Possible Existing Indebtedness Claims if standing is conferred within the deadlines set forth for the Second Challenge Period shall be deemed a waiver of any and all such objections or claims and causes of action as against the Lender and its affiliates (including G. Thomas Gamble); and

(c)    Notwithstanding anything to the contrary herein, if any of these Cases convert to a Chapter 7 prior to the expiration of an otherwise still applicable Challenge Period, the Chapter 7 trustee shall have any time remaining under the still applicable Challenge Period and an extra thirty (30) days from the date of appointment. For the avoidance of doubt, except as set forth in paragraph 19(a) above, nothing in this Final Order vests or confers on any person or Committee standing or authority to

pursue any claim or cause of action belonging to the Debtors' or their estates, including without limitation, those claims or causes of action discussed in paragraph F of this Final Order.

20.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtors to pay, and Lender to retain and apply payments made, in accordance with the terms of this Final Order and the DIP Documents.

21.    <u>Payment of the Facility Fee</u>.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the Facility Fee shall be payable on the Maturity Date.

22.    <u>Reports</u>.  All reports required to be provided to the Lender by the Debtors under this Final Order or the DIP Documents shall contemporaneously be delivered to each Committee, subject in each case to such confidentiality restrictions that the Debtors shall reasonably impose. The nondisclosure agreement currently in place between the Debtors and the UCC reflects the confidentiality restrictions that will govern the delivery of the reports required to be delivered to the UCC hereunder.

23.    <u>Pleasant Valley Leases</u>.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the sales process for the Pleasant Valley leases shall be as follows and the failure to adhere to this schedule shall be an Event of Default under the DIP Documents:

    a.    Bids will be due on November 30, 2012;

    b.    The auction will be held on December 5, 2012;

    c.    The sale hearing will be held on December 7, 2012, subject to the Court's calendar, but in any event no later than December 11, 2012; and

    d.    The closing on the sale of the Pleasant Valley leases will occur or before December 22, 2012;

provided, however, that if, at any point in time, the Debtors, in consultation with each Committee, conclude that their expected cash availability, including any amounts available under the DIP Facility, is not sufficient to support the Debtors' operations throughout the time line set forth above for the sale of the Pleasant Valley leases, then the Debtors, with the consent of the Committees or further Court order, shall be authorized to shorten the sale process time line to match their expected cash availability.

24.      Other Asset Sales.  Except as modified in paragraph 23 above, the deadlines set forth for the sales process for the Debtors' other assets in the DIP Documents shall be unaffected by this Final Order.

25.      Exercise of Remedies.  Upon the occurrence of an Event of Default, the Lender shall have the option to take any and all actions and remedies upon motion to the Court that the Lender may deem appropriate, and upon notice to the Debtors, counsel to the Debtors, the U.S. Trustee and any Committee, to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the estates of the Debtors upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender with such motion to be heard by the Court five (5) days after notice is given (or as soon thereafter as the Court's calendar permits), notwithstanding any Bankruptcy Rule or Local Rule to the contrary.

26.      No Third Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

27.      No Waiver by Failure to Seek Relief.  The failure of the Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Documents, or

applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

28.    <u>Binding Effect of Final Order</u>. Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the Lender, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Cases, or upon dismissal of the Cases.  For the avoidance of doubt, nothing in this Final Order is intended, or should be construed, to limit the ability of any committee of equity holders appointed for Opus to challenge whether the Opus chapter 11 petition was filed with proper authority; provided, however, that any relief granted in response to any such challenge shall not limit, modify, or otherwise affect this Final Order, including without limitation the liens authorized and granted to the Lender herein, the liens granted herein to each of the Debtors (including Opus) against the other Debtors (including Opus) to secure the Intercompany DIP Claims, and provided, further, that if the relief granted in response to any such challenge is the dismissal or conversion of the Opus chapter 11 case, this Final Order and the DIP Documents shall continue to be effective and enforceable against Opus or any chapter 7 trustee appointed for Opus, with respects to all amounts due under the DIP Facility as of the date of such dismissal or conversion, notwithstanding the dismissal or conversion of the Opus chapter 11 case.

29.    <u>No Modification of Final Order</u>. Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the Debtors

irrevocably waive the right to seek and shall not, without the Lender's prior written consent, seek or consent to, directly or indirectly: (a) any modification, stay, vacatur or amendment to this Final Order; (b) the granting of any priority claim or administrative expense against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases, equal or superior to the DIP Superpriority Claims, (c) the entry of any order allowing use of cash collateral resulting from Collateral; or (d) the granting any lien on any of the Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the Lender's prior written consent, and no such Lender consent shall be implied by any other action, inaction or acquiescence of the Lender.

30.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

31.    <u>Survival</u>.  The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the Lender pursuant to this Final Order and/or the DIP Documents, shall continue in the Cases, or following dismissal of the Cases, and shall maintain their priority as provided by this Final Order until all the DIP Obligations, pursuant to the DIP Documents and this Final Order, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.

32.    <u>Inconsistency Between Final Order and DIP Documents</u>.    In the event of an inconsistency between this Final Order and the DIP Documents, the terms of this Final Order shall govern.

33.    <u>Bankruptcy Rule 7052</u>. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

34.    <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated: September _____, 2012
       Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE