## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | Ref. Nos. 8, 29, 49, 79, 92, 122, 185 and _198_ |

### FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION, AND (D) GRANTING RELATED RELIEF

THIS MATTER having come before the Court for a final hearing on the motion dated August 7, 2012 (the "DIP Motion") of Tri-Valley Corporation ("TVC"), Tri-Valley Oil & Gas Company, Inc. ("TVOG"), Select Resources Corporation, Inc. ("Select"), and TVC Opus I Drilling Program, L.P. ("Opus", and collectively with TVC, TVOG, and Select, the "Debtors" or "Borrowers"), in the above-captioned chapter 11 cases (collectively, the "Cases") pursuant to Sections 105, 361, 362, 363, 364(c), 364(d) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"), including Local Rule 4001-2, seeking, among other things:

(i)    authorization for the Debtors to obtain a secured post-petition debtor-in-possession financing facility (the "DIP Facility") from George T. Gamble 1991 Trust or an affiliated

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

designee ("Lender") pursuant to the terms and conditions of that certain term sheet attached as Exhibit A to the DIP Motion (the "DIP Term Sheet")

(ii)    authorization for the Debtors to execute and deliver all final documentation for the DIP Facility consistent with the DIP Term Sheet and the Debtor-in-Possession Credit Agreement between the Debtors and Lender dated September 1, 2012 (in form and substance satisfactory to the Lender and substantially similar to and without material modification thereto, the "DIP Credit Agreement") (all such final documentation, together with the DIP Term Sheet and the DIP Credit Agreement, the "DIP Documents"), in form and substance satisfactory to Lender, and to perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Documents;

(iii)    authorization for the Debtors to draw on the DIP Facility, subject to the conditions precedent set forth in the DIP Term Sheet and in the DIP Documents, and to use proceeds of the DIP Facility and Cash Collateral (as defined below) to pay for, among other things, working capital and general corporate purposes of the Debtors and the administration of the Cases, but only in accordance with a budget to be approved by the Lender;

(iv)    the granting of adequate protection to the Lender on account of its liens and security interests being primed by the DIP Facility;

(v)    the granting to the DIP Facility and all obligations arising thereunder (collectively, the "DIP Obligations") of allowed superpriority administrative expense claim status in the Cases;

(vi)    the granting to the Lender of automatically perfected first-priority security interests in and liens on all of the Collateral (as defined below) to secure all DIP Obligations;

(vii)    modification of the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Documents;

(viii)    an interim hearing on the DIP Motion (the "Interim Hearing") before this Court to consider entry of an order providing for certain relief requested therein on an interim basis (as entered, the "Interim Order");

(ix)    a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider entry of this final order (the "Final Order") authorizing the balance of the credit available under the DIP Facility, all as set forth in the DIP Documents, and any requested relief not granted under the Interim Order on a final basis, including without limitation authorization to effectuate the Roll-Up Loan (as defined in the DIP Term Sheet), all as set forth in the DIP Motion and in the DIP Credit Agreement filed with this Court.

NOW THEREFORE, the Interim Hearing having been held by the Court on August 9, 2012; and the Court having entered the Interim Order [Dkt. No. 29]; and the Court having considered the DIP Motion, the Affidavit of Maston Cunningham, the Chief Executive Officer of Tri-Valley Corporation, in support of the Debtors' First Day Motions and Applications, the exhibits attached thereto, the DIP Term Sheet, the DIP Documents, and the evidence submitted at the Final Hearing; and due and appropriate notice of the DIP Motion, the final relief requested therein, the Final Hearing, the Interim Order, and the proposed Final Order, having been served by the Debtors in accordance with the Interim Order and Bankruptcy Rules 2002, 4001 and 9014; and the Final Hearing to consider the relief requested in the DIP Motion having been held on and concluded on September 27, 2012; and upon consideration of all of the objections to the final relief requested in the DIP Motion raised by the U.S. Trustee (as defined

below), the Opus Special Committee, the UCC (as defined below), and the OEC (as defined below) having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the final relief requested is fair and reasonable and in the best interests of the Debtors, their estates, their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1) or to obtain credit secured solely by the Debtors' unencumbered assets or by junior liens on previously-encumbered assets; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND AT THE FINAL HEARING BY THE DEBTORS AND OTHER PARTIES IN INTEREST, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      *Petition Date.* On August 7, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court commencing its Case.

B.      *Debtors in Possession.* The Debtors are continuing to manage and operate their business and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue.* This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the Cases, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for these Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    _Committees_. The Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Cases (the "UCC") on August 27, 2012, and appointed an official committee of Opus equity security holders (the "OEC") on September 15, 2012, pursuant to Section 1102 of the Bankruptcy Code.

E.    _Notice_. The notice given by the Debtors of the DIP Motion, the relief requested therein, the Interim Hearing, the Interim Order, the Final Hearing, the proposed Final Order, and the DIP Documents constitutes appropriate, due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

F.    _Debtors' Stipulations_. Subject to Paragraph 19 of this Final Order, the Debtors each admit, stipulate and agree that:

(i)    As of the Petition Date, TVC, TVOG, and Select each are obligated, as borrowers or guarantors, to Lender pursuant to that First Gamble Senior Secured Note, Second Gamble Senior Secured Note, and Gamble Demand Note and related documentation (collectively, the "Prepetition Note Documentation"), in the amount (including interest, fees, and other costs) of $7,198,078.55 (the "Existing Indebtedness"), which obligations are secured by liens on and security interests (the "Existing Security Interests") in certain real and personal property of those Debtors pursuant to those security agreements, pledge agreements, mortgages, deeds of trust or other security documents executed prior to the Petition Date by any Debtor in favor of Lender;

(ii)    The Existing Indebtedness constitutes the legal, valid and binding obligation of the respective Debtors named in the Prepetition Note Documentation and is

enforceable in accordance with its terms, other than in respect of the stay operating pursuant to Section 362 of the Bankruptcy Code;

(iii)    The Existing Security Interests constitute legal, valid, perfected, unavoidable, and enforceable liens and interests, other than in respect of the stay operating pursuant to Section 362 of the Bankruptcy Code;

(iv)    No portion of the Existing Indebtedness or the Existing Security Interests is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or claim of any kind pursuant to the Bankruptcy Code or other applicable law; and

(v)    Each Debtor hereby forever waives and releases any and all claims, counterclaims, causes of action, defenses, recoupment rights, or setoff rights against Lender, its officers, directors, principals, beneficiaries and affiliates (including G. Thomas Gamble), arising prior to the Petition Date, whether arising at law or in equity, including without limitation any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or similar provisions of applicable nonbankruptcy law.

G.    *Findings Regarding the Post-petition Financing.*

(i)    *Cause.* Good cause has been shown for entry of this Final Order.

(ii)    *Need for Post-petition Financing.* Without the financing proposed by the DIP Motion, the Debtors do not have the funds necessary to continue their operations. The Debtors' ability to continue their operations, including to maintain oil and gas operations, to maintain business relationships, to make payroll, to pay the costs of administration of their estates and to satisfy other working capital and operational needs, depends on obtaining access to the DIP Facility and the use of cash collateral (as defined in the Bankruptcy Code) subject to the Existing Security Interests (the "Cash Collateral"). The access of the Debtors to sufficient

working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations under the DIP Facility is vital for preserving and maintaining the going concern values of the Debtors and to a successful reorganization. Failure to obtain the relief requested in the DIP Motion will harm (a) the Debtors, their estates, creditors and equity holders, and (b) the possibility of a successful sale or reorganization.

(iii)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing on terms more favorable than those offered by the Lender under the DIP Facility and are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit under Sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the Lender under the DIP Facility. The Debtors have made more than an adequate showing of their efforts to obtain financing on more favorable terms, and have shown that no other lender even proposed to extend credit to the Debtors. A credit facility in the amount and under the terms provided under the DIP Facility is not available from Lender without (a) granting to the Lender, subject to the Carve-Out (as defined below), the DIP Liens and DIP Superpriority Claims (each as defined below), (b) a roll up, as modified herein, of the Existing Indebtedness, and (c) the other protections set forth in this Final Order.

(iv)    *Additional Findings Concerning the Roll Up.* The Debtors have shown that despite a diligent effort to obtain alternative financing, no other lender proposed to extend credit to the Debtors. Indeed, the only lenders that even discussed the prospect of DIP financing for the Debtors indicated that if a DIP loan were possible, they would insist upon refinancing the entire Existing Indebtedness. The roll up, as modified herein, and deemed refinancing of the

Existing Indebtedness is a prudent exercise of the Debtors' business judgment consistent with their fiduciary duties in light of the benefits available with the DIP Facility and to avoid the harms of losing the DIP Facility, and the risk, expense and delay attendant to litigation that would have ensued had the Debtors sought to impose new liens without this refinancing, and to avoid burdensome administration of segregating cash collateral.

(v)     *Use of Proceeds of the DIP Facility.* As a condition to the extension of credit under the DIP Facility, the Lender and the Debtors have agreed that proceeds of any advance made under the DIP Facility shall be used exclusively in a manner consistent with the terms of the DIP Facility and the Approved Budget (as defined below), including for ordinary and necessary operating costs and expenses arising after the Petition Date or other payments as may be agreed to by the Lender.  No portion of the proceeds of any advance under the DIP Facility shall be used, directly or indirectly, to make any payment or prepayment that is prohibited under the DIP Facility, including any payment or prepayment relating to pre-petition indebtedness of the Debtors to the extent prohibited thereunder.

(vi)     *Final Relief.*  Absent the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility in accordance with the DIP Documents is therefore in the best interests of the Debtors and their estates, and is consistent with their fiduciary duties.

H.     *Good Faith of the Lender.*

(i)     *Willingness to Provide Financing.* The Lender is willing to provide financing to the Debtors subject to: (a) the entry of this Final Order; (b) the approval of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the Lender is extending credit

to the Debtors pursuant to the DIP Documents in good faith, and that the Lender's security interests, liens, superpriority administrative claims, and other protections granted pursuant to the Interim Order and this Final Order will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of the DIP Facility and the DIP Documents are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the DIP Documents were negotiated without collusion, in good faith and at arms' length among the Debtors and the Lender. Use of credit under the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by Section 364(e) of the Bankruptcy Code, and the Lender is therefore entitled to the full protection and benefits of Section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Financing Approved. The DIP Motion is granted in accordance with the terms of this Final Order.

2.    <u>Objections Overruled</u>. All objections to the DIP Motion to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

3.    <u>Authorization of the DIP Facility</u>. The Debtors are expressly and immediately authorized to incur and to satisfy the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and are expressly approved and incorporated herein by reference.  The DIP Facility is hereby approved upon the terms and conditions set forth herein and in the DIP Documents.  The DIP Obligations shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.

4.    <u>Authorization to Execute Documentation</u>.  The Debtors, to the extent not yet completed pursuant to the authority granted in the Interim Order, are hereby authorized to execute, enter into, and deliver the DIP Documents and all instruments and documents which may be required or reasonably necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) as described in and provided for by this Final Order and the DIP Documents, and the DIP Documents are hereby approved.  The DIP Documents and this Final Order shall evidence the validity and binding effect of the Debtors' DIP Obligations and shall govern the financial accommodations to be provided to the Debtors by Lender.  The Debtors and the Lender may make nonmaterial modifications to the DIP Documents.

5.    <u>Authorization to Borrow</u>.  Subject to the terms, conditions, limitations on availability set forth in the DIP Documents and this Final Order, the Debtors are hereby authorized to draw on the New Money Loan of the DIP Facility from the Lender, on the terms and conditions set forth in the DIP Documents.

6.      <u>No Obligation to Extend Credit</u>. The Lender shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Final Order have been satisfied in full or waived by the Lender in its sole discretion.  Furthermore, and notwithstanding anything to the contrary contained in the DIP Documents or this Final Order, provided that (a) the Debtors submit a budget through the Maturity Date (absent acceleration) that is acceptable to the Lender and does not increase the need for borrowing beyond $3.85 million (the "<u>Approved Budget</u>", a copy of which is attached as <u>Exhibit A</u> to this Final Order), and (b) the Debtors operate within variances to that budget set forth in the DIP Documents and an event of default otherwise does not occur, the Lender will commit to fund through the Maturity Date against that budget. Subject to the conditions set forth in this paragraph, the Debtors have agreed to expend the funds allotted to the "Steam Operations" line item set forth in the Approved Budget so as to optimize production from its oil and gas wells.

7.      <u>Effectiveness of Roll Up</u>.  In accordance with the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, as a necessary inducement to, and material portion of the compensation for, Lender providing the New Money Loan, the Existing Indebtedness is hereby deemed refinanced and designated as the Roll Up Loan, <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in the DIP Documents, Opus shall be liable for fifty percent (50%) of the Roll Up Loan, subject to paragraph 15.

8.      <u>Use of DIP Facility Proceeds</u>.  The Debtors shall use advances under the DIP Facility only for the purposes specifically set forth in this Final Order or in the DIP Documents, and in compliance with the Approved Budget.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, in no event shall the proceeds of the DIP Facility be used

(A) for any purpose that is not permitted under this Final Order; (B) in a manner not consistent with the Approved Budget; (C) to pay more than a total of $30,000 for the fees and expenses of any investigation or analysis by the UCC of any claim or cause of action against Lender or any affiliate of Lender; and (D) to pay more than a total of $10,000 for the fees and expenses of any investigation or analysis of the OEC of any claim or cause of action against Lender or any affiliate of Lender.

9.    <u>Superpriority Claims</u>.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out (as defined below), all of the DIP Obligations shall constitute allowed superpriority administrative expense claim against each of the Debtors (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates in the Cases, at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code; and which shall at all times be senior to the rights of the Debtors and their estates, any successor trustee or other estate representative and any creditor or other party in interest to the fullest extent permitted by law; provided however that the DIP Superpriority Claims shall be paid from Avoidance Action Proceeds only to the extent that any amounts due to the Lender on account of post-petition new money advances under the DIP Facility plus unpaid interest on those advances, plus all other charges and expenses incurred post-petition have otherwise not been paid in full.

10.     <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Final Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Lender or its agents over any Collateral, the following security interests and liens are hereby granted by the Debtors to Lender (collectively, the "<u>DIP Liens</u>"):

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all currently-owned or hereafter acquired assets and property, including without limitation all real and personal property, plant and equipment, accounts receivable and inventory, intellectual property, claims and causes of action (but not claims and causes of action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law), and any proceeds of any claims and causes of action (including without limitation any proceeds of any claims or causes of action available under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar non-bankruptcy law (all such proceeds, the "<u>Avoidance Action Proceeds</u>")), and any rights to receive proceeds or distributions from any affiliates or subsidiaries, of the Borrowers (the "<u>Collateral</u>"), to the extent that such Collateral is not subject to valid, perfected, and non-avoidable liens as of the commencement of the Cases.  Without limiting the generality of the foregoing, the Collateral shall include a fully perfected security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrowers, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, fixtures, leasehold interests and real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, investment property, commercial tort claims, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds.  Notwithstanding anything to the contrary contained in in the DIP Documents or this Final Order, the Collateral will not include commercial tort claims other than commercial tort claims based on tortious interference with contract or that impact the value of any of the Collateral;

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien on all Collateral, subject only to valid, perfected and non-avoidable liens and in favor of third parties and in existence as of the commencement of the Cases, or to valid and non-avoidable liens in favor

of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code; and

(c) pursuant to section 364(d) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all Collateral to the extent such Collateral is subject to valid, perfected and non-avoidable liens in favor of (i) third parties as of the commencement of the Cases, or (ii) securing the Existing Indebtedness.

Lender shall not be required to marshal the Collateral, and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Documents, in any manner or order in the Lender's sole and absolute discretion. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the amount secured by the liens granted herein to the Lender on any Avoidance Action Proceeds shall not exceed the amount of all post-petition advances under the DIP Facility, plus unpaid interest on those advances, plus all other charges and expenses incurred post-petition.

11. <u>Perfection of Liens</u>. This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted to the Lender herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the Lender to the priorities granted herein. Notwithstanding the foregoing, the Lender is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or recorded as of the Petition Date; *provided,*

*however,* that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the Lender all such financing statements, mortgages, notices and other documents as the Lender reasonably request.  The Lender in its discretion may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

12.    <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of the Carve-Out (as defined below), no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral or the Cash Collateral against Lender pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of Lender.

13.    <u>Carve-Out</u>.  Each of the liens and claims, including superpriority administrative expense claims granted to the Lender in connection with the DIP Facility under this Final Order shall be subject only to a carve-out (the "<u>Carve-Out</u>") for the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000.00; and (iii) after the occurrence and during the continuation of an Event of Default (as defined in the DIP Documents), a total amount not to exceed $225,000 to pay any fees or expenses incurred by counsel and financial advisors to the Borrowers and any statutory committee appointed in the Cases (each, a "<u>Committee</u>") that remain unpaid after allowance by the Bankruptcy Court and

subsequent to the payment of such fees and expenses from existing retainers, if any, or available funds remaining in the Borrowers' estates for expense reimbursement or compensation as allowed by the Bankruptcy Court; provided, however, that nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described above.  In addition, subject to Paragraph 8 of this Final Order but notwithstanding anything else to the contrary herein, to the extent that existing retainers or available funds remaining in the Borrowers' estates are insufficient to satisfy the allowed claims by counsel or financial advisors to the Borrowers or any Committee for fees and expenses incurred prior to the occurrence of an Event of Default, then the Lender shall fund these allowed claims, provided that in no event shall Lender be obligated to fund any claims exceeding the aggregate amount budgeted specifically for the Borrowers' professionals, the UCC's professionals, and any other Committee's professionals in the line items specifically provided for the foregoing professionals as set forth in the Approved Budget from the date of such professionals retention by such Committee through the date that such fees and expenses were incurred, and provided further that in no event shall Lender be obligated to fund any claims if doing so would, when combined with the amounts advanced by the Lender under the DIP Facility (including without limitation the Roll-Up Loan and any amounts prepaid by the Borrowers), exceed the aggregate principal amount of the DIP Facility.

14.    <u>Maturity</u>.  All DIP Obligations shall be immediately due and payable on the Maturity Date, in full and in cash without deduction or setoff, and all of Lender's commitments under the DIP Facility will terminate, including any further obligation to extend credit; provided, however, that the Prepetition Balance (as defined in the DIP Documents) shall not be due and

payable upon the closing of the Sale (as defined in the DIP Documents) but shall be set aside in the Carve-Out Reserve (as defined in the DIP Documents), and any plan of reorganization proposed by the Debtors in these Cases shall separately classify the Prepetition Balance and shall provide that the Prepetition Balance shall be paid in full in cash (with interest) upon the effective date of the plan, absent the affirmative vote of the Lender, who shall be entitled to vote to accept or reject any alternative treatment of the Prepetition Balance in accordance with bankruptcy majorities as set forth in section 1126 of the Bankruptcy Code, and such alternative treatment shall be treated as an allowed prepetition secured claim.  For the avoidance of doubt, except as provided above with respect to the Prepetition Balance, any confirmation order entered in the Cases shall not discharge or otherwise affect any of the obligations of the Borrowers to the Lender under the DIP Documents, which shall be joint and several obligations, other than after the indefeasible payment, in full and in cash without deduction or setoff, to the Lender of all DIP Obligations on or before the effective date of a plan of reorganization in the Cases or the Maturity Date.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the definition of Maturity Date as used in the DIP Credit Agreement shall be as follows:

> "Maturity Date" means the earliest to occur of (a) January 4, 2013, (b) the effective date of a plan of reorganization for one or more of the Debtors, (c) the date on which the Debtors have consummated, pursuant to Section 363 of the Bankruptcy Code and a final order of the Bankruptcy Court in respect thereof, a sale or sales of all or substantially all of the Debtors' assets; (d) the date of acceleration of any of the DIP Obligations, including without limitation, an acceleration pursuant to an Event of Default, and (e) the date of indefeasible payment in full of all DIP Obligations.

15.    <u>Intercompany DIP Claims</u>.  Without limiting the obligations of any Debtor to the Lender, each Debtor shall be obligated, solely with respect to each other Debtor, to satisfy its fair allocated share of the DIP Obligations (the "<u>Intercompany DIP Claims</u>"), which amount shall be determined as of the Maturity Date by the Court unless otherwise agreed to in writing by the

Debtors and each Committee. Solely to secure payment of these Intercompany DIP Claims, each Debtor hereby receives duly and properly perfected liens, subordinate in priority and in right of payment only to the DIP Superpriority Claims and the DIP Liens and to the Carve Out, on all Collateral of all other Debtors.

16.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay</u>. The Lender has acted in good faith in connection with the DIP Facility and the DIP Documents, and its reliance on this Final Order is in good faith. Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the Lender is entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby. Any liens or claims granted to the Lender hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

17.    <u>Proofs of Claim</u>. The Lender will not be required to file proofs of claim in any of the Cases for any claim allowed herein in relation to the DIP Facility. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the to the contrary, the Lender is hereby authorized and entitled, but not required, in its sole discretion to file (and amend and/or supplement, as it sees fit) a proof of claim in the Cases for any claim allowed herein in relation to the DIP Facility.

18.    <u>Limitations on the DIP Facility and the Collateral</u>. The DIP Facility and the Collateral may not be used in connection with: (a) preventing, hindering, or delaying any of the Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) using or seeking to use any cash Collateral or selling or otherwise disposing of the Collateral without the prior written consent of the Lender; (c) using or seeking to use any insurance proceeds constituting Collateral without the prior written consent of the Lender; (d) incurring indebtedness without the prior written consent of the Lender, except to the extent permitted under the DIP Documents; (e) objecting or challenging in any way any claims, liens, Collateral, as the case may be, held by or on behalf of the Lender; (f) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; or (g) prosecuting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other rights or interests of the Lender.

19.    <u>Effect of Stipulations on Third Parties</u>.    Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph F of this Final Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all claims against Lender as of the date of entry of this Final Order. Notwithstanding the foregoing:

(a)    Any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until October 30, 2012 (the "<u>First Challenge Period</u>"), to object to, or

file any affirmative claims or causes of action (including any avoidance claims) relating to, the amount, validity and/or priority of Lender's Existing Indebtedness and the liens or claims securing same against the Lender or any affiliate of the Lender (including G. Thomas Gamble), which claims may include claims derivative of the Debtors' estates notwithstanding the stipulations, admissions and agreements of the Debtors contained in this Final Order (collectively, "Possible Existing Indebtedness Claims"). Standing is hereby conferred on each Committee, without further order of the Court, to institute and to prosecute Possible Existing Indebtedness Claims before the expiration of the First Challenge Period. Failure to do so prior to the expiration of the First Challenge Period shall be deemed a waiver of any and all such objections or claims and causes of action as against the Lender and its affiliates (including G. Thomas Gamble), and the Existing Indebtedness shall be an allowed claim not subject to any further challenge;

(b)     Any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until the earlier of (V) 120 days from the closing of the sales of substantially all of the Debtors' assets or (W) April 30, 2013, to seek standing to prosecute any claims or causes of action other than Possible Existing Indebtedness Claims against Lender or its affiliates, which claims may include claims derivative of the Debtors' estates notwithstanding the stipulations, admissions and agreements of the Debtors contained in this Final Order, and, if standing is conferred, until the earlier of (X) two weeks after standing is conferred on a Committee or (Y) May 15, 2013, to initiate an action on any such claim or cause of action (the "Second Challenge Period," and together with the First Challenge Period, the "Challenge Periods"). Failure to obtain standing or to commence an action on claims other than Possible Existing Indebtedness Claims if standing is conferred within the deadlines set forth for the Second Challenge Period shall be deemed a waiver of any and all such objections or claims and causes of action as against the Lender and its affiliates (including G. Thomas Gamble); and

(c)     Notwithstanding anything to the contrary herein, if any of these Cases convert to a Chapter 7 prior to the expiration of an otherwise still applicable Challenge Period, the Chapter 7 trustee shall have any time remaining under the still applicable Challenge Period and an extra thirty (30) days from the date of appointment. For the avoidance of doubt, except as set forth in paragraph 19(a) above, nothing in this Final Order vests or confers on any person or Committee standing or authority to pursue any claim or cause of action belonging to the Debtors' or their estates, including without limitation, those claims or causes of action discussed in paragraph F of this Final Order.

(d)     For the avoidance of doubt, nothing in this Final Order shall release, impair, or otherwise affect any claim or cause of action that any holder of

an equity security interest in Opus may have in its own capacity, existing as of the Petition Date and which did not – under applicable law – become property of the Opus estate, against the Lender and its affiliates (including G. Thomas Gamble).

20.    <u>Modification of Automatic Stay</u>. The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtors to pay, and Lender to retain and apply payments made, in accordance with the terms of this Final Order and the DIP Documents.

21.    <u>Payment of the Facility Fee</u>. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the Facility Fee shall be payable on the Maturity Date. As set forth in the DIP Documents, on the Maturity Date (as defined in the DIP Documents), all of Lender's actual out-of-pocket expenses and professionals' fees and costs incurred in connection with monitoring the Borrowers' operations and value, participating in the Bankruptcy Cases, or enforcing the Lender's rights with respect to the DIP Obligations, shall be paid by the Borrowers to Lender in full in cash, without deduction or setoff, subject to Lender's submission to the Borrowers, the U.S. Trustee, the UCC and the OEC of invoices documenting such expenses, fees, and costs. The U.S. Trustee, the UCC and the OEC shall have the right to review and object to the reasonableness of any charge for the Lender's professionals fees and expenses within ten (10) days of receipt of such documentation. Any dispute concerning the reasonableness of any such fees or expenses shall be determined by the Court. For the avoidance of doubt, the submitted invoices may be redacted on account of considerations of confidentiality or privilege.

22.    <u>Prepayments</u>. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, any prepayments by the Debtors shall be applied first to repayment of the Roll Up Loan until repaid in full, including associated fees, interest, and expenses, and then to

repayment of the New Money Loan, until repaid in full, with such prepayments to be applied by date of the outstanding draw amount (together with associated fees, interest, and expenses), with the oldest being paid down first.

23.    Order Entry.  Notwithstanding anything to the contrary in the DIP Term Sheet, the entry of this Final Order shall be deemed to have timely satisfied all conditions and requirements therein concerning the Final Order and the Final Order Entry Date (as defined in the DIP Term Sheet).

24.    Reports.  All reports required to be provided to the Lender by the Debtors under this Final Order or the DIP Documents shall contemporaneously be delivered to each Committee, subject in each case to such confidentiality restrictions that the Debtors shall reasonably impose. The nondisclosure agreement currently in place between the Debtors and the UCC reflects the confidentiality restrictions that will govern the delivery of the reports required to be delivered to the UCC hereunder.

25.    Pleasant Valley Leases.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, the sales process for the Pleasant Valley leases shall be as follows and the failure to adhere to this schedule shall be an Event of Default under the DIP Documents:

   a.  Bids will be due on November 30, 2012;

   b.  The auction will be held on December 5, 2012;

   c.  The sale hearing will be held on December 7, 2012, subject to the Court's calendar, but in any event no later than December 11, 2012; and

   d.  The closing on the sale of the Pleasant Valley leases will occur or before December 22, 2012;

provided, however, that if, at any point in time, the Debtors, in consultation with each Committee, conclude that their expected cash availability, including any amounts available under

the DIP Facility, is not sufficient to support the Debtors' operations throughout the time line set forth above for the sale of the Pleasant Valley leases, then the Debtors, with the consent of the Committees or further Court order, shall be authorized to shorten the sale process time line to match their expected cash availability.

26.     Other Asset Sales.  Except as modified in paragraph 25 above, the deadlines set forth for the sales process for the Debtors' other assets in the DIP Documents shall be unaffected by this Final Order.

27.     Resolution of OEC Objection.  Anything to the contrary in the Opus partnership agreement notwithstanding, upon the occurrence of the effective date of any plan of reorganization that provides for Opus to continue to operate as an entity independent of TVC and TVOG, TVC and TVOG agree that upon the written request of the reorganized Opus entity, to resign their respective responsibilities as managing partner and drilling program manager, respectively, and to reasonably cooperate with the transition of management to a newly appointed manager.

28.     Exercise of Remedies.  Upon the occurrence of an Event of Default, the Lender shall have the option to take any and all actions and remedies upon motion to the Court that the Lender may deem appropriate, and upon notice to the Debtors, counsel to the Debtors, the U.S. Trustee and any Committee, to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the estates of the Debtors upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender with such motion to be heard by the Court five (5) days after notice is given (or as soon thereafter as the Court's calendar permits), notwithstanding any Bankruptcy Rule or Local Rule to the contrary.

29.    <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

30.    <u>No Waiver by Failure to Seek Relief</u>. The failure of the Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

31.    <u>Binding Effect of Final Order</u>. Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the Lender, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Cases, or upon dismissal of the Cases.  For the avoidance of doubt, nothing in this Final Order is intended, or should be construed, to limit the ability of the OEC to challenge whether the Opus chapter 11 petition was filed with proper authority; provided, however, that any relief granted in response to any such challenge shall not limit, modify, or otherwise affect this Final Order, including without limitation the liens authorized and granted to the Lender herein, the liens granted herein to each of the Debtors (including Opus) against the other Debtors (including Opus) to secure the Intercompany DIP Claims, and provided, further, that if the relief granted in response to any such challenge is the dismissal or conversion of the Opus chapter 11 case, this Final Order and the DIP Documents shall continue to be effective and enforceable against Opus or any chapter 7 trustee appointed for Opus, with respects to all amounts due under the DIP Facility as of the date of such dismissal or conversion, notwithstanding the dismissal or conversion of the Opus chapter 11 case.

32.    <u>No Modification of Final Order</u>. Until and unless the DIP Obligations have been indefeasibly paid in full in immediately available funds (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not, without the Lender's prior written consent, seek or consent to, directly or indirectly: (a) any modification, stay, vacatur or amendment to this Final Order; (b) the granting of any priority claim or administrative expense against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases, equal or superior to the DIP Superpriority Claims, (c) the entry of any order allowing use of cash collateral resulting from Collateral; or (d) the granting any lien on any of the Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the Lender's prior written consent, and no such Lender consent shall be implied by any other action, inaction or acquiescence of the Lender.

33.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

34.    <u>Survival</u>.  The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the Lender pursuant to this Final Order and/or the DIP Documents, shall continue in the Cases, or following dismissal of the Cases, and shall maintain their priority as provided by this Final Order until all the DIP Obligations, pursuant to the DIP Documents and this Final Order, have been indefeasibly paid in full (such

payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.

35.    <u>Budget Variance</u>.    Anything to the contrary in the DIP Credit Agreement notwithstanding, the Debtors will not allow the payment of any expenses or disbursements other than those set forth in the Approved Budget, except that, with respect to each line item of the Approved Budget, the total amount of any expense or disbursement during any calendar week period that is reflected in the Approved Budget may not exceed the sum of (a) one-hundred and ten percent (110%) of the budgeted weekly expenses and disbursements for any calendar-week period (for the line-item in question) plus (b) any budgeted amounts from the preceding calendar weeks not spent during such week (for the line item in question) (it being understood that such expenses and disbursements shall not include finance charges, professional fees, and capital expenditures) (a "<u>Permitted Variance</u>"); provided that (x) any proposed Permitted Variance is reported and tested weekly, and (y) in no event shall the total of the aggregate expenses and disbursements during any calendar week period exceed by more than the sum of (i) one-hundred and ten percent (110%) of the aggregate budgeted expenses and disbursements for such period in the Approved Budget plus (ii) any budgeted amounts from all preceding weekly periods not spent during such weeks (it being understood that such expenses and disbursements shall not include finance charges, professional fees, and capital expenditures).

36.    <u>Inconsistency Between Final Order and DIP Documents</u>.    In the event of an inconsistency between this Final Order and the DIP Documents, the terms of this Final Order shall govern.

37.    <u>Bankruptcy Rule 7052</u>. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

38.    <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated: September 28 , 2012
        Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE