### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>TRI-VALLEY CORPORATION, *et al.*,[1]<br><br>Debtors. | : Chapter 7<br>:<br>:<br>: Case No. 12-12291 (MFW)<br>:<br>: (Jointly Administered)<br>: **Related Docket No. 769**<br>:<br>: **Objections Due:  July 30, 2013 @ 12:00 p.m.**<br>: **Hearing Date:  August 7, 2013 @ 2:00 p.m.** |

**OPUS TRUSTEE'S OBJECTION TO MOTION OF GEORGE T. GAMBLE 1991 TRUST PURSUANT TO 11 U.S.C. § 105 TO COMPEL PAYMENT OF FEES AND EXPENSES IN ACCORDANCE WITH (I) FINAL ORDER (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION, AND (D) GRANTING RELATED RELIEF, AND (II) SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

Jeoffrey L. Burtch, as chapter 7 trustee (the "Opus Trustee") for the Estate of TVC Opus I Drilling Program, L.P. ("Opus"), by and through his undersigned attorneys, hereby objects to the Motion of the George T. Gamble 1991 Trust ( the "Gamble Trust") Pursuant to 11 U.S.C. § 105 to Compel Payment of Fees and Expenses in Accordance with (I) Final Order (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection, and (D) Granting Related Relief, and (II) Senior Secured Superpriority Priming Debtor in Possession Credit and Security Agreement (the "Motion"),[2] and in support thereof states as follows:

---

[1]  The Debtors in these proceedings are:  Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0389) and TVC Opus Drilling Program L.P. (0334).

[2]  Capitalized terms not specifically defined herein shall have the same meaning given to them in the Motion.

**BACKGROUND**

1.    On August 7, 2012 (the "Petition Date"), Tri-Valley Corporation ("Tri-Valley"), Tri-Valley Oil & Gas Co. ("TVOG"), Select Resources Corporation, Inc. ("Select") and Opus (together with Tri-Valley, TVOG and Select, the "Debtors") each filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Opus was placed into bankruptcy by Tri-Valley, which purported to be acting in its capacity as Managing Partner of Opus.

2.    One of the Debtors' first-day motions was a motion seeking approval of debtor-in-possession financing to be provided by the Gamble Trust. The proposed DIP Loan was negotiated by Tri-Valley, the Gamble Parties, and their respective attorneys prior to the Petition Date and before the appointment of special conflicts counsel in the Chapter 11.

3.    On September 28, 2012, the Court entered the Final Order (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection, and (d) Granting Related Relief (the "Final DIP Order"), pursuant to which the Gamble Trust provided debtor-in-possession financing to the Debtors. The Gamble Trust extended a $3.8 million loan (the "New Money Loan") to the Debtors and Tri-Valley's existing indebtedness to the Gamble Trust in the amount of $7.2 million was rolled-up (the "Roll-Up Loan") and secured by the assets of the Debtors, including Opus, subject to the rights of all parties, including any future chapter 7 trustees, to challenge, inter alia, the Roll-Up Loan and the underlying pre-petition indebtedness to the Gamble Trust.

4.    It is noteworthy that prior to the commencement of these cases, Opus had no obligation to the Gamble Trust, nor did it benefit in any way from Tri-Valley's existing indebtedness to the Gamble Trust. Prior to the filing, Opus was solvent and its assets were largely unencumbered.

2

5.      The Final DIP Order authorized the Debtors to execute and deliver final documentation for the DIP Facility consistent with the DIP Term Sheet and the Senior Secured Super Priority Priming Debtor in Possession Credit and Security Agreement dated as of September 1, 2012 (the "DIP Credit Agreement").

6.      On December 7, 2012, the Debtors entered into an Asset Purchase Agreement with Clarity Management LP.  In connection with the closing on the Asset Purchase Agreement, the Debtors transferred more than $11 million to the Gamble Trust in full satisfaction of the amounts outstanding under the DIP Credit Agreement (the "Post-Petition Transfer"), which included the New Money Loan and the Roll-Up Loan.

7.      On March 25, 2013, the Court entered an Order converting the Debtors' cases from Chapter 11 to Chapter 7 of the Bankruptcy Code.

8.      On March 26, 2013, the Office of the United States Trustee appointed the Opus Trustee as chapter 7 trustee of Opus's estate, and Charles A. Stanziale, Jr. as chapter 7 trustee (the "Tri-Valley Trustee") of the estates of Tri-Valley, TVOG and Select (the "Non-Opus Debtors").

9.      The Gamble Trust filed this Motion on July 2, 2013 seeking an Order of the Court compelling the payment of certain fees and expenses that are alleged to be owed under the Final DIP Order and DIP Credit Agreement.  Specifically, the Gamble Trust seeks an Order for the payment of approximately $768,013 in fees and expenses incurred by the Gamble Trust and G. Thomas Gamble during the period from January 1, 2013 through May 31, 2013, and, as applicable, the payment of fees and expenses of "other [unspecified] parties entitled to reimbursement or indemnification."  Motion,      ¶ 32.

10.      The fees and expenses sought in the Motion are for legal services performed on or after January 1, 2013, after the DIP Facility was paid in full.  See Motion, Exs. A-D.  These fees

3

16970021\2

and expenses represent more than 20% of the New Money Loan that the Debtors received from the Gamble Trust.

11. The Gamble Trust and G. Thomas Gamble are defendants in three separate adversary proceedings brought by the pre-conversion committees, the Opus Trustee and the Tri-Valley Trustee in which the plaintiffs seek to avoid liens securing the Roll-Up Loan and/or equitably subordinate or recharacterize the Roll-Up Loan as equity. Mr. Gamble is a defendant in two additional adversary proceedings in which the Trustees assert breach of fiduciary duty claims against Mr. Gamble and other former officers and directors of the Debtors. Lastly, Mr. Gamble is also a defendant in a putative class action pending in California state court alleging various breaches of duty and law against Mr. Gamble and other former officers and directors of the Debtors.

## OBJECTION

12. The Opus Trustee objects to the Motion, because the relief requested is not supported by the applicable documents. Specifically, the Gamble Trust's request for payment of fees and expenses after the DIP Facility was paid in full is not supported by the Final DIP Order or DIP Credit Agreement. Also, the fees and expenses sought by the Gamble Trust are excessive and unreasonable.

13. The Gamble Trust seeks the payment of its fees and expenses pursuant to sections 10.2 and 10.3 of the DIP Credit Agreement.

14. Sections 10.2 of the DIP Credit Agreement provides for the reimbursement of certain expenses of the Gamble Trust as follows:

> 10.2    Expenses.   Whether or not the transactions contemplated hereby shall be consummated, Borrowers agree jointly and severally to pay in full to the Administrative Agent, for the account of the lenders, the Secured Parties, or itself, as applicable, on the Maturity Date, in cash: (a) the fees, expenses and disbursements of counsel to the Gamble Trust (including travel costs and expenses)

4

in connection with the negotiation, preparation, execution and administration of the Transaction Documents and any proposed or completed consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrowers... (c) all actual costs and expenses (including the fees, expenses and disbursements of any appraisers, consultants, advisors, auditors, accountants, attorneys, and agents employed or retained by the Gamble Trust) in connection with the Transaction Documents and the transactions contemplated thereunder;... (e) all fees and expenses of the Gamble Trust incurred in connection with monitoring, administering, or enforcing any Agent's or Lender's rights under the Facility and the Transaction Documents; (f) all fees and expenses of the Gamble Trust incurred in connection with monitoring and participating in the Case...[3] (emphasis added).

15.    The "Maturity Date" is defined in the Final DIP Order as follows:

"Maturity Date" means the earliest to occur of (a) January 4, 2013, (b) the effective date of a plan of reorganization for one or more of the Debtors, (c) the date on which the Debtors have consummated, pursuant to Section 363 of the Bankruptcy Code and a final order of the Bankruptcy Court in respect thereof, a sale or sales of all or substantially all of the Debtors' assets; (d) the date of acceleration of any of the DIP Obligations, including without limitation, an acceleration pursuant to an event of default, and (e) the date of indefeasible payment in full of all DIP Obligations.

16.    Section 10.3 of the DIP Credit Agreement provides for

indemnification of certain "Indemnified Liabilities" as follows:

10.3    Indemnity; WAIVER OF PUNITIVE DAMAGES. (a) In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Borrower agrees jointly and severally to defend (subject to Indemnities' selection of counsel), indemnify, pay and hold harmless, the Gamble Trust, each agent, each Lender and the officers, partners, directors, trustees, employees, agents, advisors, attorneys principals and Affiliates of the Gamble Trust, each Agent and each Lender (each an "Indemnitee"), from and against any and all Indemnified Liabilities, INCLUDING ANY INDEMNIFIED LIABILITIES CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE OF SUCH INDEMNIFIED PARTY OR IMPOSED, IN WHOLE OR IN PART, UNDER ANY LAW PROVIDING FOR STRICT LIABILITY (IN EACH

---

[3] Only those subsections referred to in the Motion are quoted, but each subsection is quoted in its entirety without any ellipsis.

1697002 1\2

CASE WHETHER ALLEGED, ARISING OR IMPOSED IN A
LEGAL PROCEEDING BROUGHT BY OR AGAINST ANY
BORROWER, ANY INDEMNITEE, OR ANY OTHER
PERSON), provided, no Borrower shall have any obligation to any
Indemnitee hereunder with respect to any Indemnified Liabilities
to the extent such Indemnified Liabilities arise from the gross
negligence or the willful misconduct of that Indemnitee. ...
(emphasis added; capitalized words in original).

17.    Section 1.1 of the DIP Credit Agreement defines "Indemnified Liabilities" as

follows:

"Indemnified Liabilities" means, collectively, any and all
liabilities, obligations, losses, damages (including natural resource
damages), penalties, claims (including Environmental Claims),
costs (including the costs of any investigation, study, sampling,
testing, abatement, cleanup, removal, remediation or other
response action necessary to remove, remediate, clean up or abate
any Hazardous Materials Activity), expenses and disbursements of
any kind or nature whatsoever (including the reasonable fees and
disbursements of counsel for Indemnitees in connection with any
investigative, administrative or judicial proceedings commenced or
threatened by any Person, whether or not any such Indemnitee
shall be designated as a party or a potential party thereto, and any
reasonable fees or expenses incurred by Indemnitees in enforcing
this indemnity), whether direct, indirect or consequential and
whether based on any federal, state or foreign laws, statutes, rules
or regulations (including securities and commercial laws, statutes,
rules or regulations and Environmental Laws), on common law or
equitable cause or on contract or otherwise, that may be imposed
on, incurred by, or asserted against any Indemnitee, in any manner
relating to or arising out of (i) this Agreement or the other
Transaction Documents or the transactions contemplated hereby or
thereby (including any grant of Collateral or Lenders' agreement to
make Credit Extensions or the use or intended use of the proceeds
thereof, or any enforcement of any of the Transaction Documents
(including any sale of, collection from, or other realization upon
any of the Collateral) or any defense against allegations of
misconduct by any Indemnitee); (ii) the statements contained in
any commitment letter, summary of terms or proposal letters
delivered by any Indemnitee to any Borrower or any of its
Subsidiaries with respect to the transactions contemplated by this
Agreement; or (iii) any Environmental Claim or any Hazardous
Materials Activity relating to or arising from, directly or indirectly,
any past or present activity, operation, land ownership, or practice
of any of the Borrowers or any of their Subsidiaries.

6

16970021\2

18.      The agreement to pay expenses under § 10.2 of the DIP Credit Agreement contemplates payment of those expenses by the Maturity Date.  In fact, as the Gamble Trust acknowledges, upon the closing of the sale of the Pleasant Valley Assets in December 2012, the Debtors paid, from the sale proceeds, the outstanding amounts owed under the DIP Facility.   In any event, the Maturity Date occurred no later than January 4, 2013.  The Final DIP Order and DIP Credit Agreement do not contemplate that the Gamble Trust's fees and expenses under § 10.2 would continue to be paid after the Maturity Date.

19.      Sections 10.2 (a), (c) and (e) of the DIP Credit Agreement, cited by the Gamble Trust in the Motion, all refer, one way or another, to expenses for the negotiation, preparation, execution, administration or enforcement of the DIP Facility and Transaction Documents, activities which are unnecessary after  the DIP Facility is paid in full and the Maturity Date occurs.

20.      While Section 10.2 (f), also cited in the Motion, refers to "fees and expenses of the Gamble Trust incurred in connection with monitoring and participating in the Case," it is clear from the context that the subsection has as its purpose the payment of expenses of the Gamble Trust for monitoring and participating in the case to protect its interests under the DIP Facility, which is no longer necessary after the Maturity Date once the DIP Facility has been paid in full.

21.      The indemnity obligation in § 10.3 is similarly limited.  Section 10.3 provides that the Debtors will indemnify, pay and hold harmless the Gamble Trust from and against any "Indemnified Liabilities".  Indemnified Liabilities is a defined term, and refers to liabilities "in any manner relating to or arising out of... this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby (including ... any defense against allegations of misconduct by any Indemnitee)..." It is clear that the indemnity extends only to matters related

7

to or arising out of the DIP Credit Agreement or the DIP Credit Facility, and not to any other pre-petition or post-petition matters. Even the indemnity for the defense of allegations of misconduct by any Indemnitee is limited to misconduct alleged in connection with the DIP Credit Agreement or the transactions contemplated by the DIP Credit Agreement, and does not extend to any and all allegations of misconduct by any Indemnitee alleged to have occurred pre-petition or even post-petition but unrelated to the DIP Credit Agreement.

22.     The Gamble Trust argues that the Final DIP Order contains General Releases of claims by the Debtors against the Gamble Trust and its affiliates, subject to certain challenge rights for any committee or subsequently appointed chapter 7 or chapter 11 trustee. Motion, ¶ 9. Those challenge rights, including the filing of any affirmative claims or causes of action (including any avoidance claims) relating to the amount, validity and/or priority of the Existing Indebtedness and the liens or claims securing them against the Lender or its affiliates, and claims or causes of action other than Possible Existing Indebtedness Claims, may be brought "notwithstanding the stipulations, admissions and agreements of the Debtors " contained in the Final DIP Order, which include the so-called General Releases. See Final DIP Order ¶ 19. Pursuant to the Final DIP Order, those claims were not released and the viability of those claims were not extinguished by the DIP Credit Agreement or the Final DIP Order unless the challenge period expired and no such claims were asserted. There is nothing in the DIP Credit Agreement or the Final DIP Order that would make the estates liable for the fees and expenses of the Gamble Trust in defending against those claims, including the Rule 2004 Motion, the Rule 2004 Examination or the Pending Adversary Proceeding, if timely pursued.

23.     The Gamble Trust argues that the Committees' claims and requests for related relief are  inconsistent with, and contrary to the terms of the DIP Documents. See Motion, ¶ 35. Those claims seek to obtain disgorgement of amounts paid to the Gamble Trust pursuant to the

8

Final DIP Order and DIP Credit Agreement, undo the Roll Up Loan, and effectively set aside the General Releases. Id. But the Final DIP Order expressly created a carve-out to the General Releases and other "stipulations, admissions and agreements of the Debtors" in the Final DIP Order for the Committees and any subsequently appointed chapter 7 trustee to raise those challenges. The Final DIP Order and the DIP Credit Agreement both expressly provide that the terms of the Final DIP Order govern in the event of an inconsistency between the DIP Documents and the Final Order. See DIP Credit Agreement, ¶ 10.21; Final DIP Order, § 36.

24.     The Court could not have intended that the Committees or a subsequently appointed chapter 7 trustee would have the right and opportunity to challenge the provisions of the DIP Loan, but if they did, the estates would have to defend, indemnify and hold harmless the Gamble Trust for any such challenge. That result is absurd and renders the rights in the carve-out illusory.

25.     If the DIP Loan Agreement provides the Gamble Trust a right of indemnity for any challenge to the validity of the Lender's pre- or post- petition loans, as the Gamble Trust argues, citing the Debtor's Motion to Convert, that right to indemnity is trumped by the provisions of the Final DIP Order, which expressly carved out the right of any Committee or subsequently appointed chapter 7 or 11 trustee to bring those claims "notwithstanding" the General Releases. It cannot be that the Final DIP Order created a carve out for the claims, but would then require the same chapter 7 or 11 trustee to indemnify the Gamble Trust for any such challenge, thus effectively negating the carve out itself.

26.     In addition to seeking the payment of the fees and expenses of the Gamble Trust and G. Thomas Gamble for the Rule 2004 Motion, the Rule 2004 Examination and the Adversary Action, which are not subject to reimbursement or indemnification by the estates, the Gamble Trust also seeks payment for its fees and expenses for other activities. Much of the fees

and expenses are related to the change in law firms by the Gamble Trust and G. Thomas Gamble in the first quarter of 2013, well after the DIP Facility was repaid and the Maturity Date had passed. For example, the April 2013 invoice from Reed Smith, covering March 2013 and totaling $49,994.35,[4] includes fees and expenses for "transfer of files," "review of background documents," "review of files and documents," "review and analysis of DIP Order, DIP Agreement, First Day affidavit and filings early in the case," "review of documents relating to OEC [Opus Equity Committee] and Rule 2004 exam," and "review and preliminary analysis of hearing transcripts". See Motion, Reed Smith April 2013 Invoice (D.I. 769-3, pp. 64-71). In April and May 2013, the first two months in Chapter 7 when all litigation was at a standstill, and more than three months after the DIP Facility was paid in full and the Maturity Date under the Final DIP Order, the Gamble Trust incurred more than $220,000 in fees and expenses which it seeks to recover through this Motion. See Motion, Reed Smith May & June 2013 Invoices ( D.I. 769-4, pp. 78-84 & D.I. 769-5, pp. 5-16). These charges are unreasonable and should not be borne by these estates in any event.

27.     It is not possible to determine the reasonableness of the other fees and expenses incurred by the Gamble Trust during this period, nor to determine precisely how much was incurred for what purpose, since the statements from the Gamble Trust's lawyers contain "block billing," where the time and expenses for specific tasks are not identified.

28.     The Motion seeks payment for more than $768,000 in fees and expenses, an amount in excess of 20% of the New Money Loan under the DIP Facility. This sum is in addition to the hundreds of thousands paid to the Gamble Trust for fees and expenses for the period prior to January 1, 2013. Even if these fees and expenses were subject to payment from

---

[4] The total fees and expenses incurred by the Gamble Trust in March 2013 were $162,177.78, spread among three different law firms, all of which the Gamble Trust seeks to recover by this Motion.

16970021\2

the estates, which they are not, the amount of the fees and expenses is clearly unreasonable and payment should be denied.

29.    In addition to these Objections, the Opus Trustee also incorporates any additional Objections to the Motion made by the Tri-Valley Trustee.

WHEREFORE, the Opus Trustee respectfully requests that the Court enter an Order denying the Motion of the Gamble Trust and granting such other and further relief as the Court deems just and appropriate.

Dated: July 30, 2013                          COZEN O'CONNOR

                                              /s/ Mark E. Felger
                                              Mark E. Felger (No. 3919)
                                              Barry M. Klayman (No. 3676)
                                              1201 N. Market Street, Suite 1001
                                              Wilmington, DE 19801
                                              Telephone:  (302) 295-2000
                                              Facsimile:  (302) 295-2013

                                              *Counsel to Jeoffrey L. Burtch,*
                                              *Chapter 7 Trustee*

16970021\2