## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 7 |
| TRI-VALLEY CORPORATION, *et al.*, | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| In re | Chapter 7 |
| TVC OPUS I DRILLING PROGRAM L.P., | Case No. 12-12294 (MFW) |
| Debtor. | **Hearing Date: TBD**<br>**Objection Deadline: February 27, 2015 at 4:00 p.m. (ET)**<br>**Related Docket No.: 916** |

## LIMITED OBJECTION OF K&L GATES LLP TO TRUSTEES' MOTION FOR APPROVAL OF (A) GLOBAL SETTLEMENT OF LITIGATION AND DISPUTES INVOLVING FORMER DIRECTORS AND OFFICERS OF TRI-VALLEY CORP. AND (B) AGREEMENT ON HOW TO ALLOCATE SETTLEMENT PROCEEDS AMONG THE TRUSTEES AND CLASS ACTION PLAINTIFFS PURSUANT TO FED. R. BANKR. P. 9019

K&L Gates LLP ("K&L Gates")[1], by and through its undersigned attorneys, hereby submits this limited objection (the "Objection") to the *Trustees' Motion for Approval of (A) Global Settlement of Litigation and Disputes Involving Former Directors and Officers of Tri-Valley Corp. and (B) Agreement on How to Allocate Settlement Proceeds Among the Trustees and Class Action Plaintiffs Pursuant to Fed. R. Bankr. P. 9019* (the "Settlement Motion") [Docket No. 916]. In support of this Objection, K&L Gates respectfully states as follows:

### SUMMARY OF ARGUMENT

That portion of the settlement providing for the assignment of alleged malpractice-related claims against K&L Gates and a present and former partner and for a "bar

---

[1]    K&L Gates is a creditor in these Chapter 7 proceedings, holding an allowed, unpaid Chapter 11 administrative expense claim in the amount of $39,085.84. See Omnibus Final Fee Application Approval Order [Docket No. 776].

order" should not be approved.  The settlement violates well-established law and public policy. The proposed assignment of the alleged malpractice-related claims should not be approved for the following reasons:  (i) the claims are equitably barred under the doctrines of collateral estoppel, waiver, implied consent and *res judicata*; (ii) the claims are an impermissible collateral attack on the orders entered during the pendency of this case approving K&L Gates' retention, appointment of an independent director and conflicts counsel, debtor in possession financing, sale procedures and the sale of Debtors' assets; (iii) the proposed assignment violates applicable California law which prohibits the assignment of legal malpractice-related claims; (iv) the disposition of any claim against K&L Gates is procedurally improper due to the Opus Trustee's (defined below) failure to comply with 11 U.S.C. § 363 or § 554; and (v) it violates the priority scheme set forth in 11 U.S.C. § 726.[2]  A bar order is also improper because it impermissibly cuts off K&L Gates' set-off,  contribution and indemnification claims.  Finally, as demonstrated below, the claims that are the subject of the proposed assignment are utterly meritless.  If, as contemplated by the settlement, the Opus Trustee were to pursue the claims (for the exclusive benefit of the California Plaintiffs (defined below)) he would expose the estate to claims for sanctions and damages and incur further administrative expense, which by itself dictates that the Court not approve that portion of the settlement.

---

[2]       In addition to the reasons why the proposed assignment should not be approved, the alleged malpractice-related claims are barred by the expiration of the applicable statute of limitations.  K&L Gates intends to raise this and other issues, if necessary, in a motion to dismiss in the California Action.

#32575304 v12

# BACKGROUND

## I.    Bankruptcy Case Background

### A.    The Debtors and Their Bankruptcy Filings

1.    On August 7, 2012 (the "Petition Date"), Tri-Valley Corporation ("Tri-Valley" or the "Company"), Tri-Valley Oil & Gas Co. ("TVOG"), Select Resources Corporation, Inc. ("Select"), and TVC Opus 1 Drilling Program, L.P. ("Opus" or the "Partnership" and collectively with the others, the "Debtors") filed voluntary Chapter 11 petitions in this Court.  On the Petition Date, the Debtors also filed the Declaration of Maston N. Cunningham in Support of Chapter 11 Petitions and First Day Motions and Applications (the "First Day Declaration") [Docket No. 3].[3]

2.    In 2002, Tri-Valley established Opus as a Delaware limited partnership for the purpose of exploring and operating oil and gas prospects in California and Nevada.  First Day Declaration, ¶ 30.  Between February 2002 and March 2010, approximately $97 million was raised through the private placement of Opus Partnership units.  First Day Declaration, ¶ 30.  As of the Petition Date, Opus had approximately 73 general partners and 222 limited partners.  First Day Declaration, ¶ 45.

3.    Tri-Valley served as managing partner of Opus pursuant to an Agreement of Partnership (the "Partnership Agreement").  First Day Declaration, ¶ 31.  As managing partner of Opus, Tri-Valley had the full and exclusive authority to manage, control and administer the Partnership's affairs.  First Day Declaration, ¶ 31.

---

[3]    The First Day Declaration provided the factual underpinnings for all of the first day orders entered by the Court, as well as the Final DIP Order, the Sale Procedure Order and the Sale Order (defined below).  No party in interest ever challenged any of the facts set forth in the First Day Declaration.

#32575304 v12

4.      As of the Petition Date, Opus's revenue opportunities were limited to certain leases comprising a project known as "Pleasant Valley." First Day Declaration, ¶ 8. Tri-Valley, through its wholly-owned subsidiary TVOG, had a 25% working interest in, and management and operational control over, the leases that comprised the Pleasant Valley project (the "Pleasant Valley Leases"). Opus held a 75% working interest in those leases. First Day Declaration, ¶¶ 8, 12, and 14.

5.      As of the Petition Date, Opus owed Tri-Valley and TVOG approximately $5.7 million for costs Tri-Valley incurred as the managing general partner and which TVOG incurred as program manager for the Partnership. First Day Declaration, ¶ 38. As further discussed below, however, the Partnership had asserted offsetting claims against Tri-Valley and TVOG. First Day Declaration, ¶ 38.

6.      In March 2010, Maston Cunningham became the president and Chief Executive Officer of Tri-Valley. December 11, 2012 Transcript, pg. 18, l. 21-23 (Proffered Testimony of Maston Cunningham) [Docket No. 436].

7.      In August 2010, George Robert "Bob" Miller ("Mr. Miller"), one of the Opus general partners and an attorney, told Tri-Valley that he believed the Opus partners had claims against the Company and its former management relating to their operation of the Pleasant Valley assets. First Day Declaration, ¶ 69; OSC Partners' DIP Financing Objection [Docket No. 79].

8.      In January 2011, K&L Gates was engaged to represent Tri-Valley with respect to certain corporate matters. This was the first time K&L Gates had been engaged to represent the Company and its affiliates. Upon the advice of K&L Gates, Tri-Valley encouraged the formation of an *ad hoc* group of Opus partners (the "Opus Special Committee") in an effort

to facilitate a resolution of disputes between Tri-Valley and Opus.  See First Day Declaration, ¶ 69.

9.      In April 2011, the Opus Special Committee was organized and consisted of five members:  Mr. Miller (chair), George Bean, Peter Huggins, Todd Garrett and Peter Marguglio (the "OSC Partners").  First Day Declaration, fn. 13.  The Opus Special Committee engaged its own independent counsel, the fees for which were paid by Tri-Valley.  See August 30, 2012 Transcript, pg. 11, l. 3-6.  [Docket No. 159].

10.     Between June 2011 and July 2012, Tri-Valley and the Opus Special Committee met numerous times and had extensive discussions concerning the nature of the disputes between the companies and the parameters of a global settlement.  First Day Declaration, ¶ 69.

11.     By the end of 2011, because the Debtors' cash flow from operations was insufficient to sustain operations, and without any other financing alternatives, the Company began relying on debt financing from G. Thomas Gamble ("Mr. Gamble") and an affiliate, The George T. Gamble 1991 Trust (the "Gamble Trust").  First Day Declaration, ¶ 47-58.

12.     Over a four-month period, beginning in late March 2012 until early August 2012, Tri-Valley regularly borrowed money from the Gamble Trust to sustain its operations.  First Day Declaration, ¶ 47-58.  By the Petition Date, Tri-Valley owed the Gamble Trust $7,198,078.55.  First Day Declaration, ¶ 58.

13.     In May 2012, K&L Gates's retention was expanded to include insolvency, restructuring, and bankruptcy advice and in June 2012, the Debtors engaged FTI Consulting, Inc. ("FTI") to review the Debtors' cash flow and liquidity position.  First Day Declaration, ¶ 75.

#32575304 v12

14.     In July 2012, the Company's management, K&L Gates, FTI, representatives of the Gamble Trust, the Opus Special Committee and their counsel met in San Francisco to discuss the Debtors' precarious cash situation and their strategic options.  First Day Declaration, ¶ 76.

15.     By early August 2012, the Gamble Trust was no longer willing to provide additional financing to the Debtors outside of Chapter 11.  First Day Declaration, ¶ 68.

16.     After further consultation with their major stakeholders, including the Gamble Trust and the Opus Special Committee, the Debtors determined that the best (and perhaps the only feasible) way to maximize the value of their assets was to commence Chapter 11 cases and to proceed with a "going concern" sale of the Debtors' assets under Section 363 of the Bankruptcy Code.  First Day Declaration, ¶ 76.

17.     FTI assisted the Debtors in their efforts to secure debtor-in-possession financing for the Chapter 11 process.  First Day Declaration, ¶ 77.  Ultimately, the Gamble Trust agreed to provide debtor-in-possession financing that would allow the Debtors adequate time to market and sell their assets over a period of 90 days.  First Day Declaration, ¶ 77.  The Gamble Trust was the only party willing to provide such financial support on realistic terms and within a realistic time frame.  First Day Declaration, ¶ 77.

18.     Without the pre- and post-bankruptcy financing provided by the Gamble Trust, the Debtors would have been forced to cease operations completely, in which case the Debtors would have lost their interests in the Pleasant Valley Leases.  Had that occurred, neither creditors nor partners of Opus would have recovered anything on account of their pre-petition claims or investments, as Opus would no longer have any leasehold interests to sell.

B.    **K&L Gates's Retention, Formation of the Official Opus Equity Committee, Appointment of an Independent Director and Retention of Special Counsel**

19.    On the Petition Date, the Debtors filed an application to retain K&L Gates as counsel to the Debtors (the "K&L Retention Application") [Docket No. 11], together with the Affidavit of Charles A. Dale III in Support of the K&L Retention Application (the "Dale Affidavit") [Docket No. 11-1].    The OSC Partners received notice of the K&L Retention Application [Affidavit of Service, Docket No. 53].

20.    In the First Day Declaration and the Dale Affidavit, K&L Gates alerted the Court, creditors and parties-in-interest to the structural conflict between Tri-Valley and Opus: that Tri-Valley was the decision maker for itself and for Opus.    The Dale Affidavit suggested that the appointment of an official equity committee for Opus would alleviate the practical tension between Tri-Valley and Opus.    Dale Affidavit; ¶ 18, 19, 20, 21, 22.    K&L Gates also raised the issue directly with the Office of the United States Trustee (the "U.S. Trustee"). August 30, 2012 Transcript, pg. 15, l. 3-4 (Ms. Patton: ". . . and Mr. Dale has been very cooperative with our office.  They did bring this conflict to our attention.")

21.    On August 22, 2012, Kathleen M. Miller ("Attorney Miller") filed a notice of appearance on behalf of the OSC Partners.  [Docket No. 70].

22.    The OSC Partners never filed an objection to the K&L Retention Application.  Rather, at the August 30, 2012 hearing, the first of several at which the structural conflict between Tri-Valley and Opus was discussed, Attorney Miller raised concerns about the impact the structural conflict might have on the bankruptcy cases and requested the appointment of an official equity committee to address those issues.  August 30, 2012 Transcript, pg. 16, l. 6-18 to pg. 17, l. 4-10.  Consistent with the Dale Affidavit, Charles A. Dale III ("Attorney Dale") of K&L Gates responded that he supported appointment of an equity committee to address the

structural conflict and that he had been in discussions with the U.S. Trustee and Attorney Miller regarding the same.  August 30, 2012 Transcript, pg. 11, l. 15 to pg. 13, l. 7.  The Court agreed that the issue was a structural one.  August 30, 2012 Transcript, pg. 13, l. 20 to pg. 14, l. 1.  At the conclusion of the August 30, 2012 hearing, the Court agreed with Attorney Dale's suggestion, approving the retention of K&L Gates for three of the four debtors (Tri-Valley, TVOG, and Select) [Docket No. 117] and continuing its application as to Opus to let the committee formation process unfold or for a more "creative" solution to the structural conflict to emerge.  August 30, 2012 Transcript, pg. 20, l. 4-7.

23.     On September 15, 2012, an official Opus equity committee (the "Official Opus Equity Committee") was formed.  The committee consisted of seven members.  [Docket No. 161].  Mr. Miller - the Opus general partner who chaired the Opus Special Committee pre-bankruptcy - became chairman of the Official Opus Equity Committee.  James Rybicki - one of the plaintiffs in the California Action (defined below) - was a member of the Official Opus Equity Committee.  The Official Opus Equity Committee engaged the law firm of Ashby & Geddes, P.A. as its counsel and Conway McKenzie as its financial advisor.  Both advisors were thereafter consulted by the Debtors and their counsel and advisors on virtually every aspect of the bankruptcy cases.

24.     The Debtors and the Official Opus Equity Committee developed a two part solution to the structural conflict issue by:  (i) appointing an independent director ("Independent Director"), Hobart Truesdell ("Mr. Truesdell"), to the Tri-Valley Board of Directors and (ii) retaining Robert Brady ("Attorney Brady") of Young Conaway Stargatt & Taylor LLP as special counsel ("Special Counsel") to Opus to address Opus conflict issues - which were those issues attendant "to debtor-in-possession financing, . . . to allocation of assets .

. . and any other issues that the parties and the Court may seek to have Opus special counsel deal with."  September 19, 2012 Transcript, pg. 6, l. 23-25 to pg. 7, l. 1-21.

25.     The K&L Retention Application **as to all four Debtors, including Opus,** was thereafter approved by the Court under certification of counsel.  The Official Opus Equity Committee never objected to K&L Gates's retention as counsel for all of the Debtors and supported the resolution of the structural conflict described above.  [Certification of Counsel, Docket No. 240, ¶ 10; Supplemental Order Approving K&L Retention Application, Docket No. 252, dated October 17, 2012].  The order found that the "employment of K&L Gates is necessary and is in the best interest of TVC Opus I Drilling Program L.P."

26.     At a hearing on October 18, 2012, the Debtors presented the retention application of Attorney Brady, as well as the motion to confirm the appointment of Mr. Truesdell as Independent Director, both of which were approved by the Court.  [Docket Nos. 266 and 267].  The Official Opus Equity Committee was represented at that hearing and did not object to entry of these orders.  October 18, 2012 Transcript, pg. 4, l. 5-6; pg. 9, l. 12.  [Docket No. 291].

C.     <u>Authority to File Opus Case</u>

27.     On August 17, 2012, the Debtors sent a formal notice to all Opus partners alerting them to the commencement of the bankruptcy cases.  [Affidavit of Service, Docket. No. 61].  The OSC Partners, as well as the four plaintiffs (the "<u>California Plaintiffs</u>") in the California Action (as defined below) each received the notice.  [Affidavit of Service, Docket. No. 61, pg. 4, 5, 6, 12, 14, 16, 21].

28.     The Company's management, K&L Gates and FTI scheduled a September 11, 2012 information meeting for all Opus investors.  On August 24, 2012, one of the Opus partners, Martin Dolan ("<u>Mr. Dolan</u>"), sent a letter and agenda (collectively, the "<u>Dolan Letter</u>") for the Opus investors' September 10, 2012 pre-meeting to the email distribution list of all Opus

partners (including the OSC Partners and California Plaintiffs). The Dolan Letter outlined the pre-meeting objectives, which included consideration of (i) removing Tri-Valley as managing partner of Opus, (ii) creating a new partnership agreement, (iii) authorizing a new board to represent the Opus partners in the bankruptcy cases, and (iv) retaining legal counsel in the bankruptcy cases to pursue conversion of Opus to "creditor status" and a delay of Tri-Valley's plan to sell the Debtors' assets in the bankruptcy cases.

29.    On September 10, 2012, the Opus partners met among themselves at a pre-meeting in Los Angeles to discuss various issues and organize the group for their official meeting with the Company and its advisors the following day.

30.    On September 11, 2012, the Company's management, K&L Gates, and FTI held an in-person informational meeting in Los Angeles for all Opus investors, as required under the Partnership Agreement. In the PowerPoint presentation given to the Opus partners at that meeting, the Company and its advisors explained, in detail, the events leading up to bankruptcy filing, the terms of the proposed DIP financing, the timeline for the proposed sale of the Pleasant Valley assets and the lack of other strategic alternatives. Hundreds of Opus investors, including each of the OSC Partners, and their individual attorneys and advisors, attended the meeting in person, at which some of them questioned how it was factually or legally possible that the Partnership had ended up in bankruptcy.

31.    On August 27, 2012, Attorney Miller filed an objection on behalf of the OSC Partners to the Debtors' proposed DIP financing [Docket No. 79]. The Objection was the first time a party-in-interest formally questioned the authority of Tri-Valley to place Opus in a Chapter 11 proceeding on the grounds that Tri-Valley did not seek the consent of the Opus partners, which was not required under the Partnership Agreement. See Objection, ¶¶ 2, 7.

32.     On September 5, 2012, the Court held a hearing on the proposed DIP financing. Attorney Miller appeared at the hearing on behalf of the OSC Partners to argue their objection. September 5, 2012 Transcript, pg. 4, l. 14. [Docket No. 150]. Prior to the hearing, the parties believed that a consensual resolution had been reached between the Debtors, the Gamble Trust, the Official Unsecured Creditors' Committee (the "Creditors' Committee"), and the OSC Partners represented by Attorney Miller. However, at the hearing, when addressing Opus's authority to file for bankruptcy, Attorney Miller (i) expressed concern that her clients did not speak for the other 295 Opus partners, (ii) argued that the proposed financing benefitted the Gamble Trust at the expense of Opus and the Opus investors, and that the proposed roll-up of Tri-Valley's pre-petition debt to the Gamble Trust improperly encumbered Opus's assets, and therefore (iii) requested that the Court maintain the status quo with respect to Opus until it could be determined whether there was appropriate authority to file a Chapter 11 proceeding for Opus and an equity committee had been appointed. See September 5, 2012 Transcript, pg. 10, l. 2-12; 14, l. 9-18; 16 l. 16-18.

33.     In light of this concern, the Court ruled that it was premature to proceed with respect to the final DIP order without resolving the structural conflict that existed between Tri-Valley and Opus. September 5, 2012 Transcript, pg. 31, l. 7-16 to pg. 32, l. 3-10. Given the Court's concerns, the Gamble Trust agreed to extend the interim funding until a continued hearing could be held on September 19, 2012, by which time the parties anticipated that an official Opus equity committee would have been formed. See September 5, 2012 Transcript, pg. 10, l. 2-12; 14, l. 9-18; 16 l. 16-18.

34.     Notwithstanding the foregoing, at no time was a motion to dismiss the Opus Chapter 11 proceeding filed by or on behalf of Opus or any of its partners. Moreover, the

#32575304 v12

Official Opus Equity Committee never filed a motion to dismiss the Opus bankruptcy case (or otherwise question the authority of its Chapter 11 filing). This is true despite the fact that their fee applications make it clear counsel to the Official Opus Equity Committee researched the issue, drafted a motion to dismiss and discussed it internally. See Docket No. 351-2 at pgs. 9, 10, 12. It is apparent from these entries that a conscious decision was made by the Official Opus Equity Committee and its counsel not to pursue dismissal. In fact, aside from the limited discussion at the September 5, 2012 hearing, the dismissal or authority issue was never raised again by the Official Opus Equity Committee, formally or informally, despite numerous hearings at which its counsel was present.

35.     It was not until the December 11, 2012 sale hearing on the Pleasant Valley assets that Mr. Dolan appeared telephonically and conveyed his disappointment that the Official Opus Equity Committee had not moved to dismiss the Opus bankruptcy case, despite requests that they do so. December 11, 2012 Transcript, pg. 34, l. 2-25. [Docket No. 436]. He asked whether the Court would entertain his motion to dismiss the Opus case, to which the Court replied that it would not. See December 11, 2012 Transcript, pg. 38, l. 22-15 to pg. 39, l. 1-5.

**D.     Resolution of Disputes Concerning Debtor-in-Possession Financing**

36.     As previously noted, on August 27, 2012, Attorney Miller filed an objection on behalf of the OSC Partners to the proposed DIP financing, arguing, *inter alia*, that the proposed financing benefitted the Gamble Trust at the expense of Opus and the Opus investors, and that the proposed roll-up of Tri-Valley's pre-petition debt to the Gamble Trust improperly encumbered Opus's assets. [Docket No. 79].

37.     The final DIP hearing was first held on September 5, 2012, at which Attorney Miller argued her clients' objection to the Court. The hearing was continued to

September 19, 2012, while the parties awaited the appointment of an official Opus equity committee and thereafter was adjourned to September 27, 2012.

38.     On September 24, 2012, nine days after its appointment, the Official Opus Equity Committee objected to the proposed DIP financing (the "Equity Committee DIP Financing Objection") [Docket No. 185].  The Equity Committee DIP Financing Objection argued that the Official Opus Equity Committee should be given an opportunity to find alternate, separate financing for Opus, and that the proposed financing inappropriately encumbered Opus's assets.  Equity Committee DIP Financing Objection at ¶¶ 14-32.

39.     After extensive negotiations, the Debtors, the Gamble Trust, the Creditors' Committee, the OSC Partners **and** the Official Opus Equity Committee reached agreement on the terms of a final DIP order (the "Final DIP Order"), which was ultimately entered by the Court without further hearing on September 28, 2012 [Docket No. 201].  The Final DIP Order was submitted under certification of counsel, which indicated that its entry had been consented to by the Official Opus Equity Committee as well as the OSC Partners themselves.  [Certification of Counsel, Docket No. 198, ¶ 8].  The Final DIP Order contained factual findings that the financing was in the best interests of Opus, was the only financing available to the Debtors, was essential for the continued operation of the Debtors, and was vital to preserving the going concern value of their businesses.  [Final DIP Order, Docket No. 201, ¶ G(ii), (iii), (iv), and H(ii)].  No Opus investors appealed entry of the Final DIP Order or sought to have it vacated.

40.     Further, as counsel to the Official Opus Equity Committee later acknowledged, "the final DIP order itself is an agreement.  This is an agreed-upon order." December 11, 2012 Transcript, pg. 44, l. 22-24.

#32575304 v12

E.     **Sale of Pleasant Valley Assets**

41.     At the outset of these cases, the Debtors proposed in their sale motion, filed on August 13, 2012, to sell all of their assets on a timeline that concluded with a sale hearing in mid-October 2012 (the "Sale Motion") [Docket No. 51].   At the request of the Creditors' Committee and the OSC Partners, the Debtors agreed to extend the proposed sale timeline solely for the Pleasant Valley assets owned by Opus to early December 2012.   See September 5, 2012 Transcript, pg. 7, l. 24-25 to pg. 8, l. 1-20.

42.     The Opus partners received actual notice of the sale beginning in August 2012, through multiple channels including communications from the Company, the Opus Special Committee, and individual partners such as Mr. Dolan.  At no time was a formal objection to the sale filed by or on behalf of Opus or its partners.

43.     Upon the conclusion of the auction process for the Pleasant Valley assets, Clarity Management LP ("Clarity Management") submitted the highest and best bid for the purchase of the assets.  On December 7, 2012, the Tri-Valley Board of Directors, including Mr. Truesdell, voted unanimously to proceed with the sale of the Pleasant Valley assets to Clarity Management, finding the bid to be in the best interest of the Debtors and the best and highest value available after a fair bidding process for the assets.  December 11, 2012 Transcript; pg. 22, l. 2-15.

44.     At the December 11, 2012 sale hearing, the Official Opus Equity Committee did not object to the proposed sale.   Rather, it only objected to the proposed distribution of the proceeds to the Gamble Trust.  December 11, 2012 Transcript, pg. 28, l. 8-10. The court overruled the objection.  December 11, 2012 Transcript, pg. 45, l. 18-22.

45.     Mr. Dolan appeared telephonically to ask for more time to market the Pleasant Valley assets and, as discussed, convey his disappointment that the Official Opus

-14-

Equity Committee had not moved to dismiss the Opus case.  December 11, 2012 Transcript, pg. 34, l. 2-25.  Attorney Miller appeared at the hearing on behalf of the OSC Partners and likewise requested a continuance on behalf of her clients.  December 11, 2012 Transcript, pg. 31, l. 3-19.  Mr. Dolan and Attorney Miller's requests for a continuance were overruled by the Court.  December 11, 2012 Transcript, pg. 39, l. 3-4.  No other Opus partners objected, formally or informally, to the proposed sale.

46.     At the sale hearing, the First Day Declaration and the proffered testimony of both Maston Cunningham, CEO of Tri-Valley, and Albert Conly, of FTI, were admitted into evidence in support of the sale.  See December 11, 2012 Transcript, pg. 9, l. 10-12; pg. 18, l. 6-7; and pg. 23, l. 4-5.  Both Mr. Cunningham's and Mr. Conly's proffered testimony stated that the sale of the Pleasant Valley assets was supported by sound business justifications, including the Debtors' inability to obtain alternative financing proposals.  No one challenged any of the evidence adduced in support of the sale.

47.     The sale order (the "Sale Order") contained factual findings that the sale of the Pleasant Valley assets constituted the highest and best offer for the assets, was for fair and reasonable consideration, was in the best interests of the Debtors and their equity holders and was a sound, prudent, and good faith exercise of the Debtors' business judgment.  [Pleasant Valley Sale Order, Docket No. 420, ¶ P, S].

48.     The Sale Order also found that the Debtors and their professionals, including K&L Gates, complied in good faith with the Court's sale procedures (the "Sale Procedures Order") [Docket No. 130], provided sufficient notice to all parties in interest, marketed the assets diligently, afforded potential purchasers a full, fair, and reasonable opportunity to submit higher or otherwise better offers to purchase the assets, and provided

-15-

potential purchasers sufficient information to make an informed judgment on whether to bid on the assets. [Pleasant Valley Sale Order, Docket No. 420, ¶ I, K, L, O, Q].

49.     Finally, the Sale Order found that no party engaged in any conduct that would permit the avoidance of the sale and that the auction of the assets was conducted in accordance with the Court's Sale Procedures Order, and in a non-collusive, fair, and good manner. [Pleasant Valley Sale Order, Docket No. 420, ¶ N, X].

50.     None of the Official Opus Equity Committee, any member of the Opus Special Committee, Mr. Dolan or any other Opus partner appealed entry of the Sale Order or sought to have it vacated.

## F.     Conversion of Cases to Chapter 7 Cases

51.     On March 25, 2013, the Court entered an order converting the Debtors' bankruptcy cases from Chapter 11 to Chapter 7.   [Docket No. 692].   K&L Gates ceased rendering services to the Debtors on March 25, 2013.  On March 26, 2013, the U.S. Trustee appointed Charles Stanziale, Jr. (the "TVC Trustee") as Chapter 7 trustee for the Debtors other than Opus.   On March 26, 2013, the U.S. Trustee appointed Jeoffrey L. Burtch (the "Opus Trustee" and together with the TVC Trustee, the "Trustees") as Chapter 7 trustee for Opus.

## II.   California Litigation Background

52.     Following conversion of the Debtors' cases, on June 27, 2013, the California Plaintiffs, who include two members of the Official Opus Equity Committee, filed a class action Complaint (the "Complaint" or the "California Action") in the Superior Court of California.[4]  A true and correct copy of the Complaint is attached hereto **Exhibit A**.  The California Action names various defendants and seeks alleged damages "aris[ing] from the sales

---

[4]     On August 1, 2013, the California action was removed to the United States District Court for the Northern District of California (the "California Court").

of approximately $97 million in securities issued by defendant [Opus]."  [Complaint at ¶ 1].

Moreover, in an apparent after-thought, and in violation of the automatic stay, the California

Action asserts claims against K&L Gates and two K&L Gates partners, Attorney Dale and

Joshua Lane (each of whom are subsumed within the term K&L Gates as used herein), based on

K&L Gates's representation of the Debtors in these bankruptcy cases.  The California Plaintiffs'

alleged claims against K&L Gates fall into the following general theories.

**A.      Allegations that K&L Gates committed malpractice and breached its duties to Opus and the Opus investors by representing both Tri-Valley and Opus in these cases (the "Conflicted Representation Claims").**

53.      The California Plaintiffs allege that K&L Gates's representation of both

Tri-Valley and Opus was a conflict of interest and that K&L Gates took positions adverse to the

interests of Opus and the Opus investors.  See e.g. Complaint at ¶¶ 6, 72, 77-81, 83-84.

**B.      Allegations that K&L Gates committed malpractice and breached its duties to Opus and the Opus investors by causing Opus to file for bankruptcy (the "Lack of Authority Claims").**

54.      The California Plaintiffs allege that "[w]ithout prior disclosure to or

approval of the OPUS Partners, and acting pursuant to the directions of the Defendants, K&L

Gates simultaneously filed:  i) Chapter 11 bankruptcy petitions as counsel for TVC and its

affiliated entities, and ii) a Chapter 11 bankruptcy petition as counsel for Opus, in a consolidated

bankruptcy."  [Complaint at ¶ 76].  The California Plaintiffs also allege that K&L Gates advised

the officers and directors of Tri-Valley with respect to legal and factual matters in which the

interests of Tri-Valley and Opus were in direct conflict, including "TVC's purported authority to

file bankruptcy on behalf of OPUS."  Id. at ¶ 77.  Finally, the California Plaintiffs assert that

K&L Gates breached its duty of loyalty to Opus and the Opus investors "when it failed to

identify and advocate a course of action which would allow OPUS to continue its business

outside of bankruptcy……when it failed to assert that the Opus Partnership Agreement required

-17-

the prior approval of the OPUS Investor Partners to either sell substantially all assets of the Partnership and/or to file bankruptcy on behalf of Opus….. [and] when it failed to disclose to the OPUS Partners prior to August 7, 2012 that K&L Gates was purporting to represent OPUS, and that TVC, an adverse party, proposed to file an OPUS bankruptcy which would disadvantage OPUS and its Investor Partners ….." Id. at ¶ 80.

      C.    **Allegations that K&L Gates committed malpractice and breached its duties to Opus and the Opus investors in negotiating the Debtors' post-petition financing (the "<u>DIP Financing Claims</u>").**

      55.    The California Plaintiffs allege in the California Action that in the bankruptcy "K&L Gates advocated . . . for a consolidated accounting and allocation . . . apparently to provide more security for the Gamble Trust, which is an affiliate of Defendant Gamble.  Also in its negotiations with the Gamble Trust, K&L Gates increased the OPUS Partner[ship's] liability to the detriment of the Opus Partners and to the benefit of TVC and Defendant Gamble." [Complaint at ¶ 81].  The California Plaintiffs go on to allege that "[w]hen negotiating the debtor-in-possession financing with the Gamble Trust, K&L Gates failed to comply with the Partnership Agreement (¶5.02b) which requires that any lender to OPUS shall have no recourse against individual partners." Id. at ¶ 82.

      D.    **Allegations that K&L Gates committed malpractice and breached its duties to Opus and the Opus investors in selling Opus's Pleasant Valley assets (the "<u>Sale Claims</u>").**

      56.    The California Plaintiffs allege that "K&L Gates advised the officers and directors of TVC, as counsel for both adverse entities, with respect to legal and factual matters in which the interests of TVC and OPUS were in direct conflict, including … c) TVC's purported authority to sell substantially all OPUS assets without approval of the OPUS Partners …." [Complaint at ¶ 77].  The California Plaintiffs also allege that "[b]y undertaking conflicting representations of TVC and OPUS simultaneously K&L Gates breached its fiduciary duties to

-18-

the OPUS investors K&L Gates's alleged breaches caused injuries to the Class, which include

the payment of legal fees and restoration of the losses of the Opus Partners resulting from the

bankruptcy and the sale of OPUS's oil and gas leases at bankruptcy auction far below the actual

fair market value of those leases." Id. at ¶ 78.  Finally, the California Plaintiffs allege that "K&L

Gates breached its duty of loyalty to OPUS and its Partners …4) when it failed to assert that the

Opus Partnership Agreement required the prior approval of the OPUS Investor Partners to either

sell substantially all assets of the Partnership and/or to file bankruptcy on behalf of [] Opus …."

Id. at 80.

## OBJECTION[5]

I.    **This Court Should Not Approve The Proposed Assignment Of Claims Against K&L
      Gates To The California Plaintiffs, The Delaware Bar Order Or The Opus Trustee's
      Proposed Prosecution Of Claims Against K&L Gates For The Benefit Of The
      California Plaintiffs**

            57.    Prior to approving a compromise or settlement under Rule 9019, the court

must "assess and balance the value of the claim that is being compromised against the value to

the estate of the acceptance of the compromise proposal." In re W.R. Grace & Co., 475 B.R. 34

(D. Del. 2012) (citing Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996)).  While

the Settlement Motion sets forth the general considerations for approval under the so-called

"Martin factors," it ignores the threshold issue this Court must examine first – whether, even if

those factors are satisfied, the settlement cannot be approved because it violates the law or public

policy.  See e.g., In re Rosenberg, 495 B.R. 196, at 201 (Bankr. E.D.N.Y. 2010) (denying

approval of a proposed settlement because its provisions conflicted with the Bankruptcy Code,

regardless of whether the Second Circuit's Iridium factors (similar to the Martin factors) could

---

[5]     K&L Gates is simultaneously raising objections in the California Action in response to a similar request to
approve settlement filed by the California Plaintiffs.

be met, and stating that "[b]efore applying the Rule 9019 standard, this Court must address a threshold issue: whether this Court has the ability to approve this settlement at all even if the Iridium factors weigh in favor of approval.  While it is true that settlements are encouraged, it is also true that parties cannot enter into a settlement that violates law or public policy.  It is well established that settlements are void against public policy if they directly contravene a state or federal statute or policy.") (internal citations omitted).

58.    Here, the proposed settlement cannot be approved under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") regardless of whether the proposed settlement satisfies the general Martin factors because of the proposed assignment of putative malpractice claims against K&L Gates, the Bar Order and the Opus Trustee's proposed prosecution of the malpractice claims.  As set forth in detail below, the alleged claims against K&L Gates that the Opus Trustee seeks to assign to the California Plaintiffs (i) are equitably barred under the doctrines of collateral estoppel, waiver, implied consent and *res judicata*; (ii) are an impermissible collateral attack on this Court's orders entered during the pendency of the Chapter 11 cases; (iii) violate applicable California law which prohibits the assignment of legal malpractice-related claims; (iv) are procedurally improper for failing to comply with sections 363 and 554 of the Bankruptcy Code; and (v) violate the Bankruptcy Code's priority scheme under section 726 of the Bankruptcy Code.[6]  Each of these defects alone is reason to deny approval of the Settlement Motion because the proposed settlement does not satisfy the threshold consideration under Rule 9019 – that the settlement must be legal and not in contravention of public policy.  The proposed settlement fails this threshold hurdle, and the Settlement Motion

---

[6]    The claims are also barred on a number of other grounds, including the statute of limitations, which if necessary will be raised in the California Action.

#32575304 v12

must therefore be denied.  The Court should also refuse to approve the Bar Order as it impermissibly cuts off K&L Gates' rights of set-off, indemnification and contribution.  Finally, the terms of the <u>proposed</u> settlement under which the Opus Trustee will act as a co-plaintiff in prosecuting the meritless malpractice claim solely for the benefit of the California Plaintiffs if the assignment is not approved should be rejected because it will expose the estate to damages and sanctions.

### A.      The Opus Trustee's Proposed Assignment

59.      The Settlement Motion seeks this Court's approval, pursuant to Rule 9019, of (i) a Settlement Agreement that resolves various adversary proceedings, pending motions, and other litigation and disputes, and (ii) an Allocation Agreement that allocates $9 million in cash proceeds of the settlement among the Trustees and the California Plaintiffs.[7]

60.      The Allocation Agreement also provides "for cooperation between the California Plaintiffs and the Trustees in dealing with the claims against former counsel to the Debtors, with any recovery inuring to the California Plaintiffs and any expenses being borne by them."  Settlement Motion at ¶ 31.  Specifically, Section 4(a)(i) of the Allocation Agreement provides:

> In connection with the litigation commenced by the California Plaintiffs against K&L Gates, **the Opus Trustee will assign all claims held by Opus against K&L Gates, or, if the assignment by Opus is challenged, then the Opus Trustee will act as a co-plaintiff with the California Plaintiffs and assign all right, title, and interest in any proceeds to the California Plaintiffs**.  In the event the Opus Trustee must join as a co-plaintiff, the California Plaintiffs and Opus Trustee will enter into a mutually acceptable hold harmless agreement for the benefit of the Opus Trustee.

---

[7]      Upon information and belief, Mr. Miller – the chairman of both the Opus Special Committee and the Official Opus Equity Committee – was the primary negotiator on behalf of the California Plaintiffs, even though he is not a named plaintiff in the case.

[Allocation Agreement at § 4(a)(i)] (emphasis added).  Thus, by the Allocation Agreement, the

Opus Trustee proposes to assign (the "<u>Proposed Assignment</u>") an asset of the estate, <u>i.e.</u>, any

claims the Opus estate purportedly has against K&L Gates to the California Plaintiffs, for no

consideration.  If the assignment is challenged, the Opus Trustee is obligated to pursue the

California Action as a co-plaintiff but assign all interest in the litigation to the California

Plaintiffs.[8]

**B.      The California Plaintiffs are Equitably Barred from Challenging K&L Gates's Actions in the Chapter 11 Bankruptcy Cases**

61.      This Court should not approve a settlement that includes the Proposed

Assignment because the California Plaintiffs are equitably barred from pursuing claims against

K&L Gates based on their actions in the Debtors' Chapter 11 bankruptcy cases.   In the

Complaint, the California Plaintiffs complain of alleged actions and conduct by K&L Gates in

the Debtors' bankruptcy cases that would have been or were the proper subject of objection and

resolution by this Court.  As demonstrated above, the interests of the California Plaintiffs were

represented in the Chapter 11 bankruptcy cases first by the OSC Partners, as represented by

Attorney Miller, and then by the Official Opus Equity Committee and its professionals, Ashby &

Geddes and Conway McKenzie, the Independent Director and Mr. Brady as Special Counsel.

The OSC Partners and the Official Opus Equity Committee were well aware of the events in the

bankruptcy proceedings, including K&L Gates's retention as counsel to Opus, the retention of

Special Counsel and the appointment of the Independent Director to deal with the structural

conflict, the Debtors' DIP financing from the Gamble Trust, the Sale Procedures Order and the

---

[8]      The Opus Trustee also agrees that upon final approval of the proposed settlement, he will "waive attorney client privilege between Opus and K&L Gates and will provide any attorney-client privileged documents in its possession relating solely to claims against K&L Gates to the California Plaintiffs."  <u>Id.</u> at § 4(a)(i)(1).  Likewise, the TVC Trustee also agrees that upon final approval of the proposed settlement, he will "waive attorney client privilege between TVC and K&L Gates."  <u>Id.</u> at § 4(b).

sale of the Pleasant Valley assets.  As discussed below in detail, the OSC Partners and the Official Opus Equity Committee either did not object to (K&L Gates's retention and the Pleasant Valley sale), did not move to dismiss (the filing of Opus's Chapter 11 case) or their objections were consensually resolved (e.g., the DIP financing).  The California Plaintiffs are, therefore, equitably barred from now asserting claims against K&L Gates based on those events.

       **i.**      **Collateral Estoppel**

      62.    Under the doctrine of collateral estoppel, "'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 247 (3d Cir. 2010) (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).  "The following four elements are required for the doctrine to apply:  '(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.'"  Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d at 247-48 (quoting Szehinskyj v. Attorney Gen. of the United States, 432 F.3d 253, 255 (3d Cir. 2005)).

      63.    **Conflicted Representation Claims** - Each of the elements of collateral estoppel are satisfied with respect to the Conflicted Representation Claims.  This Court considered and approved the resolution of the structural conflict in connection with K&L Retention Application and entered an order approving K&L Gates' representation of all the Debtors.  At the August 30, 2012 hearing, Attorney Miller, on behalf of the OSC Partners, stated on the record that while the OSC Partners supported the appointment of an equity committee, they did not object to K&L Gates being retained to represent all of the Debtors.  After the Official Opus Equity Committee was appointed and endorsed the resolution of the structural

conflict through the appointment of the Independent Director and Special Counsel, none of the Opus partners (including any of the California Plaintiffs) objected in their individual capacities to the two-part resolution.  Moreover, neither the OSC Partners nor any other Opus investor ever appealed or sought to vacate entry of the orders retaining K&L Gates and Special Counsel or appointing the Independent Director.  In authorizing K&L Gates to represent all of the Debtors, the Court determined that the appointment of the Official Opus Equity Committee and the Independent Director and the retention of Special Counsel satisfactorily addressed any conflict K&L Gates had with respect to its representation of Opus.  The California Plaintiffs therefore are collaterally estopped from asserting the Conflicted Representation Claims.

64.     **DIP Financing Claims -** Likewise, each of the elements of collateral estoppel is satisfied with respect to the DIP Financing Claims.  This Court adjudicated the propriety of the Debtors' proposed DIP financing, after both the OSC Partners and the Official Opus Equity Committee filed objections.  In their objection, the OSC Partners argued the very point raised in the California Action- that the proposed financing benefitted the Gamble Trust at the expense of Opus and the Opus investors, and that the proposed roll-up of Tri-Valley's pre-petition debt to the Gamble Trust improperly encumbered Opus's assets.  Thereafter, the Official Opus Equity Committee was formed and filed the Equity Committee DIP Financing Objection, arguing that it should be given an opportunity to find an alternate lender for separate financing for Opus.  Echoing the concerns raised by the OSC Partners, the Official Opus Equity Committee also asserted the proposed financing inappropriately encumbered Opus's assets and curtailed the ability to pursue claims against the Gamble Trust.

65.     After negotiations with both the Official Opus Equity Committee and the OSC Partners, an agreed Final DIP Order was submitted to and entered by this Court.  That

Order contained factual findings that (i) the financing was in the best interests of Opus, (ii) was the only financing available to the Debtors, (iii) was essential for the continued operation of the Debtors, and (iv) was vital to preserving the going concern value of the Debtors' businesses. As such, the propriety of the Debtors' DIP financing, including its propriety for Opus, was adjudicated and resolved by this Court, after active input from and negotiation with the OSC Partners and the Official Opus Equity Committee. The California Plaintiffs are therefore collaterally estopped from asserting the DIP Financing Claims.

66. **<u>Sale Claims</u>** - The Sale Claims are also collaterally estopped. The Opus partners knew of the proposed Pleasant Valley sale as early as August 2012, and at the request of the OSC Partners, the Debtors agreed to extend the proposed sale timeline for the Pleasant Valley assets to early December 2012. At no time from August 2012, when the Sale Motion was filed, to December 11, 2012, the date of the sale hearing, was a formal objection to the sale filed by or on behalf of any of the Opus partners, including the OSC Partners or by the Official Opus Equity Committee. The Independent Director, charged with representing the interests of Opus and the Opus investors, voted in favor of the sale.

67. At the sale hearing, neither the Official Opus Equity Committee nor the OSC Partners objected to the proposed sale. Mr. Dolan's request for more time to market the assets, seconded by Attorney Miller, was overruled. The Court entered the Sale Order, including factual findings that (i) the sale of the Pleasant Valley assets to Clarity Management constituted the highest and best offer for the assets, (iii) was for fair and reasonable consideration, and (iii) was in the best interests of the Debtors and their equity holders. The Sale Order also found that (i) the Debtors and their professionals, including K&L Gates, complied in good faith with the Sale Procedures Order, (ii) provided sufficient notice to all parties in interest, (iii) marketed the

assets diligently, afforded potential purchasers a full, fair, and reasonable opportunity to submit

higher or otherwise better offers to purchase the assets, and (iv) provided potential purchasers

sufficient information to make an informed judgment on whether to bid on the assets.  It is clear

that the propriety of the sale of the Pleasant Valley assets, the price obtained and K&L Gates's

actions in connection with that sale were adjudicated by this Court, without objection or appeal

by the Opus investors.   Therefore, the California Plaintiffs are collaterally estopped from

attacking that sale and K&L Gates's role therein.[9]

### ii.   Waiver and Implied Consent

68.   The Court should not approve the Proposed Assignment aspect of the

settlement because the California Plaintiffs' claims against K&L Gates are barred because the

Opus investors, including these very same plaintiffs, waived any alleged claims based on K&L

Gates's actions in the bankruptcy cases by failing to object to them in the Chapter 11

proceedings and by expressly or impliedly consenting to them.

69.   "An argument is not waived if it 'is inherent in the parties' positions

throughout [the] case.'"   Nuveen Mun. Trust v. Withumsmith Brown, P.C., 692 F.3d 283, 301

(3d Cir. 2012) (quoting Huber v. Taylor, 469 F.3d 67, 75 (3d Cir. 2006)).   However, the

argument must do more than "emanat[e] from the ethers of briefs filed in the district court."

Nuveen Mun. Trust, 692 F.3d at 301; Brennan v. Norton, 350 F.3d 399, 418 (3d Cir. 2003).  The

---

[9]     The Conflicted Representation Claims, DIP Financing Claims and Sale Claims are also barred by the
doctrine of *res judicata*, which prohibits relitigation of claims that have been, or could have been, decided on the
merits.  Mullarkey v. Tamboer, 536 F.3d 215, 225 (3d Cir. 2008).  Application of the doctrine is appropriate where
there is "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a
subsequent suit based on the same cause of action."   Duhaney v. Att'y Gen., 621 F.3d 340, 347 (3d Cir. 2010).
K&L Gates's retention as counsel to Opus, the Debtors' post-petition financing, and the Pleasant Valley asset sale
were each authorized and approved by orders of this Court.  The California Plaintiffs' interests were represented in
the bankruptcy cases, first by the OSC Partners, and then by the Official Opus Equity Committee, as well as by the
Independent Director and Mr. Brady as Special Counsel.  Finally, the claims in the California Action are implicitly
based on the same "cause of action" that each of those orders decided, *i.e.,* whether the relief sought and granted was
in the best interests of the Debtors and the Debtors' estates, including Opus.

#32575304 v12

party must "present[] the argument with sufficient specificity to alert the district court." Id. (internal citations omitted). However, where a party receives adequate notice of relief requested and fails to object, the party's right to object is waived. See e.g., In re Chandler, 459 B.R. 215, 219 (Bankr. E.D.Pa. 2011) (declining to consider the debtor's objection to the sufficiency of the sale price received because it was untimely, and stating that a party's failure to raise an objection to a proposed plan prior to the deadline fixed by the court results in a waiver of a party's right to object) (citing In re Seatco, Inc., 259 B.R. 279 (Bankr. N.D.Tex. 2001); In re Richard Buick, Inc., 126 B.R. 840) (Bankr. E.D.Pa. 1991)).

70.    An issue is tried by implied consent where (i) both parties introduced evidence on the issue, (ii) or evidence was introduced by one party and no objection was raised by the other, or (iii) the issue not raised by the pleadings was in reality only an unanticipated line of proof which served to establish a duly pleaded ultimate fact. Freitag v. Strand of Atlantic City, Inc., 205 F.2d 778, 781 (3d Cir. 1953). "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Bankr. P. 7015 (incorporating Fed. R. Civ. P. 15).

71.    With respect to the Conflicted Representation Claims, no party, including the OSC Partners, the Official Opus Equity Committee or any Opus investor objected to K&L Gates's representation of Opus once the Official Opus Equity Committee and the Independent Director were appointed and Special Counsel was retained. Although the OSC Partners raised the structural conflict at the August 30th hearing, Attorney Miller expressly stated that her clients did not object to K&L Gates's Retention Application. The argument that K&L Gates had a conflict precluding the representation of Opus was, therefore, waived, as the Opus investors impliedly consented to K&L Gates's representation of Opus by failing to object.

72.     Likewise, with respect to the Lack of Authority Claims, the Debtors sent a formal notice to all Opus partners, including the OSC Partners and the California Plaintiffs, alerting them to the commencement of the bankruptcy cases.  K&L Gates, FTI and the Debtors also met with the Opus Partners in California shortly after the Chapter 11 cases were filed.  No party moved to dismiss the Opus bankruptcy case for lack of authority to file or for any other reason.[10]  The OSC Partners initially raised this issue in their objection to the Debtors' DIP financing motion, but did not press it again.  Their fee applications show that the Official Opus Equity Committee went so far as to research the issue and draft a motion to dismiss, but did not pursue it.  Any argument that Opus's bankruptcy case was improper was therefore waived, and the Opus investors impliedly consented to the Opus bankruptcy case by failing to seek its dismissal.  See In re Martin-Trigona, 760 F.2d 1334, 1341 (2d Cir. 1985) (holding, on assumption of initial lack of authority to file voluntary petition on behalf of corporation, that corporation and sole stockholder "acquiesced in and ratified" filing by their ensuing participatory conduct); In re Atlas Supply Corp., 857 F.2d 1061, 1064 (5th Cir. 1988) (treating failure of fifty percent shareholder to object for over a year to allegedly unauthorized filing while participating in proceeding properly as "acquiescence" in bankruptcy proceeding); In re Globus Corp., 195 Bankr. 263, 265-66 (Bankr. S.D.N.Y. 1996) (finding "acquiescence" by thirty percent shareholder in unauthorized filing by seventy percent shareholder without required unanimous shareholder consent).

73.     With respect to the DIP Financing Claims, both the OSC Partners and the Official Opus Equity Committee objected to the Debtors' proposed DIP financing, raising

---

[10]     Contrary to the unsubstantiated allegations in the Complaint, the Opus Partnership Agreement does not require the consent of the Opus investor partners for a bankruptcy filing.

#32575304 v12

exactly the same grounds that underlie the DIP Financing Claims in the Complaint.  No Opus

investor objected to the proposed DIP financing.  After negotiation with the Debtors, however,

both the OSC Partners and the Official Opus Equity Committee consented to the Final DIP

Order.  Therefore, the DIP Financing Claims are barred because by failing to object, and in fact

expressly consenting to it after negotiations with the Debtors, the Opus investors waived any

challenge to the propriety of the DIP financing.

74.    Finally, with respect to the Sale Claims, no party formally objected to the

sale of the Pleasant Valley assets.  The Opus investors, each of whom had actual notice of the

Pleasant Valley sale, as well as the OSC Partners and the Official Opus Equity Committee, had

the opportunity to challenge the sale process before this Court but failed to do so.  Both the OSC

Partners and the Official Opus Equity Committee appeared through counsel and were heard at

the sale hearing, but did not object to the sale of the Pleasant Valley assets on any grounds.  In

failing to object to the Pleasant Valley sale, the Opus investors waived any challenge to it, and

impliedly consented to its consummation.

### C.    The Opus Trustee's Proposed Assignment is a Collateral Attack on this Court's Orders in the Chapter 11 Cases

75.    This Court also should not approve a settlement containing the Proposed

Assignment because it represents a collateral attack on this Court's orders entered in the Debtors'

Chapter 11 bankruptcy cases.  The time to challenge this Court's decisions in the Debtors'

Chapter 11 cases was during the pendency of the cases.  If the Opus investors were dissatisfied

with this Court's rulings, the proper course of action would have been to appeal those rulings.

Instead, by the California Action, the California Plaintiffs are mounting an improper attack on

this Court's orders.  The Court should not sanction this collateral attack on its orders.  See e.g.,

In re Federal Mogul Global Inc., 684 F.3d 355, 362 (3d Cir. 2012) (finding that arguments

regarding conflict of interest in the formation of an asbestos trust under section 524(g) were properly raised in proceedings to confirm the reorganization plan, and because no objection was raised before the bankruptcy court in the confirmation proceedings, the court would not entertain a collateral attack on a final, non-appealable judgment); see also Celotex Corp. v. Edwards, 514 U.S. 300, 313 (1995) ("If respondents believed the Section 105 Injunction was improper, they should have challenged it in the Bankruptcy Court, like other similarly situated bonded judgment creditors have done.  If dissatisfied with the Bankruptcy Court's ultimate decision, respondents can appeal 'to the district court for the judicial district in which the bankruptcy judge is serving,' . . . and then to the Court of Appeals.  Respondents chose not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's Section 105 Injunction in the federal courts in Texas.  This they cannot be permitted to do without seriously undercutting the orderly process of the law.").  The same result should obtain here.

76.     The Conflicted Representation Claims are a collateral attack on this Court's orders approving K&L Gates's representation of all of the Debtors, including Opus, as well as this Court's orders appointing the Independent Director and approving the retention of Special Counsel.  Notwithstanding this Court findings, the California Plaintiffs are seeking to litigate these exact issues in California with the impermissible goal that the California Court will somehow find that K&L Gates's representation of the Debtors was an impermissible conflict of interest.  The Opus investors should not be allowed to collaterally attack the Court's retention orders in California.

77.     The DIP Financing Claims are also a collateral attack on this Court's order authorizing the Debtors' post-petition financing.  This Court adjudicated and approved the Debtors' DIP financing from the Gamble Trust.  The Final DIP Order found that (i) the financing

was in the best interests of Opus, (ii) was the only financing available to the Debtors, (iii) was

essential for the continued operation of the Debtors (including Opus), and (iv) was vital to

preserving the going concern value of their businesses.  Despite that, the California Plaintiffs

now want these issues revisited by another court in the false hope that the California Court will

find that the DIP financing was not in the best interests of Opus.  This Court should not sanction

that effort.

78.    The Sale Claims are also a collateral attack on the Sale Order.  The Sale

Order found that (i) the sale of Pleasant Valley was for fair and reasonable consideration, (ii) was

in the best interests of the Debtors and their equity holders, and (iii) that the Debtors and their

professionals, including K&L Gates, complied in good faith with the Sale Procedures Order.  By

the California Action, the California Plaintiffs are seeking a finding by the California Court that

the sale was for insufficient consideration and not in the interests of Opus or the Opus investors,

and that K&L Gates breached its duties in conducting the sale.  Any such finding would directly

contradict the Sale Order.  The Opus investors should not be allowed to collaterally attack the

Sale Order in California.

**D.    California Law Prohibits the Assignment of Malpractice Claims**

79.    The settlement insofar as it provides for the Proposed Assignment cannot

be approved because California law prohibits it.

80.    California law applies to the Proposed Assignment for the reasons alleged

by the California Plaintiffs in their Complaint:

- The California Plaintiffs brought their claims against K&L Gates in California state court.  The California Action was removed to the California federal court, which would apply the substantive law of California to the asserted claims against K&L Gates, all of which are state law claims.

#32575304 v12

- At least one named California Plaintiff (Steven Siegal) and several named defendants are alleged to be residents of California.

- Opus was headquartered in California, and as alleged in the Complaint, was in the business of acquiring oil and gas leases in California. [Complaint at ¶ 42].

- The Complaint asserts the application of and relies on California law.

- The Complaint alleges generally that "[a]ll claims asserted in this case concern actions or omissions by Defendants in the County of San Francisco and elsewhere in the State of California" and, more specifically with respect to the claims asserted against K&L Gates, "**the acts complained of in this Complaint were conducted principally in California with effects in California, including this judicial district**".    [Complaint at ¶¶ 9, 13 (emphasis added)].

81.    With one narrow exception that is not applicable here, the assignment of legal malpractice claims is prohibited under California law.  See Kracht v. Perrin, 219 Cal. App. 3d 1019, 1023 (Cal. App. 4th Dist. 1990); Goodley v. Wank & Wank, 62 Cal. App. 3d 389, 398 (Cal. App. 2d Dist. 1976).  The law applies broadly to voluntary and involuntary assignments. Kracht, supra, 219 Cal. App. 3d 1019, 1024; Baum v. Duckor, Spradling & Metzger, 72 Cal. App. 4th 54, 66-69 (1999).  California courts have applied this general rule on at least two occasions to invalidate a bankruptcy estate's purported assignment of legal malpractice claims from a corporation to a creditor or creditors.  Curtis v. Kellogg & Andelson, 73 Cal. App. 4th 492, 506-07 (Cal. App. 2d Dist. 1999) (holding that a legal malpractice claim belonging to the bankruptcy estate of a corporation may not be assigned by the trustee of that estate to a creditor of that corporation);[11]  Baum v. Duckor, 72 Cal. App. 4th 54, 70-72 (Cal. App. 4th Dist. 1999).

---

[11]    While the California Court of Appeals, in White Mountains Reinsurance Co. of America v. Borton Petrini, LLP, 221 Cal. App. 4th 890, 892-93 (Cal. App. 3d Dist. 2013), recently created a "narrow exception" to the general prohibition against assigning legal malpractice claims (where the claim is a small incidental part of a larger commercial transfer of assets and liabilities between insurance companies), that exception is inapplicable here.

82.     Moreover, the Opus Trustee should not be permitted to pursue the California Action as a co-plaintiff all for the sole benefit of the California Plaintiffs.  First, the Opus Trustee would not be the plaintiff, but the co-plaintiff, which is a distinction without a difference from the assignment.  Second, doing so exalts form over substance and allows the Opus Trustee to do indirectly what he cannot do directly- assign the malpractice claims to the California Plaintiffs.  In re Yobe, 74 B.R. 430, 435 (Bankr. W.D. Pa. 1987) ("To permit [the requested relief] would actually exalt form over substance.  The activities of a chameleon will not be condoned by this Court.").  Courts which have considered this issue have rejected efforts to circumvent the anti-assignment rule where, as here, the proceeds of the malpractice claim are assigned to the client's litigation adversary and the adversary (here, the California Plaintiffs) control the legal malpractice litigation.  See Gurski v. Rosenblum and Filan, 885 A.2d 163, 178 (2005); Greene v. Leasing Assoc., Inc., 935 So.2d 21, 24-25 (Fla. Ct. App. 2006) (an agreement which assigns the rights to proceeds from a malpractice recovery is an illegal assignment).

83.     Because California law applies to the claims against K&L Gates, and because California law prohibits the assignment of legal malpractice claims, the Proposed Assignment cannot be approved because it is in violation of the law.

### E.     The Proposed Assignment Is Procedurally Improper

84.     The Court should not approve the Proposed Assignment aspect of the settlement because it is an improper exercise of the Trustee's obligations under the Bankruptcy Code.  A Chapter 7 trustee is charged with marshalling the Chapter 7 estate's assets and either liquidating them and distributing the proceeds to creditors, or abandoning those assets that are deemed to have no or inconsequential value.  Mother African Union Methodist Church v. Conference of AUFCMP Church (In re Conference of African Union First Colored Methodist Protestant Church), 184 B.R. 207, 218 (Bankr. D. Del. 1995) (the objective of a Chapter 7 case is

to cause the appointment of an independent trustee to marshal and liquidate the assets of the estate for pro rata distribution among the classes of creditors); <u>Menotte v. Maritas (In re Maritas)</u>, 2008 U.S. Dist. LEXIS 109361 (S.D. Fla. Nov. 20, 2008) (noting that the Chapter 7 trustee could choose to either liquidate and distribute the proceeds of certain real property in accordance with the statutory scheme codified at 11 U.S.C. §§ 725, 726 or abandon it under section 554).

85.     Any disposition of estate assets in Chapter 7 is outside the ordinary course of the debtor's business, and, therefore, is governed by section 363 of the Bankruptcy Code. Section 363(b)(1) provides that the trustee "after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate …." 11 U.S.C. 363(b).  Therefore, in order for the Opus Trustee to assign the estate's purported claims against K&L Gates -- which clearly would constitute property of the estate -- he must file a motion under section 363 seeking authority to sell the claims outside the ordinary course of business.  <u>See</u> Rule 6004.  Any such sale would then be subject to higher and better offers, and the Proposed Assignment itself would then be subject to the Opus Trustee establishing that it is a legitimate exercise of his business judgment.  <u>Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represents a 'business judgment'.).

86.     If, instead, the Opus Trustee is abandoning the purported claims against K&L Gates, he has still not followed the procedure mandated by the Bankruptcy Code and Rules.  Section 554(a) provides that "after notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and

benefit to the estate."  11 U.S.C. § 554.  The Opus Trustee has not filed a motion alleging that

the purported claims against K&L Gates are either burdensome to the Opus estate or of

inconsequential value and benefit.  See Rule 6007.

87.     To the extent the purported claims against K&L Gates have value, and

K&L Gates submits they do not, they are the proper subject of a section 363 motion to sell estate

property.   To the extent the purported claims are worthless, they are the proper subject of a

section 554 motion to abandon.   The Opus Trustee has done neither, and the Proposed

Assignment cannot be approved.

### F.     The Proposed Assignment Violates the Priority Scheme Under Section 726

88.     The Bankruptcy Code dictates that in a Chapter 7 liquidation, general

unsecured creditors must be paid before equity.  The order of distribution in a Chapter 7 case is

established in section 726 which provides as follows:  (i) section 507 priority claims, (ii) general

unsecured claims, (iii) late claims, (iv) non-pecuniary loss penalties and fines, (v) post-petition

interest, and (vi) the debtor receives the remainder of any distribution.   11 U.S.C. § 726.

Payments must be made in accordance with the priorities set forth in section 726 and all

claimants in a particular class share *pro rata* when the distribution is insufficient to pay each in

full.  Goldberg v. New Jersey Lawyers' Fund for Client Protection, 932 F.2d 273, 280-81 (3d

Cir. 1991); In re Penn-Mahoning Mining, Inc., 45 B.R. 51, 52 (Bankr. M.D. Pa. 1984).

89.     The Proposed Assignment seeks to make a distribution of an estate asset

(the alleged malpractice claims) in contravention of section 726's priority scheme, assigning

purported claims of the estate to equity (the California Plaintiffs) so that equity can pursue them,

and if successful, recover on them.  Further, doing so is in direct contravention of section 723(b)

by utterly ignoring the statutory requirement that would otherwise obligate the seventy-three

Opus general partners to contribute funds to the estate for any deficiency that leaves creditors not

-35-

paid in full. The Proposed Assignment violates the priority scheme under section 726 of the Bankruptcy Code and end runs the general partner contribution. The settlement, therefore, cannot be approved.

## II.    This Court Should Not Approve the Settlement Agreement's Delaware Bar Order

### A.    The Proposed Release and Bar Orders

90.    The Settlement Motion seeks approval of a mutual release and bar orders prohibiting claims by or against the Plaintiffs and Defendants (as defined in the Settlement Agreement).

91.    Section 5(a) of the Settlement Agreement provides, in general, for a mutual release (the "Release") by the Plaintiffs and Defendants, including, *inter alia*, their current and former attorneys and agents, from all claims that were or could have been alleged "in the Proceedings," which is defined to include the Debtors' bankruptcy cases, various related adversary proceedings, and the California Action, or which relate in any way to the subject matter of the Proceedings (the "Released Claims").

92.    Section 6 of the Settlement Agreement provides for bar orders from the California Court (the "California Bar Order") and this Court (the "Delaware Bar Order"). The California Bar Order, in general terms and relevant part, would permanently bar members of the "Settlement Class" and anyone acting through or on their behalf from pursuing claims based on the Released Claims, the California Action or the transactions or occurrences referred to in the Complaint. See Settlement Agreement, at § 6(a). The California Bar Order expressly would not apply to claims against "K&L Gates and its affiliates," and thus members of the Settlement Class would not be barred from asserting claims against K&L Gates. Id.

93.    The Delaware Bar Order, in general terms and in relevant part, would permanently enjoin and bar the "Trustees, Tri-Valley and Opus (and all other persons that hold,

-36-

have held, or may hold a claim or other debt or liability, or interest or other right of an equity holder, against, in or relating to Tri-Valley or Opus or their respective estates)" from pursuing claims "against any of the Releasees constituting or arising from the Released Claims, including any claims that are duplicative or derivative of any Released Claims, or any claims that could have been brought by or on behalf of the Trustees, Tri-Valley or Opus." Id. at § 6(b)(i).  Thus, to the extent K&L Gates is a "person that hold[s], [has] held, or may hold a claim … against, in or relating to Tri-Valley or Opus or their respective estates," K&L Gates would be barred under the Delaware Bar Order from asserting any claims against the Plaintiffs or Defendants, *or their attorneys and agents*, that arise from the Debtors' bankruptcy cases, various related adversary proceedings, and the California Action.

**B.**        **The Delaware Bar Order Should Not Be Approved**

94.        The Settlement Motion at paragraph 29 simply states the broad principle that bankruptcy courts are authorized to enter settlement bar orders to encourage partial settlements of litigation by barring contribution claims, without providing this Court any further support for why that authority should be exercised here.  In fact, the cases the Trustees cite, rather than supporting the approval of the Delaware Bar Order, dictate that it be stricken.

95.        This Court in In re Tribune Co., 464 B.R. 126 (Bankr. D. Del. 2011) stated that although bankruptcy courts have authority to enter settlement bar orders, "it must also be fair to the non-settling defendants, who are losing contribution and indemnification claims, by providing an appropriate right of set-off from any judgment imposed against them." Id. at 177. The proposed Settlement Agreement, however, includes no such reservation, nor is it limited to contribution and indemnification claims.  Instead, it seeks to permanently bar all persons holding or that may hold a claim against or relating to the Tri-Valley or Opus estates from pursuing *any* claims against any of the Releasees constituting or arising from the Released Claims.  There is

no preservation of K&L Gates's right to set-off or to seek indemnification or contribution against any of the Releasees, including the Official Opus Equity Committee's professionals. A broad bar order like this is exactly the type the court in <u>In re Devon Capital Mgmt., Inc.</u>, 261 B.R. 619 (Bankr. W.D. Pa. 2001), cited in the Settlement Motion, declined to approve (finding that the proportionate fault reduction provision of the proposed bar order did not cure the over-breadth of the injunction because it applied only to contribution claims, whereas the bar order applied to claims beyond contribution).[12]

      96.    The Delaware Bar Order should not be approved because, under its terms, it would bar K&L Gates, if found liable in the California Action, from pursuing contribution or indemnification claims from **other** estate professionals, including but not limited to the Official Opus Equity Committee's professionals. Moreover, contrary to the requirement articulated in <u>Tribune</u>, neither the Delaware Bar Order specifically nor the Settlement Agreement generally preserves K&L Gates's ability to set-off or recoup any potential liability it may be found to have against the liability of others. Such an injunction would be manifestly inequitable because, if in the unlikely event that K&L Gates were found liable to the Opus investors for its actions in the Debtors' Chapter 11 bankruptcy cases, then other professionals must be liable as well, particularly those advising the Official Opus Equity Committee (and perhaps the members of that committee or the OSC Partners) given (i) their failure to object or their consent to the actions K&L Gates took in the bankruptcy cases and (ii) the fact that the Debtors, K&L Gates and the

---

[12]    It is unclear what authority the Trustees believe is offered by this Court's order confirming the plan in <u>In re Washington Mutual, Inc.</u>, Case No. 08-12229 (MFW) [Docket No. 9759], cited generally by the Trustees without further discussion. The bar order approved there came in the context of the confirmation of an extremely complicated plan, whereby the Debtors' estates received billions of dollars in consideration from the released parties. This is far different than the context in which the Trustees currently seek approval of the Delaware Bar Order, under a Rule 9019 settlement motion and without any showing that the released parties under the Delaware Bar Order have provided <u>any</u> consideration.

Debtors' professionals consulted with them on virtually every aspect of the bankruptcy cases. Further, certain of those professionals (notably the financial advisor to the Official Opus Equity Committee) would then have indemnification claims against the Opus estate, causing further administrative expense and complication, neither of which is in the best interest of creditors. K&L Gates should not be precluded from seeking set-off, contribution or indemnification from other liable professionals were it to be found liable to the Opus investors.

C.    **K&L Gates Reserves the Right to Pursue Claims Against the Opus Trustee**

97.    As discussed above, the Allocation Agreement provides that if the Proposed Assignment is challenged, the Opus Trustee will "act as a co-plaintiff with the California Plaintiffs and assign all right, title, and interest in any proceeds to the California Plaintiffs." As demonstrated above, any malpractice claim is completely meritless and barred by the applicable statute of limitations. However, should the Opus Trustee facilitate the California Plaintiffs' meritless claims as a co-plaintiff, the Opus Trustee and the Opus estate would be liable to K&L Gates for fees and costs, under 28 U.S.C. § 1927, Rule 11 of the Federal Rules of Civil Procedure, or the federal courts' inherent power to sanction. United States v. Henry (In re White), 2013 U.S. Dist. LEXIS 133148 (E.D. Va. Sept. 13, 2013) ("Thus, '[i]t is well-settled that a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct.'") (quoting In re Yorkshire, LLC, 540 F.3d 328 (5th Cir. 2008)).

98.    Moreover, even if the Opus Trustee is not a named co-plaintiff but assigns the estate's purported claims to the California Plaintiffs, K&L Gates would be entitled to recover fees and costs for the facilitation of meritless claims. In re Rainbow Magazine, Inc., 77 F.3d 278 (9th Cir. 1996) (upholding sanctions levied under the court's inherent powers against corporate debtor's principal who orchestrated the bad faith filing of the bankruptcy petition but who could

-39-

not be sanctioned under Rule 11 because he was neither an attorney, a party or a signatory); Corder v. Howard Johnson & Co., 53 F.3d 225, 232 (9th Cir. 1994) ("[E]ven in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices") (citing Roadway Express v. Piper, 447 U.S. 752, 764 (1980)).  For this reason, this aspect of the Settlement does not pass muster and should not be approved.

## CONCLUSION

WHEREFORE K&L Gates respectfully requests that the Court deny the Settlement Motion insofar as it relates to disposition of the California Action and the Bar Order with prejudice.

Dated: February 27, 2015  
      Wilmington, DE

Respectfully submitted,

PEPPER HAMILTON LLP

  /s/ David B. Stratton
David B. Stratton (DE No. 960)
Evelyn J. Meltzer (DE No. 4581)
Michael J. Custer (DE No. 4843)
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, Delaware 19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

*Counsel to K&L Gates LLP*

-40-